# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS;
STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH
OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF
COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF
MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF
NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO;
STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON;
STATE OF WISCONSIN, OFFICE OF THE GOVERNOR OF KENTUCKY, ex
rel. ANDREW BESHEAR, in their official capacity as Governor of the
Commonwealth of Kentucky,

Plaintiffs-Appellees,

(*caption continued on inside cover*)

———————————

On Appeal from the United States District Court
for the District of Rhode Island

———————————

## BRIEF FOR APPELLANTS

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in their official capacity as Secretary of the Treasury; PATRICIA COLLINS, in their official capacity as Treasurer of the U.S.; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in their official capacity as Secretary of Education; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, in their official capacity as Acting Administrator of the U.S. Federal Emergency Management Agency; U.S. DEPARTMENT OF TRANSPORTATION; SEAN P. DUFFY, in their official capacity as Secretary of Transportation; U.S. DEPARTMENT OF LABOR; LORI CHAVEZDEREMER, in their official capacity as Secretary of Labor; U.S. DEPARTMENT OF ENERGY; CHRISTOPHER ALLEN WRIGHT, in their official capacity as Secretary of the U.S. Department of Energy; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, in their official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, in their official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in their official capacity as Attorney General; NATIONAL SCIENCE FOUNDATION; DR. SETHURAMAN PANCHANATHAN, in their official capacity as Director of the National Science Foundation; U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in their official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacities as Secretary of State and Acting Administrator of the United States Agency for International Development; US AGENCY FOR INTERNATIONAL DEVELOPMENT; U.S. DEPARTMENT OF DEFENSE; PETE HEGSETH, in their official capacity as Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS; DOUGLAS COLLINS, in their official capacity as Secretary of Veterans Affairs; U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JANET PETRO, in their official capacity as Acting Administrator of National Aeronautics and Space Administration; CORPORATION FOR NATIONAL AND COMMUNITY SERVICE; JENNIFER BASTRESS TAHMASEBI, in their official capacity as Interim Head of the Corporation for National and Community Service; U.S. SOCIAL SECURITY ADMINISTRATION; LELAND DUDEK, in their official capacity as Acting Commissioner of United States Social Security Administration; U.S. SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, in their official capacity as Acting Administrator of U.S. Small Business Administration,

Defendants-Appellants.

**TABLE OF CONTENTS**

**Page**

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION ..............................................................3

STATEMENT OF THE ISSUE........................................................................3

STATEMENT OF THE CASE.........................................................................4

      A.    Legal and Factual Background....................................................4

      B.    Prior Proceedings...........................................................................5

SUMMARY OF ARGUMENT....................................................................... 12

STANDARD OF REVIEW ............................................................................. 15

ARGUMENT ....................................................................................................... 15

I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Challenges to the OMB Memorandum........................................................................... 16

      A.    The District Court Misconstrued the OMB Memorandum.....................16

      B.    Plaintiffs' Challenges to the OMB Memorandum Are Moot ..................19

      C.    Plaintiffs' Challenges to the OMB Memorandum Fail on the Merits ....................................................................................................23

II.    The Preliminary Injunction Must Be Vacated Because It Covers a Vast Array of Additional Agency Decisions that Are Not Properly Enjoined.......... 33

      A.    The Broad Injunction Was Procedurally Improper ...................................33

      B.    Plaintiffs' Claims Fail on the Merits...........................................................36

            1.    Numerous Covered Grant Programs Allow Funding Pauses.......37

2.      Funding Decisions Are Frequently Committed to Agency Discretion by Law ................................................................41

3.      The District Court Lacks the Power to Order Direct Monetary Payments ..........................................................44

III.    The Remaining Preliminary Injunction Factors Counsel Against Relief ........... 49

CONCLUSION .............................................................................................. 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Air Courier Conference of Am. v. American Postal Workers Union*,
    498 U.S. 517 (1991) ............................................................................ 28

*Alabama v. U.S. Army Corps of Eng'rs*,
    424 F.3d 1117 (11th Cir. 2005) ......................................................... 35

*Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) ........................................................... 46

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) ........................................................................... 19

*American Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*,
    781 F.3d 571 (1st Cir. 2015) ............................................................ 15

*American Sci. & Eng'g, Inc. v. Califano*,
    571 F.2d 58 (1st Cir. 1978) ............................................................. 46

*Bennett v. New Jersey*,
    470 U.S. 632 (1985) ......................................................................... 47

*Block v. Community Nutrition Inst.*,
    467 U.S. 340 (1984) ................................................................... 28, 31

*Boaz Hous. Auth. v. United States*,
    994 F.3d 1359 (Fed. Cir. 2021) .................................................. 46, 49

*Boston Bit Labs, Inc. v. Baker*,
    11 F.4th 3 (1st Cir. 2021) ................................................................ 20

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ......................................................................... 48

*Building & Constr. Trades Dep't v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ..................................................... 24, 25

*California v. U.S. Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025) ............................................................ 47

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    595 U.S. 267 (2022) ......................................................................... 34

*City of New Haven v. United States,*
  809 F.2d 900 (D.C. Cir. 1987) ................................................................. 30, 32

*Clarke v. Securities Indus. Ass'n,*
  479 U.S. 388 (1987) ...................................................................................... 29

*Columbus Reg'l Hosp. v. United States,*
  990 F.3d 1330 (Fed. Cir. 2021) .................................................................... 48

*Common Cause v. Trump,*
  506 F. Supp. 3d 39 (D.D.C. 2020) ............................................................... 25

*Community Action of Laramie Cty., Inc. v. Bowen,*
  866 F.2d 347 (10th Cir. 1989) ...................................................................... 42

*Corrigan v. Boston Univ.,*
  98 F.4th 346 (1st Cir. 2024) ................................................................... 21, 22

*Department of Educ. v. California,*
  145 S. Ct. 966 (2025) ........................................... 45, 47, 48, 49, 52, 53

*Diaz v. Johnson,*
  No. 19-1501, 2020 WL 9437887 (1st Cir. Nov. 12, 2020) ......................... 46

*Doe v. Trustees of Bos. Coll.,*
  942 F.3d 527 (1st Cir. 2019) ................................................................... 15, 49

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ...................................................................................... 26

*General Land Office v. Biden,*
  722 F. Supp. 3d 710 (S.D. Tex. 2024) ......................................................... 31

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) ...................................................................................... 52

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ..........................................................37, 38, 41, 42, 44

*Lujan v. National Wildlife Fed'n,*
  497 U.S. 871 (1990) ...................................................................................... 18

*Maine Cmty. Health Options v. United States,*
  590 U.S. 296 (2020) ...................................................................................... 45

iv

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ............................................................................ 46

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
    367 F.3d 68 (1st Cir. 2004) ............................................................... 35

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) .......................................................... 46

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) .......................................................... 42

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) ............................................................. 50

*Missouri ex rel. Nixon v. Craig*,
    163 F.3d 482 (8th Cir. 1998) ............................................................ 21

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................... 49

*Norton v. Southern Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................... 35

*OfficeMax, Inc. v. Levesque*,
    658 F.3d 94 (1st Cir. 2011) ........................................................ 15, 49

*Ohio v. U.S. EPA*,
    969 F.3d 306 (6th Cir. 2020) ............................................................ 22

*Pacific Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ............................................................ 35

*Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) .................................................... 42

*Public Citizen v. Stockman*,
    528 F. Supp. 824 (D.D.C. 1981) ...................................................... 31

*Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*,
    427 F. Supp. 118 (D.D.C. 1977) ...................................................... 31

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ......................................................................... 23

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981) ........................................................ 23

*Sprague Elec. Co. v. Tax Court*,
340 F.2d 947 (1st Cir. 1965) ...........................................................46

*Thompson v. North Am. Stainless, LP*,
562 U.S. 170 (2011) ...................................................................... 29

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) ...................................................................... 31

*Union of Concerned Scientists v. Wheeler*,
954 F.3d 11 (1st Cir. 2020) ............................................................ 41

*University of Tex. v. Camenisch*,
451 U.S. 390 (1981) ...................................................................... 22

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
587 F.3d 464 (1st Cir. 2009) .......................................................... 31

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................... 15, 40

**Statute:**

Administrative Procedure Act (APA):
5 U.S.C. § 701(a)(1) ...................................................................... 28
5 U.S.C. § 701(a)(2) ...................................................................... 41

Consolidated Appropriations Act, 2022,
Pub. L. No. 117-103, div. B, tit. III, 136 Stat. 49, 139 ...................................38

Impoundment Control Act of 1974:
2 U.S.C. § 681 ............................................................................. 30
2 U.S.C. § 683(a) .......................................................................... 29
2 U.S.C. § 684 ........................................................................... 8, 28
2 U.S.C. § 684(a) .......................................................................... 29
2 U.S.C. § 687 ......................................................................... 29, 30
2 U.S.C. § 688 ............................................................................. 29

Pub. L. No. 117-169, § 23003(a)(2),
136 Stat. 1818, 2026 (2022) ....................................................... 43, 44

16 U.S.C. § 2105(c) ................................................................ 43

23 U.S.C. § 179 ...................................................................... 39

28 U.S.C. § 1292(a)(1) ........................................................ 3, 45

28 U.S.C. § 1331 ...................................................................... 3

28 U.S.C. § 1491(a)(1) ............................................................ 46

31 U.S.C. § 1512 .................................................................... 32

31 U.S.C. § 1512(c) ................................................................ 32

42 U.S.C. § 1862q .................................................................. 38

42 U.S.C. § 7434(a)(1) ............................................................ 43

42 U.S.C. § 7437(a)(1) ............................................................ 43

42 U.S.C. § 7437(a)(2) ............................................................ 43

42 U.S.C. § 7437(b) ................................................................ 43

42 U.S.C. § 7437(c)(1) ............................................................ 43

42 U.S.C. § 7437(c)(3) ............................................................ 43

**Regulatory Materials:**

2 C.F.R. § 200.340(a)(4) ......................................................... 23

Exec. Order No. 14,154,
  *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025) ................................... 4

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ......................................................... 3

Fed. R. Civ. P. 65(d)(1)(C) ........................................................ 50

**Other Authorities:**

Fed. Highway Admin., Dep't of Transp. *Contractors & Recipients*
    *General Terms and Conditions for Assistance Awards,*
    https://perma.cc/M7LK-D9SU ........................................................................39

Fed. Highway Admin., Dept. of Transp., *Low-Carbon Transportation*
    *Materials Grants Program,* https://perma.cc/UU7K-43SD ..........................................39

*James R. Jones, House of Representatives,* B-203057,
    1981 WL 23385 (Comp. Gen. Sept. 15, 1981) ...............................................32

National Science Foundation, *Research Terms & Conditions:*
    *Agency Specific Requirements* (Jan. 30, 2023),
    https://perma.cc/VUC3-QYJQ ..........................................................38, 39

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The district court entered a preliminary injunction that interferes with dozens of agency defendants' ability to ensure that federal funding is properly aligned with the President's policy priorities. The government respectfully requests that the Court hold oral argument. Argument will aid the Court in resolving the important issues presented by this appeal.

**INTRODUCTION**

When this case began, the plaintiff States challenged a memorandum issued in January by the Office of Management and Budget (OMB). The OMB Memorandum generally directed agencies to submit information about federal funding programs relating to any of seven then-recent Executive Orders to allow the new Administration to review the programs and ensure that federal funds were spent in accordance with the President's priorities. And the Memorandum instructed agencies to temporarily pause—if consistent with applicable law—disbursing federal funds under those programs pending that review. Shortly after this lawsuit was filed, the Memorandum was rescinded.

Nonetheless, plaintiffs continued to press their claims—and, over the course of preliminary-injunction briefing, shifted the focus of their attack from the rescinded OMB Memorandum to an amorphous "Federal Funding Freeze" comprising untold numbers of funding decisions made by dozens of agency defendants across the federal government. The district court granted a preliminary injunction that mirrored the breadth of plaintiffs' reformulated claims, broadly prohibiting agencies from implementing any pauses in funding "based on" the OMB Memorandum or the President's Executive Orders. In determining that plaintiffs were entitled to that relief, the district court primarily relied on its belief that the Memorandum amounted to a command to agencies to execute a categorical, indefinite funding freeze.

That decision was erroneous on all levels. At the outset, the district court fundamentally misunderstood the OMB Memorandum, which envisioned only a limited, temporary funding freeze tied to the specific reviews contemplated by the President's Executive Orders and which repeatedly instructed agencies to pause funding only when permitted to do so by applicable law. With that proper understanding, plaintiffs cannot succeed on their claims against the Memorandum. Not only are those claims now moot because the Memorandum has been rescinded, but the Memorandum and underlying Executive Orders were routine and permissible exercises of the President's and OMB's power to instruct the President's subordinates in the Executive Branch on how to carry out discretionary authorities.

The district court compounded the problem by enjoining not just the OMB Memorandum but also a vast range of unspecified funding decisions across the Executive Branch. That sweeping injunction—based on plaintiffs' late-breaking and impermissible programmatic attack—was procedurally improper. And it was substantively unjustified. There are indisputably many circumstances where agencies may lawfully pause federal funding—and, indeed, agencies' decisions regarding such funding are often committed to agency discretion by law. But the district court failed to grapple with the authorities permitting such pauses in specific contexts. As a result, its categorical injunction prohibits a broad swath of lawful conduct.

That intrusion on the President's Article II authority to direct his subordinates and to ensure that federal funding programs are aligned, where legally permitted, with

his policy priorities is bad enough. But the intrusion is made worse in this case by the injunction's vague and sweeping terms, which chill legitimate agency activity. And in the guise of enforcing that injunction, the district court has improperly scrutinized the genesis of agency action and has exceeded its jurisdiction by effectively ordering the payment of grant funds. This Court should reverse.

## STATEMENT OF JURISDICTION

In this action brought under the Administrative Procedure Act (APA), plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, A308, but the existence of a continuing case or controversy is disputed, *see infra* pp. 19-23. The district court granted plaintiffs' motion for a preliminary injunction on March 6, 2025. A1-45. The government filed a timely notice of appeal on March 10, 2025. A421; *see* Fed. R. App. P. 4(a)(1)(B). The court granted plaintiffs' motion to enforce the preliminary injunction on April 4, 2025, A46-60, and denied the government's motion for reconsideration on April 14, 2025, A61-69. The government filed a timely notice of appeal on April 28, 2025. A602-03. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The issue presented is whether the district court erred in entering a preliminary injunction broadly prohibiting agencies from pausing federal funding "based on" the rescinded OMB Memorandum or the President's Executive Orders.

3

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

In the days after his inauguration, the President issued several Executive Orders setting forth Administration priorities and instructing agencies to pause funding where legally permissible to allow time to review whether that funding aligns with those priorities.  For example, Executive Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025), titled *Unleashing American Energy*, declares the policy of the United States to encourage certain "energy exploration and production," guarantee the accessibility of "an abundant supply of reliable energy," and ensure no federal funding is "employed in a manner contrary to the principles outlined in this section, unless required by law," *id.* § 2(a), (c), (i), 90 Fed. Reg. at 8353-54.  The American Energy Executive Order further instructs agencies to "immediately pause the disbursement of funds" under two federal statutes to assess "consistency with the law and the policy outlined in" the Executive Order, *id.* § 7(a), 90 Fed. Reg. at 8357, but provides that all implementation must be "in a manner consistent with applicable law," *id.* § 10(b), 90 Fed. Reg. at 8359.

On January 27, OMB issued a memorandum that called for agencies to review federal financial assistance programs "consistent with the President's policies and requirements."  A115.  While that review was ongoing, agencies were to "temporarily pause all activities related to obligation or disbursement" of funds "and other relevant agency activities that may be implicated by [the President's] executive orders," including the American Energy Executive Order, "to the extent permissible under

4

applicable law." A116 (emphasis omitted). The next day, OMB released guidance reiterating that the pause applied only to funding implicated by the President's recent Executive Orders and that agencies should pause funding only if consistent with underlying law. *See* A171-72.

Following a partial administrative stay of the OMB Memorandum in a different lawsuit, OMB rescinded the memorandum. A170. That rescission did not affect the President's Executive Orders, which continue to direct agencies to carry out the President's policy directives, consistent with applicable law.

## B.    Prior Proceedings

1. Twenty-one states and the District of Columbia brought this suit and initially challenged the OMB Memorandum on various grounds. *See* A97-105. Shortly after the suit was filed, the district court granted a temporary restraining order against the OMB Memorandum, directing that defendants "shall not pause, freeze, impede, block, cancel, or terminate [their] compliance with awards and obligations to provide federal financial assistance to the States" and "shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." A183. Following disputes regarding the scope of the order, the district court eventually declared that its order "prohibit[ed] all categorical pauses or freezes in obligations or disbursements based on the OMB Directive or based on the President's 2025 Executive Orders." A288. The court ordered the government to "immediately restore frozen funding" and indicated that

5

the government could "request targeted relief" in specific instances of demonstrated compliance. A289-90.

The government appealed and sought a stay pending appeal. In their response, plaintiffs disclaimed that the government needed to preclear funding terminations with the district court. Opposition to Motion for Administrative Stay Pending Appeal at 8-9, *New York v. Trump*, No. 25-1138 (1st Cir. Feb. 11, 2025). This Court denied an administrative stay without prejudice, stating that it expected that the district court would promptly "provide any clarification needed" regarding whether it was ordering the government to seek "prior approval of the district court" before defendant agencies could "exercis[e] their own lawful authorities to withhold funding." A292 (quotation omitted). Once the district court disclaimed that the government was required to obtain any such "preclearance," A295 (quotation omitted), the government dismissed its appeal, *see* A370.

2. Plaintiffs moved for a preliminary injunction. After the government filed its opposition, plaintiffs amended their complaint to expand the scope of this suit, which now encompasses more than 20 agency defendants. In their amended complaint, plaintiffs recast their case as a challenge to what they describe as an "indefinite pause on federal funds" that allegedly applies "across myriad federal funding programs" and "extend[s] to nearly all federal funding streams nationwide." A306-07, A312-19. Plaintiffs also added the Governor of Kentucky as a plaintiff.

6

The district court granted a preliminary injunction. The court first determined that plaintiffs' claims were not moot, notwithstanding the OMB Memorandum's rescission. The court held that the "voluntary cessation doctrine precludes a finding of mootness" because, in the court's view, the rescission "was a clear effort to moot legal challenges to the federal funding freeze" and it was reasonable to believe that the government would "reinstate the challenged funding freeze absent an injunction." A15-17. And the court held that plaintiffs' specific request for preliminary relief was not moot because the court believed that plaintiffs sought relief against "a pause on federal funding that was implemented under not only the" OMB Memorandum but also under various "other agency actions." A17-18. Therefore, the court concluded, the Memorandum's rescission did "not provide [plaintiffs] with *all* the prospective relief they have requested." A18.

The district court concluded that plaintiffs had identified final agency actions challengeable under the APA. First, the court concluded that the OMB Memorandum constituted final agency action, stating that the Memorandum "amounted to a command" to agencies to "execute a categorical, indefinite funding freeze." A21-23. Second, the court concluded—for the same reasons—that implementation of the American Energy Executive Order and OMB guidance constituted final agency action. A23-24.

On the merits, the district court concluded that the asserted "federal funding freeze," A25, was unlawful. First, the court held that the funding freeze violated the

Impoundment Control Act of 1974, 2 U.S.C. § 684, which allows the Executive

Branch to "defer any budget authority provided for a specific purpose or project"

only for certain reasons and only upon sending a "special message" to Congress. The

court believed that the OMB Memorandum "constituted a budget authority deferral

because it commanded—and prompted—an indefinite withholding or delay of

obligated funds" and that the deferral violated the statute because no "special

message" was "ever communicated to Congress." A27.

Second, the district court held that in some circumstances pausing funding

could violate federal statutes because there are some "examples in which Congress has

appropriated funds to federal programs and has strictly prescribed how those funds

must be expended." A28. The court cataloged a handful of examples of such

purportedly mandatory funding, most of which involve formula grants. *See* A28-29.

Based on its determination that the government "withheld funding" under these

programs "in implementing the funding freeze" after the OMB Memorandum was

issued in January, the court concluded that the pause was contrary to law. A29.

Third, the district court held that the "challenged federal funding freeze" was

arbitrary and capricious because the government had "not provided a rational reason

that the need to 'safeguard valuable taxpayer resources' is justified by such a sweeping

pause of nearly all federal financial assistance with such short notice" and the

government had not engaged in "thoughtful consideration of practical

consequences." A30-32. The court also emphasized that the OMB Memorandum

provided agencies a "mere twenty-four hours" to "discern which of thousands of funding" streams "must or must not be paused." A32. And the court concluded that the freeze of any "funding streams that mandated expenditures based on fixed formulas" was "substantively unreasonable." A33.

On the equities, the district court concluded that the suspension of certain funding streams would irreparably harm the States, although the court emphasized that "while the States are the plaintiffs in this Court, it is their citizens" who "are enduring much of the harm." A36; *see* A34-42. On the other side of the balance, the court believed that Executive Branch agencies and officials would not be "harmed" by an order "requir[ing] them to disburse funds that Congress has appropriated to the States and that they have obligated" because an "agency is not harmed by an order prohibiting it from violating the law." A42-43. The court also stated that its preliminary injunction would "not prevent the Defendants from making funding decisions in situations under the Executive's actual authority in the applicable statutory, regulatory, or grant terms" but would only "enjoi[n] agency action that violates statutory appropriations and obligations." *Id.* (quotation omitted).

The district court entered a preliminary injunction. In relevant part, the injunction prohibits defendants—which include 23 federal agencies—from "reissuing, adopting, implementing, giving effect to, or reinstating under a different name the directives in" the OMB Memorandum "with respect to the disbursement and transmission of appropriated federal funds to the States under awarded grants,

executed contracts, or other executed financial obligations." A44. And the injunction prohibits defendants from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations"—"based on" not only the OMB Memorandum but also any "funding freezes dictated, described, or implied by Executive Orders issued by the President," including but "by no means . . . limited to" the American Energy Executive Order described above. *Id.*

3. The government appealed and sought a stay pending appeal in this Court. The government's stay motion focused on the mismatch between plaintiffs' substantive claims, which primarily challenge the rescinded OMB Memorandum, and the district court's injunction, which provided "broad-based relief against innumerable funding decisions at twenty-three federal agencies." A562 (quotation omitted).

The stay panel concluded that those arguments did not support a stay pending appeal, which the panel characterized as "an intrusion into the ordinary processes of administration and judicial review." A559-60 (quotation omitted). The stay panel primarily emphasized its view that the government had not met its burden to establish that the individual funding decisions enjoined by the district court were independent of the OMB Memorandum. *See* A565-67, A569-71, A573. In considering the equities, the stay panel stated that the preliminary injunction "does not bar all freezes

10

in funding" but "instead enjoins" only the adoption of "the broad, categorical freezes challenged here."  A574.

4.  While this appeal of the preliminary injunction was pending, plaintiffs moved to enforce the preliminary injunction, arguing that the Federal Emergency Management Agency (FEMA) had improperly failed to make funds under 215 grants available to plaintiffs.  *See* A49, A52-53.  In response, the government explained that the funds were subject to internal processing controls and argued that it was permissible to continue implementing those controls because they were not directed by the OMB Memorandum and thus were not enjoined.  *Id.* at 6-8.

The district court granted plaintiffs' motion.  The court characterized the "challenged manual review process" as "essentially impos[ing] an indefinite categorical pause on payments" that was not justified by any specific grant term or regulation.  A54-55.  And the court stated that plaintiffs had "presented evidence that strongly suggests that FEMA is implementing this manual review process based, covertly, on" one of the Executive Orders referenced by the OMB Memorandum.  A55-58.  The court thus ordered FEMA to "cease the challenged manual review process" and to refrain from "paus[ing] or otherwise imped[ing] the disbursement of appropriated federal funds to the States based on funding freezes dictated, described, or implied by Executive Orders issued by the President before the rescission" of the OMB Memorandum.  A59.  And the court denied reconsideration, concluding that its order was "*not* enforcing a contractual obligation to pay money."  A67.

The government appealed, and this Court has now consolidated that appeal with the appeal of the underlying preliminary injunction.

## SUMMARY OF ARGUMENT

I.  Plaintiffs are unlikely to succeed on their original challenges to the OMB Memorandum, which has been rescinded and which was lawful in any event.  The district court's contrary conclusion rested on a fundamental misunderstanding of the Memorandum.

In the district court's view, the OMB Memorandum "amounted to a command" to agencies to "execute a categorical, indefinite funding freeze."  A21-23. But that characterization is impossible to square with the text of the Memorandum, which reflects more limited internal directions to agencies.  The Memorandum required agencies to submit information to OMB regarding federal programs implicated by any of seven Executive Orders to allow the Administration to determine whether continued funding of those programs cohered with the Administration's priorities.  Pending that review, the Memorandum instructed agencies to temporarily pause funding under those programs—but only if permissible under applicable law.  And OMB exempted various programs from those instructions.

That proper understanding of the OMB Memorandum makes clear that plaintiffs' challenges to the Memorandum, which has since been rescinded, are moot. The OMB Memorandum arose in the specific context of a programmatic review tied to seven Executive Orders issued at the beginning of the new Administration.  There

is no basis to conclude that such circumstances will materialize again. And plaintiffs'

challenges to the Memorandum were specific to the circumstances in which the

Memorandum was issued. The dispute presented in this case is unlikely to recur.

Regardless, plaintiffs' claims against the OMB Memorandum fail. The

Memorandum reflected a proper exercise of the President's and OMB's authority to

issue guidance to the Executive Branch directing agency officials. The plain language

of the Memorandum restricted that guidance to circumstances where pausing funding

would comport with applicable law. And the Memorandum reasonably explained that

such a pause—which included multiple exceptions—was necessary to effectuate the

President's Executive Orders and safeguard federal funds. The Impoundment

Control Act likewise does not support the district court's injunction. Plaintiffs cannot

properly enforce that statute, which regulates the relationship between Congress and

the Executive Branch, and the short-term pauses contemplated by the Memorandum

do not implicate that statute.

II. Making matters worse, the district court not only enjoined implementation

of the rescinded OMB Memorandum but also enjoined a host of other agency

funding decisions. That was improper.

The district court's broad injunction was procedurally improper. Plaintiffs'

original complaint raised claims regarding, and sought relief against, the OMB

Memorandum alone. After the government filed its preliminary-injunction

opposition, plaintiffs amended their complaint to add a new plaintiff, several new

defendants, a new theory of liability, and a new focus of their challenge on an amorphous "Federal Funding Freeze."  Granting plaintiffs a preliminary injunction based on these late-breaking amendments was improper.  And even on its own terms, plaintiffs' attempt to levy a programmatic attack on federal spending decisions across a wide assortment of agencies was improper.

Moreover, by extending across the breadth of federal funding decisions, the district court's injunction improperly prohibits substantial lawful conduct and exceeds the court's power.  In many circumstances, federal agencies have broad discretion to pause funding—and many of the Executive Branch's decisions in this area are committed to agency discretion by law.  Examples of such discretionary funding programs abound among the grants received by plaintiffs.  In enjoining the Executive Branch from pausing funding across these programs, the district court failed to consider, much less grapple with, the statutes providing this discretionary authority.

In addition, the district court apparently views its injunction as covering contract disputes over which it lacks jurisdiction.  For example, in the guise of enforcing its injunction, the court has now ordered that FEMA may not impede the disbursement of funds to plaintiffs on certain bases.  But as the Supreme Court has recently made clear, district courts lack jurisdiction to order such monetary payments; instead, plaintiffs must pursue those claims in the Court of Federal Claims.

III.  The equities also counsel against the district court's preliminary injunction. The injunction substantially harms the government's and the public's interests by

undermining the President's Article II authority to direct his subordinates. And the injunction impermissibly contains vague instructions that threaten to chill agencies from taking legally permissible actions to ensure that funding is aligned with the President's policy priorities. By contrast, plaintiffs' asserted harms are relatively minimal. Not only do plaintiffs have no cognizable interest in receiving funds to which they are not entitled, but plaintiffs may also pursue in an appropriate forum any claim to recover specific funds that they believe have been unlawfully withheld.

## STANDARD OF REVIEW

This Court reviews the district court's decision to grant a preliminary injunction for abuse of discretion. *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 97 (1st Cir. 2011). Where the district court's analysis is premised on an error of law, the court "has abused its discretion and [this Court is] required to vacate the injunction." *Doe v. Trustees of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).

## ARGUMENT

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Here, plaintiffs have not established "a strong likelihood that they will ultimately prevail on the merits." *American Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*, 781 F.3d 571, 578 (1st Cir. 2015) (quotation omitted). Nor have they shown irreparable injury to justify an injunction that inflicts outsized harm on the government and the public. *See Winter*, 555 U.S. at 24. The

district court erred in concluding that plaintiffs satisfied the requirements for interim injunctive relief.

## I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Challenges to the OMB Memorandum

### A.    The District Court Misconstrued the OMB Memorandum

The district court's holdings on both mootness and the merits stem from a fundamental misunderstanding of the OMB Memorandum, as well as a conflation of a review of the Memorandum itself and a generalized assessment of the actions of a broad swath of federal agencies.

1. The OMB Memorandum was simply an internal instruction to agencies to carry out the President's directions to temporarily pause certain federal funding—if agencies could lawfully do so—while the Executive Branch reviewed that funding for consistency with the President's priorities. Shortly after taking office, President Trump issued Executive Orders articulating policy views on several subjects and generally directed his subordinates in the Executive Branch to pause or terminate federal funding programs—to the extent consistent with applicable law—to ensure that those programs are consistent with the President's policy priorities. *See* A9. The OMB Memorandum expounded on those Executive Orders with additional internal directions to agencies.

The OMB Memorandum explained to agencies that, "[t]o implement these [Executive O]rders, each agency must complete a comprehensive analysis of all of

their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the" Executive Orders. A116; *see also* A171 (making clear that the Memorandum's directions were "expressly limited to programs, projects, and activities implicated by the [specified] Executive Orders"). The Memorandum directed agencies to "submit to OMB detailed information on any programs, projects or activities" implicated by the Executive Orders "[n]o later than February 10, 2025"—two weeks after the Memorandum was issued. A116. The Memorandum contemplated that OMB would then "revie[w] and provid[e] guidance to" each "agency with respect to the information submitted." *Id.*

In addition, pending that review, the Memorandum directed that "agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the" Executive Orders—but only "to the extent permissible under applicable law." A116 (emphasis omitted). The Memorandum explained that this pause would "provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities." *Id.* The Memorandum also directed agencies to "immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect" and to "report this information to OMB along with an analysis of the requirement." *Id.*

To make the limitations on the Memorandum even clearer, OMB issued

guidance the day after the Memorandum reiterating that "[a]ny payment required by

law to be paid will be paid" and that the Memorandum "request[ed] that agencies

temporarily pause" certain programs only "to the extent permitted by law." A171.

OMB also categorically exempted not only those programs where payments were

"required by law" but also "[a]ny program that provides direct benefits to

individuals." *Id.* And the record reflects that OMB "worked with agencies" and

"approved many programs to continue even before the pause" took effect. *Id.*

2. The crux of the district court's analysis was to interpret the OMB

Memorandum in a manner irreconcilable with its plain text. In the court's view, the

Memorandum "amounted to a command" to agencies to "execute a categorical,

indefinite funding freeze." A21-23. The court also allowed plaintiffs' challenge to

expand beyond the Memorandum itself to an amorphous challenge to an alleged

general federal funding freeze encompassing numerous actions by a wide variety of

agencies. *But see Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (explaining

that the APA does not permit plaintiffs to "seek wholesale improvement" of agency

management "by court decree"—even in the face of allegations of "rampant"

violations (emphasis omitted)).

These errors permeated the court's analysis. In assessing mootness, the court

emphasized that plaintiffs "are challenging a pause on federal funding" and cited "not

only the OMB Directive, but also" the Executive Orders "incorporated therein and

other agency actions." A18. On the merits, the court concluded that a categorical freeze would violate statutes where Congress "has strictly prescribed how [appropriated] funds must be expended," A28; that an "indefinite withholding or delay of obligated funds" would violate the Impoundment Control Act, A27; and that OMB had offered no rational justification for a "sweeping pause of nearly all federal financial assistance," A31-33.

The district court did not even attempt to reconcile these characterizations with the Memorandum's text. As discussed below, these mischaracterizations caused the district court to issue an erroneous injunction for several mutually reinforcing reasons.

## B. Plaintiffs' Challenges to the OMB Memorandum Are Moot

The district court's misunderstanding of the proper scope of a challenge to the OMB Memorandum infected every aspect of its analysis. At the outset, the district court erroneously concluded that plaintiffs' challenges to the Memorandum were not moot, even though OMB rescinded the Memorandum before the district court issued its preliminary injunction. *See* A170.

The OMB Memorandum directed federal agencies, where permitted by law, to freeze federal funding that might be affected by seven enumerated Executive Orders pending a review to determine the best use of funds allocated to those programs. Because that Memorandum was issued in early days of the new Administration, and then rescinded a few days later, any controversy regarding the legality of that directive is clearly moot. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("No matter how

vehemently the parties continue to dispute the lawfulness of the conduct that

precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any

actual controversy about the plaintiffs' particular legal rights." (quotation omitted)).

In concluding that the rescission did not moot plaintiffs' claims against the

Memorandum, the district court held that the "voluntary cessation doctrine precludes

a finding of mootness." A15-17. Under that doctrine, where "a defendant voluntarily

ceases the challenged practice," a plaintiff's claims will not be moot if "there exists a

reasonable expectation that the challenged conduct will be repeated after the suit's

dismissal." *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021) (alteration and

quotation omitted). This exception to mootness "exists to stop a scheming defendant

from trying to immunize itself from suit indefinitely by unilaterally changing its

behavior long enough to secure a dismissal and then backsliding when the judge is out

of the picture." *Id.* at 10 (alteration and quotation omitted).

The district court's determination that any controversy about the OMB

Memorandum is not moot rests on the notion that OMB might once again direct

federal agencies to freeze any federal funding that might be affected by the seven

Executive Orders that were issued at the beginning of the new Administration while it

conducts a review of the best use of those funds. That premise is illogical. A freeze

pending such a review would necessarily happen only once, shortly after the

Executive Orders were issued and before OMB had a chance to conduct its review.

Moreover, the particular legal issues addressed by the district court were specific to the circumstances in which the OMB Memorandum was issued. Plaintiffs cannot evade mootness by establishing that they "may be parties to the same sort of dispute in the future." *Missouri ex rel. Nixon v. Craig*, 163 F.3d 482, 485 (8th Cir. 1998) (alteration and quotation omitted). Instead, "[t]o qualify for this exception," the defendant's future "conduct also must be sufficiently similar to the past conduct such that it is permissible to say that the challenged conduct continues." *Corrigan v. Boston Univ.*, 98 F.4th 346, 353 (1st Cir. 2024) (alteration and quotation omitted). But here, even if the government were in the future to pause some funding stream, any challenge to that pause would be substantially different from plaintiffs' challenges to the OMB Memorandum.

For example, plaintiffs' arbitrary-and-capricious claims turn on the specific features of the Memorandum—such as the particular explanation given in the Memorandum, the particular interests that OMB considered in issuing it, and even the specific implementation timeframe that it envisioned. *See infra* pp. 25-28. But any future decision to pause funding would come with new explanation, new consideration, and a new timeframe. Similarly, plaintiffs' claims that the Memorandum is contrary to law rest in significant part on assertions that the Memorandum has been implemented in ways that affect specific programs whose payments are required by statute. *See infra* pp. 24-25. But again, any future decision would likely have a different scope affecting a different set of programs governed by

different statutes.  Plaintiffs' factbound claims against the OMB Memorandum are unlikely to recur.

Even if plaintiffs' claims against the OMB Memorandum were not altogether moot, their request for a preliminary injunction would be.  *Cf. University of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981) (explaining that "one issue in a case"—such as the "issue of preliminary injunctive relief"—may be moot even if "the case as a whole remains alive").  Because the "purpose of a preliminary injunction, unlike a permanent one, is to prevent any violation of the plaintiff's rights before the district court enters a final judgment," a preliminary-injunction request will be moot if there is no "reasonable possibility that" the challenged conduct will recur "while [the] case remains pending in the district court."  *Ohio v. U.S. EPA*, 969 F.3d 306, 309 (6th Cir. 2020).  By rescinding the Memorandum, the government has provided all that plaintiffs could hope to get from preliminary relief on their claims challenging the Memorandum.  There is thus no way for a preliminary injunction against the Memorandum to "make a difference to the legal interests of the parties."  *Corrigan*, 98 F.4th at 352.  Of course, if any new funding pause were to be implemented, plaintiffs would be free to seek preliminary relief against that pause, ameliorating any possibility that plaintiffs' rights will be violated before final judgment.

## C. Plaintiffs' Challenges to the OMB Memorandum Fail on the Merits

Even before the OMB Memorandum was rescinded, plaintiffs' challenges to the Memorandum were unavailing because the Memorandum was plainly lawful. Properly understood, the Memorandum constituted the routine exercise of the President's authority to direct the Executive Branch.

1. There should be no dispute that the President and OMB may issue policy guidance to federal agencies, including in the form of Executive Orders and memoranda that direct agency officials. *See generally Seila Law LLC v. CFPB*, 591 U.S. 197, 203-04 (2020) (discussing how the President exercises his executive power by relying on subordinate officers subject to his direction). The President—and OMB, acting at the President's direction—may properly exercise this authority by instructing agencies generally to pause or terminate federal funding that does not accord with the President's policy priorities, to the extent agencies have authority to do so under governing law. Federal agencies often have broad discretion to determine how to implement funding programs, including to terminate funding based on policy preferences. *See, e.g.*, 2 C.F.R. § 200.340(a)(4) (authorizing terminations "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities"); *see infra* pp. 37-40. Because agencies often can terminate funding awards for policy-based reasons, so too may the President and OMB "control and supervise" agencies' decisions in this area. *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981).

Here, the President issued Executive Orders that simply direct federal agencies to pause or terminate federal funding programs that may not accord with the President's priorities where such action is consistent with applicable law. And the OMB Memorandum helped implement those Executive Orders by establishing a process for reviewing federal funding and by directing agencies to pause funding—if consistent with applicable law—pending that review. That direction is plainly lawful, and the district court identified no meaningful defect.

Instead, the district court emphasized its understanding that there are some "examples" of statutory schemes where Congress has "strictly prescribed how" funds must be spent, such that their obligation or disbursement cannot be paused. A28-29. The Memorandum—and the follow-on OMB guidance—explicitly accounted for that circumstance by repeatedly making clear that agencies should only pause funding "to the extent permissible by law." A116. The Memorandum thus did not direct agencies to pause funding if doing so would violate applicable statutes. To the contrary, "if the agency [was] prohibited, by statute or other law, from implementing the [Memorandum], then the [Memorandum] itself instruct[ed] the agency to follow the law." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). Any argument that a particular agency acted inconsistent with governing law could be raised as a separate claim against that agency, but it cannot be shoehorned into a challenge to a Memorandum that directs agencies to conform to governing law.

Although the district court believed that, in implementing the Memorandum, some agencies withheld funding in violation of mandatory funding statutes, that belief—even assuming it is correct—would not justify any conclusion that the Memorandum is unlawful. If an "agency does contravene the law in a particular instance, an aggrieved party may seek redress through any of the procedures ordinarily available to it." *Allbaugh*, 295 F.3d at 33. But the "possibility that some agency might make a legally suspect decision" with regard to funding "does not justify an injunction against enforcement of a policy" that may be properly implemented in many circumstances. *Id.*; *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

2. For similar reasons, the arbitrary-and-capricious challenge provides no basis for upholding the district court's order. At the outset, it bears repeating that because the Memorandum had been rescinded, the district court could review the arbitrary-and-capricious claim only if the particular controversy raised by that claim is likely to recur. That would require not only that OMB issue a similar memorandum in the future, but that it do so under similar circumstances and for the same reasons. Even if this Court does not regard other aspects of this appeal as moot, that circumstance is sufficiently unlikely that this claim is moot.

In any event, even at the time it was issued, the OMB Memorandum was not arbitrary and capricious. That "standard requires that agency action be reasonable and

reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*

The OMB Memorandum plainly met that standard. The Memorandum explained that its objective was to effectuate the President's Executive Orders and "safeguard valuable taxpayer resources." A115. To advance that objective, the Memorandum directed agencies to assess which funding programs may be implicated by the Executive Orders and to freeze funding—where legally permissible—for those programs pending additional review. A116. The connection between the Memorandum's objective and its directions was plain: because substantial federal funds are spent every day—more than "$3 trillion" in federal funds "such as grants and loans" are expended annually, A115—the pause contemplated by the Memorandum was necessary to minimize the expenditure of funds inconsistent with the Administration's policy priorities while the Administration reviewed funding.

At the same time, the OMB Memorandum took steps to ameliorate any negative effects, exempting not only payments required by law but also any "assistance received directly by individuals." A115 n.1. And the Memorandum permitted agencies to request additional exceptions "on a case-by-case basis." A116. The record thus reflects that OMB "worked with agencies" to "approv[e] many programs to continue." A171. That calibrated approach—particularly in the context of a

temporary pause designed to ensure that funding is consistent with the President's priorities—satisfied the APA's standard.

In concluding otherwise, the district court stated that OMB had not reasonably explained the need for "a sweeping pause of nearly all federal financial assistance with such short notice" and had not engaged in "thoughtful consideration of practical consequences." A31-32. But that characterization is incorrect on all levels. As explained, the OMB Memorandum did not contemplate "a sweeping pause of nearly all federal financial assistance" but instead applied only to certain funding programs related to specific Executive Orders. Regardless, the Memorandum expressly considered the consequences of the pause while providing carve-outs for mandatory payments and direct assistance to individuals.

Even beyond its categorical carve-outs, the Memorandum provided for agencies to request exceptions as warranted for specific programs. That case-by-case approach was particularly reasonable in this context, where the Memorandum's instructions would be implemented by many agencies across a wide variety of programs. Those agencies are best positioned to evaluate the practical consequences of pausing funding in each circumstance and to coordinate with OMB where exceptions are warranted by those consequences. Although the district court was concerned that the OMB Memorandum did not leave sufficient time for agencies to make those evaluations, A32, the need to make evaluations across different programs only underscores the reasonableness of OMB's choice to have agencies—not the

OMB Memorandum itself—undertake those evaluations in the first instance, as the agencies did in conjunction with OMB "even before the pause" took effect.  A171.

3.  Finally, no injunction can be properly predicated on a violation of the Impoundment Control Act (even apart from the fact that it was not part of the operative complaint at the time the preliminary-injunction motion was filed, *see infra* pp. 33-35).  That statute requires the President to send a "special message" to Congress if the Executive Branch "proposes to defer any budget authority."  2 U.S.C. § 684.  That requirement is not enforceable by plaintiffs, cannot result in an injunction requiring the expenditure of funds, and was in any event not violated in this case.

a.  Two related limitations restrict plaintiffs from using the APA's cause of action to enforce a statute where Congress did not intend such enforcement.  A plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1).  The Supreme Court has accordingly recognized that, by providing a detailed scheme for review, Congress can displace the APA's default cause of action.  *See, e.g., Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme."  *Id.*

In addition, to invoke the APA, a "plaintiff must establish that the injury" it complains of "falls within the zone of interests sought to be protected by the" relevant statute.  *Air Courier Conference of Am. v. American Postal Workers Union*, 498 U.S. 517, 523 (1991) (quotation omitted).  That limitation reflects the common-sense

intuition that Congress does not intend to extend a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 178 (2011). Thus, a plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987).

Nothing in the Impoundment Control Act suggests that Congress intended that its provisions be judicially enforceable by parties like plaintiffs here. To the contrary, the statute constructs a reticulated scheme to govern the relationship between the Legislative and Executive Branches when it comes to spending appropriations. That statute is built around the give-and-take between the political branches. Thus, the statute directs the President to notify Congress when he proposes to defer or rescind appropriated funds, *see* 2 U.S.C. §§ 683(a), 684(a), which allows Congress to determine how to respond given the circumstances of a specific proposal. And the statute specifies legislative action that Congress may undertake to address proposed rescissions. *See id.* § 688.

To the extent that the statute contemplates any litigation, it provides for suits brought by the Comptroller General, a Legislative Branch official. 2 U.S.C. § 687. And the statute imposes limitations on the bringing of any such suit that reinforce Congress's desire to control any response to the President, requiring the Comptroller

General to notify Congress of the contemplated suit and then wait until "25 calendar days of continuous session of the Congress" elapse before bringing it. *Id.* Regardless whether such a suit would be cognizable under Article III and the separation of powers, the statute does not contemplate enforcement at the behest of other parties. *See id.* § 681 (providing that "[n]othing contained in this Act, or in any amendments made by this Act, shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment"). And the statute certainly does not contemplate that other parties could bring enforcement actions without regard to the limitations that Congress imposed for the Comptroller General.

That scheme provides no role for plaintiffs to play in either the legislative or judicial enforcement processes. Rather, the scheme preserves the political branches' accountability for enacting and implementing the appropriations laws. And it accounts for the possibility that the Executive Branch may decide to withhold funds in a wide variety of contexts for a wide variety of reasons—some of which may implicate the Executive Branch's own constitutional prerogatives, some of which may give Congress no concern at all, and some of which may draw a response from Congress affirmatively acquiescing in or rejecting the Executive Branch's proposal. *Cf. City of New Haven v. United States*, 809 F.2d 900, 907 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from "the normal and orderly operation of the government"

(quotation omitted)).  And any disputes between the President and Congress in this sphere may be "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive."  *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (quotation omitted).

In short, permitting plaintiffs to challenge the Executive Branch's spending decisions through an APA suit would "severely disrupt" the statute's "complex and delicate" enforcement scheme.  *Block*, 467 U.S. at 348.  The Impoundment Control Act is directed at regulating the relationship between Congress and the Executive Branch.  Nothing in the statute suggests that Congress intended to permit enforcement by third parties like plaintiffs, who hope to receive appropriated funds.  *See General Land Office v. Biden*, 722 F. Supp. 3d 710, 733-35 (S.D. Tex. 2024); *Public Citizen v. Stockman*, 528 F. Supp. 824, 827-31 (D.D.C. 1981); *Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp. 118, 134 (D.D.C. 1977).

In any event, the district court's preliminary injunction is not supported by the asserted Impoundment Control Act violation.  The only violation found by the district court is that the President has deferred funds without sending the "special message" contemplated by the statute.  But "injunctions must be tailored to the specific harm to be prevented."  *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009) (alteration and quotation omitted).  At most, then, an appropriate injunction would require defendants to send the requisite message to Congress—it would not broadly prohibit funding pauses.

b.  Even assuming that requirement may be enforced by plaintiffs and could support an injunction prohibiting the deferral of funds, the temporary pauses contemplated by the OMB Memorandum were not deferrals subject to the statute. Congress has expressly directed the Executive to apportion, or reapportion, appropriated funds to determine when to make them available to agencies to carry out federal law.  31 U.S.C. § 1512.  The statute states that OMB will report to Congress under the Impoundment Control Act when it considers declining to obligate funds and instead creating a reserve "to provide for contingencies" or "to achieve savings made possible by or through changes in requirements or greater efficiency of operations."  *Id.* § 1512(c).

The temporary pauses contemplated by the Memorandum did not rise to that level.  To the contrary, such pauses are commonplace and accepted by the Legislative Branch.  *See City of New Haven*, 809 F.2d at 901.  The Government Accountability Office has approved of an agency "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated."  *James R. Jones, House of Representatives*, B-203057, 1981 WL 23385, at *4 (Comp. Gen. Sept. 15, 1981).  It would be extraordinary if a new Administration could not, consistent with applicable law, assess ongoing government spending to ensure its alignment with the President's priorities without triggering a process requiring Congress to determine whether the funds should be rescinded altogether.  And if the Legislative Branch disagrees with the Executive

Branch's understanding of its obligations, the proper resolution is not an APA suit by a nonfederal party.

## II. The Preliminary Injunction Must Be Vacated Because It Covers a Vast Array of Additional Agency Decisions that Are Not Properly Enjoined

The district court thus had no basis for enjoining the now-rescinded OMB Memorandum. To make matters worse, the district court's order extends to a wide swath of agency decisions that go well beyond the OMB Memorandum that was ostensibly the final agency action at issue in this litigation. Those parts of the order were also procedurally and substantively flawed.

### A. The Broad Injunction Was Procedurally Improper

As an initial matter, this case was originally a challenge to the OMB Memorandum, and was still such a challenge at the time plaintiffs filed their preliminary-injunction motion. In their original complaint, plaintiffs identified "the OMB Directive" as the "agency action subject to the APA." A97. They alleged that the OMB Memorandum exceeded any "authority conferred by statute" and "provide[d] no reasoned basis" for the contemplated pause of funding. A97-100. And they asked the district court for "declaratory and injunctive relief and vacatur . . . with respect to" the OMB Memorandum. A71-72; *see also* A104-05 (praying for relief solely against the "OMB Directive"). The government noted the focused nature of plaintiffs' lawsuit in opposing preliminary relief. *See, e.g.*, A298-303.

Perhaps recognizing the flaws in their challenge to the rescinded OMB Memorandum, plaintiffs amended their complaint the day after the government submitted its preliminary-injunction opposition. The amended complaint included a new plaintiff (the Governor of Kentucky[1]) and nearly doubled the number of agency defendants. *Compare* A309-19, *with* A74-81. Plaintiffs added an entirely new theory of liability, pleading for the first time a violation of the Impoundment Control Act. *See* A351. And plaintiffs shifted gears as to the object of their challenge, characterizing the whole panoply of agency funding decisions as part of an amorphous "Federal Funding Freeze" effectuated through the President's Executive Orders and the OMB Memorandum. A306-07.

Granting a preliminary injunction based on plaintiffs' late-breaking amendments was improper. Plaintiffs materially altered and expanded the nature of their challenge while preliminary-injunction briefing was ongoing and after the government had responded to plaintiffs' motion. Plaintiffs should not have been permitted to obtain interim relief that went beyond the ultimate relief requested in

---

[1] Among the many problems that resulted from plaintiffs' belated amendments to the complaint, their inclusion of this new plaintiff generated one of its own. According to the Attorney General of Kentucky, state law provides that the Attorney General—not the Governor—may represent the Commonwealth and seek relief on behalf of Commonwealth agencies. *See* Amicus Br. of Ky. (Mar. 26, 2025); *see also Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022) ("Respect for state sovereignty must also take into account the authority of a State to structure its executive branch in a way that empowers multiple officials to defend its sovereign interests in federal court.").

their operative complaint. *See Pacific Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."); *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005) ("To secure preliminary injunctive relief, a petitioner must demonstrate a substantial likelihood of prevailing on at least one of the causes of action he has asserted."). After all, the purpose of a preliminary injunction is to permit the district court to conduct a "full adjudication of the case's merits." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 72 (1st Cir. 2004) (quotation omitted).

In addition, untethered to any concrete agency action that is properly before the Court, plaintiffs' new claim constituted a thinly veiled programmatic attack on federal spending across a wide swath of federal agencies. Rather than urging that any particular decision was unlawful, plaintiffs attacked—and the district court enjoined— a category of actions that allegedly reflect an unlawful program. The Supreme Court has squarely rejected that approach. Even if the district court had identified some overarching obligation, courts are not "empowered to enter general orders compelling compliance with broad statutory mandates"; if so, "they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004).

Although the stay panel believed that this limitation did not apply because plaintiffs "do challenge discrete final agency actions," the panel described those "discrete" actions as "decisions by the Agency Defendants to implement broad, categorical freezes on obligated funds." A564. But that characterization underscores the problem: the "broad" freezes the stay panel described are, in reality, many individual decisions by dozens of agencies across a wide swath of programs, each governed by its own statutes. Attempting to amalgamate those countless discrete decisions into a single, challengeable "Federal Funding Freeze" is exactly the sort of programmatic attack that the Supreme Court rejected in *Norton*. As the stay panel pointed out, the government had not fleshed out the heterogeneity of those statutory schemes in the limited briefing available at the stay stage, but this more complete brief makes clear the impropriety of the district court's broad-brush approach. *See infra* pp. 37-44. In addition to its substantive flaws, discussed below, the district court's injunction can be vacated on that basis alone.

### B. Plaintiffs' Claims Fail on the Merits

Plaintiffs' newly expanded claims were in any event flawed on the merits. The injunction bars agencies from pausing funds in situations where it is lawful to do so. It interferes with funding decisions that are committed to agency discretion and not judicially reviewable. And it requires agencies to release funds even when the district court has no power to order that relief. These fundamental issues plague the district court's injunction, and there is no principled way to fashion a narrower injunction on

36

the present record.  Because plaintiffs have failed to demonstrate their entitlement to the preliminary injunction before this Court, the injunction must be reversed.

**1.    Numerous Covered Grant Programs Allow Funding Pauses**

The plaintiff States participate in a vast number of grant programs, *see* A446-47 (describing hundreds of grants to 19 plaintiff States across 30 grant programs administered by just one agency), and it is commonplace for those programs to provide ample room for the administering agency to pause funding.  In entering a temporary restraining order, the district court acknowledged that "some aspects of the pause" contemplated in the OMB Memorandum "might be legal and appropriate constitutionally for the Executive to take."  A176.  Yet the court did not attempt at the preliminary-injunction stage to ascertain the defendants' legal authority to pause funding across the various programs where the States have "awarded grants, executed contracts, or other executed financial obligations."  A44.  It was improper for the court to enjoin a whole swath of conduct without any showing that the Executive Branch's actions were unlawful.

In the absence of specific congressional direction, the Executive Branch has broad discretion to determine how best to allocate grant funding.  In *Lincoln v. Vigil*, for example, the agency "discontinued the direct clinical services to Indian children in the Southwest," even though Congress was aware of those services and had previously directed a pilot program for such services.  508 U.S. 182, 186-88 (1993).

Nonetheless, because "the appropriations Acts for the relevant period [did] not so much as mention the Program," and the organic statutes spoke "about Indian health only in general terms," there was no "legally binding obligatio[n]" to continue the services. *Id.* at 193-94. Although certain grant programs may "circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes," the lack of such directives leaves agencies free to "allocat[e] funds . . . to meet permissible statutory objectives." *Id.* at 193.

Here, even a brief review of the relevant funding frameworks demonstrates that agencies have authority to suspend and reorient funding. For example, plaintiffs discuss an award through which a public university in Massachusetts receives funding from the National Science Foundation. *See* A221. That award is funded under 42 U.S.C. § 1862q, which directs the agency to award grants for science, technology, engineering, and mathematics education but does not require that any specific project or grantee receive funding. The relevant appropriations provide a lump sum "[f]or necessary expenses in carrying out [these] programs and activities." Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. B, tit. III, 136 Stat. 49, 139. And the form grant agreement states that "[t]he grant may be suspended or terminated in whole or in part" by the agency, "to the greatest extent authorized by law, if a grant [no] longer effectuates the program goals or agency priorities," including without advance notice when "reasonable to protect the interests of the Government." National Science Foundation, *Research Terms & Conditions: Agency Specific Requirements*

§ 41(b)(2), (c) (Jan. 30, 2023), https://perma.cc/VUC3-QYJQ.  In light of the governing statute, appropriations, and underlying agreement, the agency plainly has authority to temporarily pause funding to determine whether the grant continues to effectuate agency priorities.

Plaintiffs also invoke certain highway grants administered by the Federal Highway Administration.  *See* A229-30.  The relevant program for low-carbon transportation materials grants is governed by 23 U.S.C. § 179, which appropriates an overall amount and defines the intended purpose, but does not mandate that any eligible recipient receive an award.  *Cf.* Fed. Highway Admin., Dept. of Transp., *Low-Carbon Transportation Materials Grants Program*, https://perma.cc/UU7K-43SD.  Standard grant conditions likewise provide that the agency may "terminat[e] or suspen[d]" the award "in whole or in part, at any time prior to its expiration date" if it no longer effectuates program goals or agency priorities.  Fed. Highway Admin., Dep't of Transp. *Contractors & Recipients General Terms and Conditions for Assistance Awards* § 17, https://perma.cc/M7LK-D9SU.  Again, nothing in this legal framework precludes the agency from implementing a short-term pause to review the program.

The broad-brush nature of plaintiffs' challenge makes it impossible to exhaustively document the full amount of discretion agencies retain as to each covered funding program and grant.  The existence of that discretion under the appropriations statutes provides an additional reason, beyond those cited above, that the district court's reliance on the Impoundment Control Act was mistaken.  And the

39

exemplary discussion here underscores why it is inappropriate to litigate the issues divorced from a specific agency decision in the context of a specific funding program and a specific funding instrument. The district court justified its wide-ranging injunction by identifying only "a few examples" of funding programs that assertedly forbid temporary pauses in funding because they involve "formula grants." A29. In doing so, the court erroneously neglected the multiple counterexamples, which suffice to show that plaintiffs have not carried their burden to establish that the conduct covered by the injunction is unlawful. *See Winter*, 555 U.S. at 20 (holding that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits"). And as noted above, agencies were not directed to pause funding where doing so was prohibited by law; if plaintiffs identified a particular instance in which an agency violated its statutory responsibilities, plaintiffs could seek appropriate, tailored recourse against that agency.

Moreover, although the stay panel excused the possibility that the district court had enjoined lawful behavior on the basis that the otherwise lawful funding freezes might be tied to the OMB Memorandum, A568-69, as discussed above no injunction is warranted based on the Memorandum itself. Especially at this much later date, no injunction can properly be allowed to continue based on an argument that the Memorandum improperly taints funding pauses that are themselves permitted under the relevant statutes—and that are, in any many cases, not subject to judicial review under the APA, *see infra* pp. 41-44.

## 2. Funding Decisions Are Frequently Committed to Agency Discretion by Law

In a similar vein, the district court's preliminary injunction will operate to dictate certain decisions on funding even when those decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Such discretionary actions fall outside the APA and are not subject to judicial review. *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020). The district court exceeded the bounds of the APA by ordering agencies to exercise or refrain from exercising their unreviewable discretion in a particular manner.

The Supreme Court has expressly held that an agency decision to discontinue a previously funded program and reallocate those funds to other uses is committed to agency discretion by law. *Lincoln*, 508 U.S. at 185-88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making this allocation, the agency must engage in "a complicated balancing of a number of factors" within "its expertise," including "whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a

program at all." *Id.* at 193 (quotation omitted). As long the agency abides by the relevant statutes and by any self-imposed obligations that may arise from regulations or grant instruments, federal law "gives the courts no leave to intrude." *Id.*

Although the Supreme Court in *Lincoln* addressed lump-sum appropriations, its logic extends beyond lump-sum appropriations to other funding programs that permit the agency to decide "how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Those decisions—like decisions regarding how best to allocate lump-sum appropriations across programs—"clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted); *see also Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018); *cf. Community Action of Laramie Cty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget." (quotation omitted)).

Many of the grant programs at issue here fall under that rubric. One statute appropriates a lump sum of $7 billion for the Environmental Protection Agency (EPA) "to make grants, on a competitive basis," to "States, municipalities, Tribal governments, and eligible recipients" as part of a program called Solar for All "to enable low-income and disadvantaged communities to deploy or benefit from zero-

emission technologies," including rooftop solar panels, "and to carry out other greenhouse gas emission reduction activities, as determined appropriate by the [EPA] Administrator." 42 U.S.C. § 7434(a)(1). Another statute similarly appropriates a lump sum of $5 billion for EPA to "competitively award grants to eligible entities to implement plans" to reduce greenhouse gas air pollution. *Id.* § 7437(a)(1)-(2), (c)(1). The district court observed that the agency must "make a grant to at least one eligible entity in each State for the costs of developing [the] plan." A28 (quoting 42 U.S.C. § 7437(b)). But that hardly eliminates the agency's ability to determine how best to direct appropriated funds, particularly when funds are to be made available to grantees "in such amounts, upon such a schedule, and subject to such conditions" as the agency determines. 42 U.S.C. § 7437(c)(3).

Plaintiffs also mention the Urban and Community Forestry Assistance Program for which the New York State Department of Environmental Conservation was awarded funding. *See* A235. The statutory language affords the agency significant leeway over how to achieve the program's purposes. Under the statute, the Department of Agriculture "is authorized to provide financial, technical, and related assistance to State foresters or equivalent State officials for the purpose of encouraging States to provide information and technical assistance to units of local government and others that will encourage cooperative efforts to plan urban forestry programs." 16 U.S.C. § 2105(c). And Congress appropriated certain funds "to provide multiyear, programmatic, competitive grants" for such programs. Pub. L.

No. 117-169, § 23003(a)(2), 136 Stat. 1818, 2026 (2022). Nothing in that language suggests that an agency must refrain from pausing funding to potentially redirect that funding to a different objective or recipient.

The district court's preliminary injunction applies across this entire range of federal funding programs without accounting for any differences between applicable statutes, regulations, or agreements. Its prohibitions subvert the defendant agencies' ability to consider the optimal distribution of funding to achieve statutory goals "in what [the agency] sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. The APA does not allow for judicial review of those discretionary judgments that implicate agency expertise about allocating limited resources and advancing policy priorities. *See id.* at 193 (noting that funding decisions involve "a complicated balancing of a number of factors" (quotation omitted)). The district court overstepped its role in enjoining funding decisions within broad statutory mandates that do not limit an agency's bases for decisionmaking.

### 3. The District Court Lacks the Power to Order Direct Monetary Payments

The district court also appears to view the preliminary injunction as encompassing contractual disputes over which it lacks jurisdiction. The court justified the injunction in part based on the plaintiff States' requests for "reimbursement" of "money that has been spent." A35. But these sorts of claims that the plaintiff States are owed "specific sums already calculated, past due, and designed to compensate for

completed labors" lie "in the Tucker Act's heartland" and therefore must be brought in the Court of Federal Claims, not district court. *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020).

The dispute over funding administered by FEMA is illustrative. FEMA implemented a set of internal controls providing that staff would conduct a manual review of documentation submitted by grant recipients to ensure that payment requests are verified prior to payment being released. *See* A427. Plaintiffs brought this issue to the district court, contending that FEMA had taken too long to process their grant funding. *See* A52-53. In the guise of enforcing its preliminary injunction, the court ordered that FEMA may not "pause or otherwise impede the disbursement of appropriated federal funds to the States" on various bases. A59. The court "lacked jurisdiction to order [such] payment of money under the APA." *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam).[2]

Although the APA provides a limited waiver of the federal government's sovereign immunity for claims seeking non-monetary relief, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids

---

[2] It is immaterial whether the district court's order is viewed as going beyond the preliminary injunction. If the court is correct that its order "merely enforced [the] Preliminary Injunction," A69, then it highlights the broader issues with that injunction. On the other hand, if the court's order is better conceived as "modify[ing] the injunction," *id.*, then the order is independently appealable under 28 U.S.C. § 1292(a)(1) and subject to reversal on its own. Out of an abundance of caution, the government filed a timely appeal from the order, and this Court has consolidated the appeals.

the relief which is sought." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted). One such statute is the Tucker Act, which provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act "impliedly forbids" bringing "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

As this Court has long recognized, a plaintiff thus may not maintain an APA suit where "the essence of the action is in contract"—and a plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise." *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Court*, 340 F.2d 947, 948 (1st Cir. 1965)). Other courts of appeals, in determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *accord Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (declining to allow litigant to

"manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act" where the alleged injury was "pecuniary in nature" and the litigant sought "monetary relief based on what he perceived as a contract").

The Supreme Court recently stayed another district court order to make payments based on certain grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act grants the Court of Federal Claims jurisdiction over suits "to order the payment of money." *California*, 145 S. Ct. at 968. There, a number of states challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and this Court denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for relief, reaffirming that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted).

That reasoning applies with full force here. As in *California*, plaintiffs in this case alleged a violation of "a contractual obligation to pay money." 145 S. Ct. at 968 (quotation omitted). The source of plaintiffs' purported rights to payment from FEMA are the grant agreements, which bear the hallmarks of a contract. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that many "federal grant programs" are

47

"much in the nature of a contract " (quotation omitted)); *see also Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021). Plaintiffs sought and obtained a judicial order compelling continued payment of funds under those particular FEMA grants. *See* A59 (ordering FEMA not to "pause or otherwise impede the disbursement of appropriated federal funds").

The district court did not deny that "the facts in the *California* case may appear to be generally analogous to the facts here." A66. The court nonetheless sought to distinguish this case from *California* on the ground that here the court did not "review and analyze the contractual obligations or any provision of the agreements between FEMA and the States." A67. But the relevant point is that the dispute sounds in contract because the agreements themselves create the asserted right to payment in the first instance and any obligation to continue making prompt payments would have to come from the grant terms. The district court also erred in relying on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), which did not involve contracts with the government at all. *See* A68. Unlike a challenge that might lead to monetary payments as "a mere by-product," *Bowen*, 487 U.S. at 910, obtaining specific monetary payments from FEMA was the entire aim of plaintiffs' endeavor here. The Supreme Court distinguished *Bowen* on this precise basis in *California*. *See* 145 S. Ct. at 968 (contrasting *Bowen* as addressing situations where "setting aside an agency's action may result in the disbursement of funds").

In short, plaintiffs contend that FEMA is bound under grant agreements with plaintiffs "to pay out past-due grant obligations and to continue paying obligations as they accrue." *California*, 145 S. Ct. at 968. The proper recourse for any asserted contractual violations is a "suit in the Claims Court for damages relating to [the] alleged breach," not a suit in district court under the APA. *Boaz Hous. Auth.*, 994 F.3d at 1368. That the district court understood its preliminary injunction to reach these sorts of disputes that the court has no power to decide underscores the impropriety of the injunction.

## III. The Remaining Preliminary Injunction Factors Counsel Against Relief

Because plaintiffs have not demonstrated a likelihood of success on the merits, this Court need not consider the remaining preliminary injunction factors. *See Doe v. Trustees of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019); *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 100 (1st Cir. 2011). However, plaintiffs likewise failed to establish that these factors favor relief.

The balance of harms and public interest overwhelmingly weigh against a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these factors merge in cases involving the government). The injunction here interferes with agencies' ability to exercise their lawful authorities to implement the President's policy directives. The injunction thus undermines the President's unquestioned Article II authority to direct subordinate agencies how to exercise their own authorities, giving

rise to an intolerable intrusion on the prerogatives of the Executive Branch. The separation-of-powers problems are especially severe because the injunction purports to govern the manner in which a range of federal agencies make funding decisions across a spectrum of federal spending programs, and it extends even to lawful implementations of the President's Executive Orders. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (holding that courts lack jurisdiction "to enjoin the President in the performance of his official duties").

The preliminary injunction's vague instructions exacerbate these harms. It enjoins the government defendants from "implementing" or "giving effect to" the OMB Memorandum "under a different name" without providing guidance as to what features matter to make that assessment. A44. And it enjoins the government defendants from pausing funds as "described" or "implied by" the President's Executive Orders but identifies only one Executive Order while indicating that it is "by no means . . . limited to" that Executive Order. *Id.* The injunction's nebulous language lacks the requisite detail and precision about the specific "act or acts restrained." Fed. R. Civ. P. 65(d)(1)(C).

If nothing else, the preliminary injunction threatens to chill agencies from taking legally permitted actions to review and realign funding. The district court purported to allow agencies to make funding decisions, informed by the President's Executive Orders, in accordance with their "actual authority in the applicable statutory, regulatory, or grant terms." A42-43 (quotation omitted). At the same time,

however, the court has determined that agency funding decisions are "based, covertly, on" one of the President's Executive Orders when any connection can be traced back to such an Executive Order. A55-58. An injunction that has the effect of prohibiting agencies from carrying out the President's lawful orders causes irreparable harm.

Despite the district court's assurances that it was not "micromanaging the administration of federal funds," A4, the injunction it entered contemplates exactly such oversight. The injunction allows plaintiffs to bring all manner of funding disputes to a single district judge to pass judgment on compliance issues whenever plaintiffs dislike a funding decision made by any of the 23 agency defendants. *Cf.* A401-07, A415-18 (previewing potential future objections). Indeed, the court has already entertained multiple disputes involving hundreds of grants spanning dozens of grant programs administered by various agencies. *See* A189-92; A446-47. It is improper for the court to demand that the nearly two dozen agency defendants and their senior officials either seek judicial approval before exercising their lawful authority and discretion or face the risk of contempt proceedings. *See* A371 n.1 (stating that plaintiffs "are not moving for contempt at this time"); *see also* Plaintiffs' Motion for Contempt at 9-10, *Washington v. Trump*, No. 25-cv-244 (W.D. Wash. Mar. 6, 2025), Dkt. No. 243 (effort by one plaintiff State to seek contempt in a different case partly on the basis that the government has violated the orders in this case by relying on an Executive Order to withhold funding pursuant to lawful authorities).

The preliminary injunction will inflict harms on the government and the public that could not be unwound. If the government's position is later vindicated in this litigation, there would be no guarantee that funds that the government obligated or disbursed pursuant to the district court's order would be retrievable from the States or their subgrantees after the fact. *See California*, 145 S. Ct. at 968-69 (crediting "the Government's representation that it is unlikely to recover the grant funds once they are disbursed"). There is no sound basis to compel the government to continue to take actions that the President considers "a waste of taxpayer dollars that d[o] not improve the day-to-day lives of those we serve." A115.

These irreversible harms far outweigh any asserted harms to plaintiffs. Plaintiffs have no cognizable interest in receiving federal funds to which they are not legally entitled or on a timeline that is not legally compelled. The district court could find irreparable harm only by presuming that federal funds would be cut off unlawfully, *see* A39, even though the government frequently enjoys broad authority to suspend and terminate funding instruments for policy reasons. Allowing the government—in accord with the plain terms of the Executive Orders—to make funding decisions consistent with federal law plainly serves the public interest.

The district court focused on the alleged "pecuniary harm to the States and their residents." A36. Even putting aside that States cannot invoke harms on behalf of their citizens in actions against the federal government, *Haaland v. Brackeen*, 599 U.S. 255, 294-95 (2023), the district court overlooked that plaintiffs will receive

any funds that agencies are legally obligated to disburse.  To the extent that plaintiffs have a justiciable legal dispute over a particular agency's decision with respect to a particular grant in a particular program, plaintiffs can bring an action in an appropriate forum where a court can consider the arguments in the context of the relevant statutes, regulations, and funding instruments.  *See California*, 145 S. Ct. at 969 (explaining that plaintiffs "would not suffer irreparable harm" where "they can recover any wrongfully withheld funds through suit in an appropriate forum").  The possibility of individualized disagreements related to discrete actions on specific funding streams does not justify a preliminary injunction imposing continuous judicial monitoring over the entire suite of funding decisions made by a huge swath of the Executive Branch.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be
reversed.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA

 *s/ Brian J. Springer*
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

May 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,898 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brian J. Springer*
Brian J. Springer

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Brian J. Springer*
Brian J. Springer

# ADDENDUM

# TABLE OF CONTENTS

Memorandum and Order Granting Preliminary Injunction
(Dkt. No. 161) ...........................................................................A1

Memorandum and Order Granting Motion to Enforce
Preliminary Injunction (Dkt. No. 175)................................. A46

Order Denying Motion for Reconsideration
(Dkt. No. 182) ........................................................................ A61

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF )
CALIFORNIA; STATE OF )
ILLINOIS; STATE OF RHODE )
ISLAND; STATE OF NEW JERSEY; )
COMMONWEALTH OF )
MASSACHUSETTS; STATE OF )
ARIZONA; STATE OF COLORADO; )
STATE OF CONNECTICUT; STATE )
OF DELAWARE; THE DISTRICT )
OF COLUMBIA; STATE OF )
HAWAII; OFFICE OF THE )
GOVERNOR *ex rel.* Andy Beshear, in )
his official capacity as Governor of )
the COMMONWEALTH OF )
KENTUCKY; STATE OF MAINE; )
STATE OF MARYLAND; STATE OF )
MICHIGAN; STATE OF )
MINNESOTA; STATE OF NEVADA; )
STATE OF NEW MEXICO; STATE )
OF NORTH CAROLINA; STATE OF )          C.A. No. 25-cv-39-JJM-PAS
OREGON; STATE OF VERMONT; )
STATE OF WASHINGTON; and )
STATE OF WISCONSIN, )
)
        Plaintiffs, )
)
v. )
)
DONALD TRUMP, in his official )
capacity as President of the United )
States; U.S. OFFICE OF )
MANAGEMENT AND BUDGET; )
RUSSELL VOUGHT, in his official )
capacity as Director of the U.S. Office )
of Management and Budget; U.S. )
DEPARTMENT OF THE )
TREASURY; SCOTT BESSENT, in )
his official capacity as Secretary of )
the Treasury; PATRICIA COLLINS, )
in her official capacity as Treasurer )
of the United States; U.S. )

A1

DEPARTMENT OF HEALTH AND               )
HUMAN SERVICES; ROBERT F.              )
KENNEDY, JR., in his official          )
capacity as Secretary of Health and    )
Human Services; U.S.                   )
DEPARTMENT OF EDUCATION;               )
LINDA MCMAHON, in her official         )
capacity as Secretary of Education;     )
U.S. DEPARTMENT OF                     )
TRANSPORTATION; SEAN DUFFY,            )
in his official capacity as Secretary of    )
Transportation; U.S. DEPARTMENT         )
OF LABOR; VINCE MICONE, in his         )
official capacity as Acting Secretary    )
of Labor; U.S. DEPARTMENT OF            )
ENERGY; CHRIS WRIGHT, in his            )
official capacity as Secretary of         )
Energy; U.S. ENVIRONMENTAL             )
PROTECTION AGENCY; LEE                 )
ZELDIN, in his official capacity as      )
Administrator of the U.S.               )
Environmental Protection Agency;        )
U.S. DEPARTMENT OF THE                 )
INTERIOR; DOUG BURGUM, in his          )
official capacity as Secretary of the     )
Interior; U.S. DEPARTMENT OF            )
HOMELAND SECURITY; KRISTI              )
NOEM, in her capacity as Secretary      )
of Homeland Security; U.S.              )
DEPARTMENT OF JUSTICE;                 )
PAMELA BONDI, in her official           )
capacity as Attorney General of the      )
U.S. Department of Justice; THE         )
NATIONAL SCIENCE                       )
FOUNDATION; DR. SETHURAMAN             )
PANCHANATHAN, in his capacity          )
as Director of the National Science      )
Foundation; U.S. DEPARTMENT OF          )
AGRICULTURE; BROOKE                    )
ROLLINS, in her official capacity as     )
Secretary of Agriculture; U.S.          )
DEPARTMENT OF HOUSING AND              )
URBAN DEVELOPMENT; SCOTT               )
TURNER, in his official capacity as      )

Secretary of Housing and Urban                    )
Development; U.S. DEPARTMENT                       )
OF STATE; U.S. AGENCY FOR                          )
INTERNATIONAL                                      )
DEVELOPMENT; MARCO RUBIO,                          )
in his official capacities as Secretary            )
of State and Acting Administrator of               )
the United States Agency for                       )
International Development; U.S.                     )
DEPARTMENT OF DEFENSE;                             )
PETER HEGSETH, in his official                     )
capacity as Secretary of Defense; U.S.             )
DEPARTMENT OF VETERANS                             )
AFFAIRS; DOUG COLLINS, in his                      )
official capacity as Secretary of                  )
Veterans Affairs; U.S.                             )
DEPARTMENT OF COMMERCE;                            )
HOWARD LUTNICK, in his official                    )
capacity as Secretary of Commerce;                 )
NATIONAL AERONAUTICS AND                           )
SPACE ADMINISTRATION; JANET                        )
PETRO in her official capacity as                  )
Acting Administrator of National                   )
Aeronautics and Space                              )
Administration; CORPORATION                        )
FOR NATIONAL AND                                   )
COMMUNITY SERVICE;                                 )
JENNIFER BASTRESS                                  )
TAHMASEBI, in her official capacity                )
as Interim Head of the Corporation                 )
for National and Community Service;                )
U.S. SOCIAL SECURITY                               )
ADMINISTRATION; LELAND                             )
DUDEK, in his official capacity as                 )
Acting Commissioner of United                      )
States Social Security                             )
Administration; U.S. SMALL                         )
BUSINESS ADMINISTRATION; and                       )
KELLY LOEFFLER, in her official                    )
capacity as Administrator of U.S.                  )
Small Business Administration,                     )
                                                   )
        Defendants.                                )
                                                   )

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Chief Judge.

The Executive's categorical freeze of appropriated and obligated funds fundamentally undermines the distinct constitutional roles of each branch of our government. The interaction of the three co-equal branches of government is an intricate, delicate, and sophisticated balance—but it is crucial to our form of constitutional governance. Here, the Executive put itself above Congress. It imposed a categorical mandate on the spending of congressionally appropriated and obligated funds without regard to Congress's authority to control spending. Federal agencies and departments can spend, award, or suspend money based only on the power Congress has given to them–they have no other spending power. The Executive has not pointed to any constitutional or statutory authority that would allow them to impose this type of categorical freeze. The Court is not limiting the Executive's discretion or micromanaging the administration of federal funds. Rather, consistent with the Constitution, statutes, and caselaw, the Court is simply holding that the Executive's discretion to impose its own policy preferences on appropriated funds can be exercised only if it is authorized by the congressionally approved appropriations statutes. Accordingly, based on these principles and the reasons stated below, the Court grants the States' Motion for Preliminary Injunction. ECF No. 67.

## I.    BACKGROUND

We begin by restating the American government principles learned during critical civics education lessons in our youth.[1]  Our founders, after enduring an eight-year war against a monarch's cruel reign from an ocean away, understood too well the importance of a more balanced approach to governance.  They constructed three co-equal branches of government, each tasked with their own unique duties, but with responsibilities over the other branches as a check in order to ensure that no branch overstepped their powers, upsetting the balance of the fledgling constitutional republic.  *See Kilbourn v. Thompson*, 103 U.S. 168, 191 (1880).  These concepts of "checks and balances" and "separation of powers" have been the lifeblood of our government, hallmarks of fairness, cooperation, and representation that made the orderly operation of a society made up of a culturally, racially, and socioeconomically diverse people possible.

The three branches of our government—Legislative, Executive, and Judicial— derive their power from the United States Constitution; they function together, and one branch's power does not supersede that of another.  "To the legislative department has been committed the duty of making laws; to the executive the duty

---

[1] "This is what it all comes down to: we may choose to survive as a country by respecting our Constitution, the laws and norms of political and civic behavior, and by educating our children on civics, the rule of law, and what it really means to be an American, and what America means. Or, we may ignore these things at our . . . peril." *A.C. v. Raimondo*, 494 F. Supp. 3d 170, 181 (D.R.I. 2020), aff'd sub nom. *A.C. by Waithe v. McKee*, 23 F.4th 37 (1st Cir. 2022).

of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *see also Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825) (Marshall, C.J.) ("[T]he legislature makes, the executive executes, and the judiciary construes the law").  Importantly, James Madison wrote that this system prevents "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands." The Federalist No. 47, at 301 (C. Rossiter ed. 1961).  Such an accumulation and concentration of power would pose an inherent "threat to liberty." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring).

The Legislative branch, consisting of two Houses of Congress elected by the citizens of the states, has the power to levy taxes, finance government operations through appropriations, and to set the terms and conditions on the use of those appropriations.  U.S. Const. art. I, §§ 8, 9.  Congress also makes laws, and the Constitution prescribes a specific procedure for it to follow involving the agreement of both the House of Representatives and the Senate and presentment of the final bill to the President for signature or veto.  U.S. Const. art. I, §§ 1, 7.  The President, as head of the Executive Branch, may recommend laws for Congress's consideration, including those related to spending.  U.S. Const. art. II, §§ 1, 3.  Once the bill becomes the law, U.S. Const. art. I, § 7, the Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  And Article III empowers the Judiciary with the "province and duty ... to say what the law is" in

particular cases and controversies.  *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 177 (1803); U.S. Const. art. III, § 2.

Important to this case is how Congress uses its power to authorize spending to support federal programs and activities.  One way is through an appropriation, which creates the legal authority to "make funds available for obligation" and to make "expenditure[s]" for the purposes, during the time periods, and in the amounts specified in the law authorizing the appropriations.  *See* 2 U.S.C. § 622(2)(A)(i).  An "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into" such a liability; an "expenditure," also known as a "disbursement," is the actual spending of federal funds.  U.S. Gov't Accountability Off., A Glossary of Terms Used in the Federal Budget Process, GAO-05-734SP, at 45, 48, 70 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf ("Budget Glossary").

Congress has enacted multiple statutes that affirm its control over federal spending.  First, the "purpose statute," 31 U.S.C. § 1301(a), states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law,"—that is, funds can be used only for the purposes that Congress has designated.  Second, the Antideficiency Act prevents agencies from obligating or spending funds absent congressional appropriation.  31 U.S.C. § 1341.  Finally, the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681 et seq. ("ICA"), permits the Executive Branch to "impound" (or

decline to spend) federal funds only under a very small set of highly circumscribed conditions.

This case also involves the actions of agencies in receipt of statutorily appropriated federal funding. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). "It is no exaggeration to say that 'an agency literally has no power to act ... unless and until Congress confers power upon it.'" *City of Providence*, 954 F.3d at 31 (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). In this case, there are specific statutory provisions instructing federal agencies to provide the States with categorical or formula grants where money is allocated on the basis of enumerated statutory factors such as population or the expenditure of qualifying state funds. ECF No. 114 ¶ 93. Several examples of these formula grants involve funding for Medicaid (42 U.S.C. § 1396(a), highway (23 U.S.C. § 104(a)(1), (b), (c)), special education services (the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.), for mental health and substance abuse treatment (42 U.S.C. §§ 300x(a), 300x-7(a), 300x-21(a), 300x-33(a)), power and heating for low-income residents, (the Low-Income Home Energy Assistance Program ("LIHEAP"), 42 U.S.C. § 8621(a)), the Infrastructure Improvement and Jobs Act ("IIJA") (Pub. L. No. 117-58, 135 Stat. 429 (2021)) and Inflation Reduction Act ("IRA") (Pub. L. No. 117-169, 136 Stat. 1818 (2022)) for projects ranging from highways, to broadband access, to pollution reduction, to increasing the reliability of the electric

grid, and clean water.  These statutes direct the agencies to make grants to states for

enumerated purposes in accordance with congressional policies.

With this backdrop, the Court moves to the Executive actions that spurred this

lawsuit.

### A.  The President's Executive Orders and OMB Memorandum M-25-13

The President issued a series of Executive Orders ("EOs") in his first eight days

of office, directing federal agencies to pause and review funding in connection with

his policy priorities—specifically relating to:

- "terminating the Green New Deal" and requiring an immediate pause on disbursement of funds appropriated under the IRA or IIJA ("*Unleashing* EO"), ECF No. 68-1;
- pausing funding programs relating to "removable or illegal aliens" ("*Invasion* EO"), ECF No. 68-3;
- identifying "diversity, equity, inclusion, accessibility" programs, in an effort to "Ending Radical and Wasteful Government DEI Programs and Preferencing" ("*DEI* EO"), ECF No. 68-2;
- ending federal funding of gender ideology ("*Gender* EO"), to ensure that research or educational grants to medical institutions do not include federal funds for transgender medical care ("*Gender-Affirming Care* EO"), ECF Nos. 68-5, 65-8; and
- pausing federal foreign aid that is not in line "with the foreign policy of the President of the United States" ("*Foreign Aid* EO").  ECF No. 68-6.

On January 27, 2025, the Office of Management and Budget's (OMB) Acting

Director, Matthew J. Vaeth issued OMB Memorandum M-25-13 ("OMB Directive"),

entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance

Programs" to executive departments and agencies' heads.  *See* ECF No. 68-9.  The

OMB Directive instructed federal agencies to "complete a comprehensive analysis of

all of their Federal financial assistance programs to identify programs, projects, and

activities that may be implicated by any of the President's executive orders."  *Id.* at 2.

Then, the OMB Directive mandated that, in the interim of the comprehensive analyses, "Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the Executive Orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI [diversity, equality, and inclusion], woke gender ideology, and the green new deal." *Id.* Agencies had until February 10, 2025 to submit to the OMB "detailed information on any programs, projects, or activities subject to this pause." *Id.* The OMB Directive further noted that the pause would continue "until OMB has reviewed and provided guidance" to the agencies in relation to the information submitted to the OMB. *Id.* The pause was set to "become effective on January 28, 2025, at 5:00 PM." *Id.*

### B. The States' Suit, the OMB Directive's Rescission, and the TRO

On January 28, the "States"—comprising twenty-two states and the District of Columbia—brought suit against the President and the heads of numerous federal executive departments and agencies, arguing that their actions to implement the OMB Directive violated: (1) the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (Counts I, II); (2) the Separation of Powers (Count III); and the Spending, Presentment, Appropriations, and Take Care Clauses of the U.S. Constitution (Counts IV, V). ECF No. 1. Additionally, the States immediately moved for a temporary restraining order ("TRO") to "restrain the Defendants from enforcing the OMB Directive's directive to 'pause all activities related to obligation or disbursement of all Federal financial assistance.'" ECF No. 3 at 3 (citing OMB Directive at 2). That

same day, the U.S. District Court for the District of Columbia issued an administrative stay on the OMB Directive until it could hold a hearing on a separate motion for a TRO from coalitions of nonprofit organizations. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 314433 (D.D.C. Jan. 28, 2025).

The next day, a hearing for the TRO motion was set for 3:00 p.m. (Hearing Notice Jan. 29, 2025) and the Defendants entered an appearance. ECF No. 39. But shortly before the hearing, the Defendants filed a notice stating that the OMB rescinded the OMB Directive and that the Plaintiffs' claims and request for prospective relief were now moot. ECF No. 43. Nonetheless, the Court preceded with the TRO hearing at the States' request. During the hearing the States argued against mootness, presenting White House Press Secretary Karoline Leavitt's post-rescission announcement on X (formerly Twitter) stating that the federal funding freeze was not rescinded and that the President's EOs remained in full force and effect. *See* Minute Entry Jan. 29, 2025; ECF No. 44; *see also* ECF No. 68-126 (screenshot of the Press Secretary's X announcement). Feeling inclined to grant a TRO based on the evidence before it, the Court requested that the States submit, and the Defendants respond, to a proposed TRO order (Minute Entry Jan. 29, 2025)—a request the parties promptly complied with, *see* ECF Nos. 46, 49.

Based on the Press Secretary's announcement—along with supplemental evidence showing continued enforcement of the OMB Directive—the Court determined that the OMB Directive's rescission was "in name only" and that the

"substantive effect of the directive carries on." ECF No. 50 at 10. Thus, the Court found that the OMB Directive's rescission did not moot the States' claims and ultimately issued a TRO on January 31. *See id.* at 11-12. The TRO provided that the Defendants: "shall not pause, freeze, impede, block, cancel, or terminate [their] compliance with awards and obligations . . . to the States . . . except on the basis of the applicable authorizing statutes, regulations, and terms" and shall be enjoined from "from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive . . .." *Id.*[2]

### C. TRO Enforcement Order, The Defendants' Appeal, And The Preliminary Injunction Hearing

A few days after the Court issued the TRO, it set an expedited briefing schedule on the States' Motion for a Preliminary Injunction. *See* Text Order, Feb. 3, 2025. Then, on February 6, the Court extended the TRO's duration, for good cause, until it could rule on the preliminary injunction motion. *See* Text Order, Feb. 6, 2025. A day later, the States filed an emergency motion to enforce the TRO, pointing to evidence that their access to federal funds was still being denied.[3] *See* ECF No. 66. Based on the evidence, the Court determined that there were "pauses in funding [that] violate[d] the plain text of the TRO" and granted the States' Motion, ordering the

---

[2] The Court later issued an order on February 10, making clear that the TRO also applied to funds paused under the *Unleashing* EO and the *Unleashing* Guidance. *See* ECF No. 96.

[3] The States filed another motion to enforce the TRO on February 28, 2025 relating to FEMA funds that continue to be frozen despite the Court's TRO and subsequent clarifying orders. ECF No. 160. The Court will address that motion later in this Order.

Defendants to end any federal funding pauses and take steps to carry out the TRO during its pendency.  ECF No. 96 at 3-4.

Soon after the Court granted the States' emergency enforcement motion, the Defendants appealed to the First Circuit the Court's: (1) TRO; (2) order extending the TRO's duration, and: (3) order enforcing the TRO.  ECF No. 98 at 1.  The Defendants sought a stay of the Court's orders from the First Circuit, including an immediate administrative stay.  *Id.*  The Defendants also filed a motion to stay, requesting the Court to stay its orders pending appeal.  ECF No. 100.  Ultimately, the First Circuit denied the Defendants' motion for an administrative stay (ECF No. 106 at 2), the Court denied the Defendants' motion to stay (ECF No. 111), and the Defendants then voluntarily dismissed their appeal.  ECF Nos. 121, 122.  In the meantime, the States amended their complaint.  ECF No. 114.

Eventually, after an expedited briefing period, the Court held a hearing on the preliminary injunction motion where the States presented evidence of the categorical pause in funding and the harms resulting.  The Defendants did not rebut any of that evidence or introduce any evidence of their own but instead simply argued against the States' Motion on other grounds.  At the close of the arguments, the Court reiterated that the TRO was in full force and effect and took the States' Motion for Preliminary Injunction under advisement.

## II.    STANDARD OF REVIEW

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022).  "To secure a preliminary

injunction, a plaintiff must show '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). In evaluating whether the plaintiffs have met the most important requirement of likelihood of success on the merits, a court must keep in mind that the merits need not be "conclusively determine[d];" instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (partially quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success–rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

## III.    DISCUSSION

### A.    Jurisdiction

The Defendants assert that the Court lacks jurisdiction to enter preliminary relief in this case because: (1) the OMB Directive's rescission renders the States' claims—or at least their request for preliminary relief—moot; and (2) the States have

not established standing to challenge the OMB Directive. *See* ECF No. 113 at 11-22. The Court will address each argument in turn.

### 1.    Mootness

The Defendants contend that the States' claims here are directed only against the OMB Directive, and thus the rescission of the OMB Directive renders the States' claims moot. *Id.* at 11. They assert that the States' allegations of ongoing harms, such as continued funding freezes, do not stem from the challenged OMB Directive but from actions that are not challenged in the States' Complaint. *Id.* at 13. Those purportedly unchallenged actions that the Defendants suggest are the true basis for the States' ongoing harms are: (1) independent agency decisions not based on the OMB Directive; and (2) the issuance of OBM Memorandum M-25-11 (the "*Unleashing* Guidance")—which directed agencies to immediately pause certain disbursement of funds appropriated under the IRA and the IIJA.[4] *Id.* at 14-15.

The OMB Directive's rescission does not render the States' claims moot. The voluntary cessation doctrine precludes a finding of mootness in this case. The voluntary cessation doctrine gives rise to a mootness exception when the following two-part test is met: (1) the defendant voluntarily ceased the challenged conduct to moot the plaintiff's case; and (2) there is a reasonable expectation that the defendant will repeat the challenged conduct after the lawsuit's dismissal. *Lowe v. Gagné-*

---

[4] After the Defendants responded to the States' preliminary injunction motion, the States filed an Amended Complaint to explicitly include challenges to the *Unleashing* Guidance, the related *Unleashing* EO, and the general implementation of funding freezes based on the President's EO. *See* ECF No. 114 ¶¶ 192, 203-04, 208-09, 215-17, 225-26, 231-32, 237-38, 244-46.

*Holmes*, 126 F.4th 747, 756 (1st Cir. 2025) (citing *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021)). Here, there was a rescission of the challenged OMB Directive, *see* ECF No. 68-12, but as the Court has previously found, the evidence suggests that the OMB Directive's rescission was in name only and "may have been issued simply to defeat the jurisdiction of the courts." ECF No. 50 at 10. The Court made this finding, in part, based on a statement from the White House Press Secretary after the OMB Directive's rescission, stating:

> This is NOT a rescission of the federal funding freeze. It is simply a rescission of the OMB memo. Why? To end any confusion created by the court's injunction. The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented.[5]

ECF No. 68-126; ECF No. 50 at 10-11. The Defendants' contentions that the sole goal of that statement was "ending confusion" and "focusing agencies on the legal effect of the President's recent Executive Orders" are unavailing. ECF No. 113 at 16. The Press Secretary's statement reflects that the OMB Directive's rescission was a direct response to a court-issued stay against the OMB Directive so that the challenged federal funding freeze could continue without any judicially-imposed impediment. Therefore, the Defendants' voluntary rescission of the OMB Directive was a clear effort to moot legal challenges to the federal funding freeze announced in the OMB Directive.

---

[5] The injunction referenced in the Press Secretary's statement is the administrative stay another federal court issued against the OMB Directive's instructions to agencies to "pause ... disbursement of Federal funds under all open awards." *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 314433, at *2 (D.D.C. Jan. 28, 2025).

Nor have the Defendants met their heavy burden of illustrating that it is
"'absolutely clear that the allegedly wrongful behavior could not reasonably be
expected to recur.'" *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 49
(1st Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167, 189 (2000)).    The Defendants purport that a reinstatement of the
challenged OMB Directive, absent an injunction, is a fear that is "wholly speculative
given the existence of the President's Executive Orders which separately address the
President's priorities."  ECF No. 113 at 16.    But nothing suggests that the OMB
voluntarily abandoned the OMB Directive because they believed that: (1) the
President's EOs, alone, sufficiently instructed agencies on how to implement the
President's priorities; or (2) the OMB Directive was deficient or exceeded the
Defendants' constitutional or statutory authority.  *See* ECF No. 68-12 (recission
without explanation).  Rather, as explained above, the Press Secretary's statement
reflects that the OMB Directive's rescission was in direct response to litigation that
impeded the execution of a federal funding freeze.  Thus, the rationale underlying the
OMB Directive's rescission makes it unreasonable to conclude that the Defendants
will not reinstate the challenged funding freeze absent an injunction from this Court.
Accordingly, the States' challenges are not moot based on the OMB Directive's
rescission.

Next, the Defendants claim that the States' request for preliminary relief is
moot because, by rescinding the OMB Directive, the Defendants have "voluntarily
provided the prospective injunctive relief that the States sought in their Complaint."

ECF No. 113 at 17.  Since the Defendants' submission of their Opposition to the States' Motion for Preliminary Injunction, the States have filed an Amended Complaint that clarifies the scope of their claims and requests for relief.  *See* ECF No. 114.  The States request that the Court preliminarily enjoin the Agency Defendants from implementing "the Federal Funding Freeze" "effectuated through EOs, the *Unleashing* [Guidance], the OMB Directive, and other agency actions . . .."  *Id.* ¶ 246.  The States' request for a preliminary injunction makes clear that they are challenging a pause on federal funding that was implemented under not only the OMB Directive, but also to the EOs incorporated therein and other agency actions such as the OMB's issuance of the *Unleashing* Guidance.  Thus, the rescission of the OMB Directive does not provide the States with *all* the prospective relief they have requested.[6]  Accordingly, the States' preliminary injunction request is not moot.

### 2.    Standing

The Defendants assert that the States lack standing to challenge the OMB Directive, particularly with respect to claims based on funding streams that "(1) are not within the scope of the OMB Memo; (2) are not managed by any of the Defendant agencies; or (3) benefit other States or third parties that are not plaintiffs in this case."  ECF No. 113 at 18-19.  "To have standing, a plaintiff must 'present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the

---

[6] Additionally, various funding disruptions that occurred after the Court's TRO—and that continue to the present day—underscore how the Directive's rescission does not suffice as "voluntarily" providing the States all the prospective relief they request.  *See* ECF No. 96 at 3.

defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)). The Defendants contend that the States seek to bring five claims against "thousands of various agency funding streams," and thus must demonstrate standing for each claim against each funding stream. ECF No. 113 at 18. But the States' claims are not against funding streams.[7] Rather, the States' claims focus on the Defendants' actions, which seek to inhibit access to obligated funds indefinitely and indiscriminately—without reference to statute, regulations, or grant terms.

The States have introduced dozens of uncontested declarations illustrating the effects of the indiscriminate and unpredictable freezing of federal funds, which implicate nearly all aspects of the States' governmental operations and inhibit their ability to administer vital services to their residents.[8] These declarations reflect at least one particularized, concrete, and imminent harm that flows from the federal funding pause—a significant, indefinite loss of obligated federal funding. And such

---

[7] Even if the States' claims were targeted at these "thousands" of funding streams, their inability to feasibly take a program-by-program, grant-by-grant approach to raising their challenges is the consequence of the Defendants' broad, sweeping efforts to indefinitely stop nearly all faucets of federal funding from flowing to carry out the President's policy priorities, without regard to Congressional authorizations. One cannot set one's house on fire and then complain that the firefighters smashed all the windows and put a hole in the roof trying to put it out.

[8] *See* e.g., ECF Nos. 68-99 ¶ 11, 12; 68-18 ¶¶ 17-19; 68-102 ¶¶ 4-6 (effects on public safety and emergency management services); 68-31 ¶¶ 6, 7; 68-32 ¶ 13 (effects on health care services); 68-75 ¶¶ 6-8; 68-76 ¶ 5; 68-89 ¶ 5 (effects on State education services); 68-113 ¶¶ 45, 60-61; 68-95 ¶¶ 8-13; 66-123 ¶¶ 5, 29 (effects on environmental safety and energy development); 68-76 ¶¶ 7-19; 68-86 ¶¶ 9-10; 68-116 ¶¶ 15-16, 21 (effects on childcare services and child welfare).

a harm is fairly traceable to the Defendants' conduct via their acts to implement a widespread federal funding pause under the OMB Directive, the EOs incorporated therein, and the *Unleashing* Guidance. Granting this Motion in the States' favor will more than likely redress their injuries because it would inhibit the abrupt, indefinite pause of obligated federal funds on which the States rely to administer vital services to their residents. Accordingly, the States have the requisite standing to challenge the federal funding freeze.

Now that the Court has jumped over these initial hurdles, it moves to resolution of the States' preliminary injunction motion.

## B.    Likelihood of Success on the Merits

### 1.  Administrative Procedure Act Claims

The States assert that the Agency Defendants'[9] implementation of the federal funding freeze, without regard to relevant authorizing statutes and regulations, violates the Administrative Procedure Act ("APA") because such actions violate the law, are ultra vires, and arbitrary and capricious. ECF No. 67 at 52 (citing 5 U.S.C. § 706(2)(A)). To begin, the Court must address the Defendants' arguments that the States' APA claims do not fall within the Court's subject matter jurisdiction.

### a.  Final Agency Action

The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An agency action is "final" if: (1)

---

[9] "Agency Defendants" refers to the federal executive agencies *and* departments that are parties in this suit.

it marks the "'consummation' of the agency's decisionmaking process," and (2) the action determines rights or obligations or creates legal consequences. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (citing *Bennett v. Spear*, 520 U.S. 154, 177 (1997)).

The States identify: (1) the OMB Directive itself; and (2) the Agency Defendants' implementation of a categorical federal funding freeze, under the OMB Directive and Section 7(a) of the *Unleashing* EO, as final agency actions. ECF No. 67 at 53. The Defendants contend that the OMB Directive and other "guidance" about implementing the President's priorities are not final agency actions because the OMB Directive did not determine which funds or grants should be paused but required agencies to make such a determination under their respective authorities. ECF No. 113 at 28.

To suggest that the challenged federal funding freezes were purely the result of independent agency decisions rather than the OMB Directive or the *Unleashing* Guidance is disingenuous. Recall that the OMB Directive informed agencies that they "must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." ECF No. 68-9 at 2. The OMB Directive mandated that "[i]n the interim" of these comprehensive analyses, "Federal agencies **must temporarily pause** all activities related to obligation or disbursement of *all* Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders . . . ." *Id.* (second emphasis added). Elsewhere, the

OMB Directive emphasized that "[e]ach agency must pause . . . disbursement of Federal funds under all open awards." *Id.*

The record makes clear that following the OMB Directive's issuance—and even before it was set to take effect—many of the States found themselves unable to draw down appropriated and awarded funding because they were completely shut out from accessing federal funding payment portals such as the Payment Management Services ("PMS").[10]  As the States highlight, such a wholesale shutdown does not suggest that agencies made individualized assessments of their statutory authorities and relevant grant terms before making the determination to blanketly pause access to obligated funds.[11]  And how could these agencies make such assessments?  The OMB Directive explicitly stated that the "temporary funding pause will become effective on January 28, 2025, at 5:00 PM"—a mere day after the Directive was

---

[10] *See* e.g., ECF Nos. 68-100 ¶ 8 (Oregon unable to access Medicaid federal funding system for entire day on January 28); 68-93 ¶ 6 (New York State Comptroller Office unable to draw over $70 million in obligated federal funds); 68-118 ¶ 18 (Washington's DCYF unable to draw down funds on morning of January 28—faced with message from federal payment system stating, "Temporary Pause on Disbursement of Federal Financial Assistance"); 68-55 ¶¶ 27-28 (New York's DCFS unable to draw down funds from PMS on morning January 28—faced with message stating: "Due to [EOs] regarding potentially unallowable grant payments, PMS is taking additional measures to process payments. Reviews of applicable programs and payments will result in delays and/or rejections of payments.").

[11] While the Defendants claim that the Directive and the EOs required the agencies to pause funding and impose restriction on obligated funds consistent with the law, the undisputed evidence before the Court is that adding the "consistent with the law" caveat was nothing more than window dressing on an unconstitutional directive by the Executive.  This is clear because when the Court clarified its TRO, when faced with evidence that the Defendants continued to freeze obligated funding, the money flowed once again.

issued. *Id.* As another court faced with a similar challenge to the OMB Directive underscored "it is unclear whether twenty-four hours is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 368852, at *8 (D.D.C. Feb. 3, 2025). Overall, the OMB Directive amounted to a command, not a suggestion, that Agency Defendants shall execute a categorical, indefinite funding freeze to align funding decisions with the President's priorities. Such a command, along with the Agency Defendants swift actions to execute the categorical funding freeze, marked the "consummation of each agency's decisionmaking process to comply with the President's executive order, the OBM [Directive], or both." *Drs. for Am. v. Off. of Pers. Mgmt.*, No. CV 25-322 (JDB), 2025 WL 452707, at *5 (D.D.C. Feb. 11, 2025).

The same analysis applies to the Agency Defendants' acts implementing funding pauses under Section 7(a) of the *Unleashing* EO and the OMB's *Unleashing* Guidance. The *Unleashing* Guidance largely reiterates the *Unleashing* EO's instruction that agencies immediately pause disbursements of funds under the IRA or IIJA and does not even attempt to allow for agency discretion.[12] *See* ECF No. 68-13 at 2. And agencies, such as the Department of Energy (DOE) and the U.S. Department of Agriculture acted quickly to implement the pause of appropriated IIJA

---

[12] The most that the *Unleashing* Guidance advances is an attempt to limit the pause of IRA/IIRA to only to "funds supporting programs, projects, or activities that may be implicated by the policy established in section 2 of the [*Unleashing*] order." *See* ECF No. 68-13.

and IRA funds.  *See* ECF Nos. 68-123 ¶¶ 33, 36, 37; 68-92 ¶¶ 14-15.  Thus, the implementation of those IIJA and IRA funding pauses likely marked the consummation of each agency's decision to comply with the *Unleashing* EO, the *Unleashing* Guidance, or both, not to exercise its discretion.

As to the second finality factor, the evidentiary record sufficiently shows that the abrupt, categorical, and indefinite pause of obligated federal funds is the direct, appreciable legal consequence that States have suffered from the Agency Defendants' actions implementing the funding pauses commanded in the OMB Directive and the *Unleashing* EO.  Accordingly, the Agency Defendants' actions suffice as "final agency action" as to permit the Court's judicial review of such actions under the APA.

Returning to the merits, the Court must decide whether the States are likely to succeed on their claim that the Defendants' implementation of the federal funding freeze was contrary to law, ultra vires, and arbitrary and capricious.  Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Because this standard is "quite narrow: a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'"  *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (quoting *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)).  Therefore, a reviewing court must uphold an agency's decision if it is: (1) devoid of legal errors; and (2) "supported by any rational review of the record."  *Mahoney v. Del Toro*, 99 F.4th 25, 34 (1st Cir. 2024) (quoting *Atieh*, 797 F.3d at 138).  The Court will

first discuss whether the Defendants' actions were contrary to law and then turn to whether such acts were arbitrary and capricious.

### b. Contrary to Law and Ultra Vires Actions

The States assert that the Defendants acted contrary to law and exceeded their statutory authority when imposing the challenged federal funding freeze. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). Therefore, "an agency literally has no power to act ... unless and until Congress confers power upon it." *Id.* (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, (1986)). Any action an agency takes that is beyond the limits of its statutory authority is ultra vires and violates the APA. *Id.*

The statutory scheme governing federal appropriations are at the forefront of the States' ultra vires and "contrary to law" claims against the Agency Defendants. The States contend that the ICA[13] permits the Executive to defer or decline the expenditure of appropriated federal funds only under certain limited conditions that are not present here. *See* ECF No. 67 at 45, 54-55. They highlight that such an expenditure deferral cannot be made based on policy reasons but only on the

---

[13] The Defendants assert that because the ICA does not provide for a private right of action, the statute is "generally not enforceable through an APA suit." ECF No. 113 at 44 (citing *Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734-35 (S.D. Tex. 2024)). The Court declines to adopt such a narrow view of what it may consider when determining whether an agency has acted "not in accordance with law" under the APA. In the Court's view, "not in accordance with law," refers to "*any* law." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003).

permissible bases listed under the ICA. *See id.* at 54 (citing 2 U.S.C. § 684(b)); Mem.

of Gen. Accountability Off*., Office of Management and Budget—Withholding of

Ukraine Security Assistance*, B-331564, at 6 (Jan. 16, 2020), https://perma.cc/6TMT-

3CH2. The States also note that the ICA requires the Executive to send a "special

message" to Congress explaining proposed deferrals. *Id.* at 55 (2 U.S.C. § 684(a)).

Thus, the States argue that the federal funding freeze exceeded the Defendants'

authority and contravened the ICA because: (1) the freeze, or deferral, was

impermissibly based on "policy disagreement with Congressional priorities;" and (2)

the Executive failed to send the required "special message" to Congress detailing the

numerous proposed deferrals.

The ICA provides that "[w]henever the President, the Director of the [OMB],

[or] the head of any [U.S.] department or agency . . . proposes to defer any budget

authority provided for a specific purpose or project," the President must send a

"special message" to Congress detailing the proposed deferrals. 2 U.S.C. § 684(a). A

"deferral of budget authority" includes: (1) "withholding or delaying the obligation or

expenditure of budget authority . . . provided for projects or activities;" or (2) "any

other type of Executive action or inaction which effectively precludes the obligation

or expenditure of budget authority . . . .." *Id.* § 682(1)(A), (B). Further, the ICA

enumerates only three bases in which a deferral is permissible: (1) "to provide for

contingencies;" (2) "to achieve savings made possible by or through changes in

requirements or greater efficiency of operations;" or (3) "as specifically provided by

law." *Id.* § 684(b). "**No officer or employee of the United States may defer any budget authority for any other purpose.**" *Id.* (emphasis added).

Here, the OMB Directive and Section 7(a) of the *Unleashing* EO, constituted a budget authority deferral because it commanded—and prompted—an indefinite withholding or delay of obligated funds. 2 U.S.C. § 682(1)(A). Thus, under the law, the President was required to send a special message to Congress detailing the proposed deferrals, such as the amounts deferred, the proposed deferral period, and the programs involved. *See id.* § 684(a). There is no evidence that such a special message detailing the indefinite, widespan deferrals of obligated funding was ever communicated to Congress. Accordingly, the States have substantiated a likelihood of success in proving that the Executive's actions were contrary to law when bringing about a deferral of budget authority without sending a special message to Congress as the ICA requires.

The States also raise that "the Funding Freeze violates the specific statutes in which Congress mandated that funding be used in a specific manner according to specific terms." ECF No. 67 at 55. They assert that many federal funding streams are so-called "categorical" or "formula" grants that Congress directed the Executive to provide to the States based on "enumerated statutory factors, such as population or the expenditure of qualifying State funds." *Id.* (citing *City of Los Angeles v. Barr*, 941 F.3d 931, 934-35 (9th Cir. 2019)). Thus, the States contend that Congress's specific directives in the statutory and regulatory schemes that govern such "formula"

funding streams are inconsistent with the sweeping authority the Defendants have asserted in carrying out the federal funding freeze.  *Id.* at 48, 55-56.

The States have underscored clear examples in which Congress has appropriated funds to federal programs and has strictly prescribed how those funds must be expended.  For example, the IIJA appropriated over $14 billion in grants for the States' Clean Water revolving funds from 2022 to 2026.  IIJA, Pub. L. No. 117-58, § 50210, 135 Stat. 429, 1169 (2021).  Those funds are a creature of a separate statute—the Federal Clean Water Act—which instructs the Environmental Protection Agency ("EPA") that it "shall make capitalization grants to each State," via formula grants, to establish and support water pollution control revolving funds for certain enumerated objectives and policy goals.  33 U.S.C. §§ 1381(a), (b); 1383(c); 1384(a), (c)(2).

Additionally, the IRA established a program to subsidize heat pump systems purchases, instructing the DOE Secretary that they "*shall* reserve funds . . . for each State energy office" based on an allotment formula.  42 U.S.C. § 18795a(a)(2)(A)(i) (emphasis added).  Further, a climate pollution reduction grant under the IRA directed that the EPA "*shall* make a grant to at least one eligible entity in each State for the costs of developing a plan for the reduction of greenhouse gas air pollution . . .." 42 U.S.C. § 7437(b).  Congress has instructed other agencies to provide the States with federal funding using a mandatory fixed formula.  *See e.g.*, 23 U.S.C. § 104(a)(1), (b), (c) (instructing that the Transportation Secretary "*shall*" distribute federal highway funds based on mandatory apportionment formulas); 42 U.S.C. §§ 300x(a),

300x-7(a), 300x-21(a), 300x-33(a) (directing that the Health and Human Services Secretary "shall make" or "shall determine the amount of" grants to States for mental health and substance abuse treatment based on fixed statutory formulas).

These are a few examples of funding streams where Congress has mandated that the Executive spend appropriated funds according to a prescribed statutory formula, thus leaving agency Secretaries with no discretion to deviate from such formula. *See* ECF No. 67 at 6-11, 48-50; *see also* ECF No. 147 at 9-10. Yet the Agency Defendants halted the disbursement of these formula grants when freezing appropriated funds to ensure spending conformed with the President's policy priorities. *See e.g.*, ECF Nos. 68-35 ¶ 20 (California's Water Resources Control Board unable to draw down funds under existing Clear Water State Revolving Funds grant agreements on January 31); 68-123 ¶ 4, 9 (Colorado unable to draw down funds for the IRA climate pollution reduction grant); *see also* ECF No. 68-124 at 2 (DOE memorandum announcing that "[a]ll funding and financial assistance . . . shall not be announced, approved, finalized, modified, or provided until a review of such takes place to ensure compliance with . . . Administration policy.").

But "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). There is sufficient evidence that, in implementing the funding freeze, the Agency Defendants withheld funding that Congress did *not* tie to compliance with the President's policy priorities in the OMB Directive and the *Unleashing* EO.

Accordingly, the States have substantiated a likelihood of success on the merits that the Agency Defendants acted "not in accordance with the law"—in violation of the APA—when exceeding their statutory authority to carry out a categorical federal funding freeze.  5 U.S.C. § 706(2)(A).

### c.  Arbitrary and Capricious

Next, the States argue that the challenged federal funding freeze is arbitrary and capricious because it is not "reasonable or reasonably explained."  ECF No. 67 at 56 (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  The States assert that the Agency Defendants did not provide a satisfactory explanation for the funding freeze and explained only that the freeze was aimed at helping the President achieve his policy priorities.  ECF No. 67 at 56.  The States contend that achieving such priorities "cannot come in the form of an across-the-board directive that contravenes numerous statutory provisions without explanation of how that action comports with applicable statutory or regulatory commands or factors relevant under those authorities."  *Id.*  Further, the States allege that the Defendants disregarded the harmful consequences of the funding freeze, particularly the danger to "critical services [upon which] millions of Americans rely."  *Id.* at 56-57.  Lastly, the States argue that the freezing of all funds appropriated under the IRA and the IIJA was substantively unreasonable because it lacks support in law and contravenes statutory text.  *Id.* at 57.

The Defendants counter that the OMB Directive adequately explained the goals of the funding freeze, which was "to effectuate the President's Executive Orders

and 'safeguard valuable taxpayer resources.'" ECF No. 113 at 57 (citing OMB Directive at 1). Further, the Defendants assert that the OMB Directive rationally connected the temporary pause to those stated objectives when explaining that the pause was needed to give "the Administration time to review agency programs and determine the best [funding uses] consistent with the law and the President's priorities." *Id.* at 57-58 (citing OMB Directive at 2). They highlight that the OMB Directive explicitly orders agencies to act "consistent with the law" six times and thus agencies were not directed to contravene their statutory authorities. *Id.* at 58.

Moreover, the Defendants argue they did consider important aspects of the problem because the OMB Directive highlighted the problem—the "significant amount of money" spent each year on financial assistance—and merely directed agencies to assess the problem by reviewing which assistance may be impacted by the President's order. *Id.* Additionally, they assert that they considered the practical consequences that would flow and took steps to mitigate them because the OMB Directive: (1) exempted assistance provided directly to individuals from the pause; (2) noted that the OMB could grant exceptions on a case-by-case basis; (3) directed only a temporary pause; and (4) provided a delayed effective date. *Id.* at 58-59.

A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Melone v. Coit*, 100 F.4th 21,

29 (1st Cir. 2024) (*Craker v. DEA*, 714 F.3d 17, 26 (1st Cir. 2013)).  The Court finds that the Defendants have not provided a rational reason that the need to "safeguard valuable taxpayer resources" is justified by such a sweeping pause of nearly all federal financial assistance with such short notice.  Rather than taking a deliberate, thoughtful approach to finding these alleged unsubstantiated "wasteful or fraudulent expenditures," the Defendants abruptly froze billions of dollars of federal funding for an indefinite period.  It is difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences—when these funding pauses endanger the States' ability to provide vital services, including but not limited to public safety, health care, education, childcare, and transportation infrastructure. *See* ECF No. 67 at 24-34, 58-61.

Further, the mere twenty-four hours that the OMB gave agencies to discern which of thousands of funding freezes must or must not be paused flouts the Defendants' arguments that either the "delayed" effective date or the "consistent with the law" instruction mitigated the harm that the pause caused.  The OMB Directive essentially ordered agencies to effectuate the blanket pause and then decide later which funding streams they actually had lawful authority to withhold.  *See e.g.*, ECF No. 68-55 ¶¶ 27-28 (New York's Office of Children and Family Services unable to draw down funds from PMS on morning January 28—faced with message stating: "Due to [EOs] regarding potentially unallowable grant payments, PMS is taking added measures to process payments.  Reviews of applicable programs and payments will result in delays and/or rejections of payments.").  Again, the Defendants have not

proffered a rational reason for how their alleged goal of safeguarding taxpayer funds justified a de facto suspension of nearly all federal funding. Thus, the States have substantiated a likelihood of success of proving that the Agency Defendants' implementation of the funding freeze was arbitrary and capricious.

Further, the Agency Defendants' categorical freeze of funding appropriated under the IRA and IIJA is also likely substantively unreasonable in violation of the APA. Generally, substantive unreasonableness may arise when an agency "exercise[s] its discretion unreasonably." *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.). As discussed above, the IRA and IIJA appropriated funds to certain programs and funding streams that mandated expenditures based on fixed formulas—*not* the contravening policies of the President. Based on the record, the Agency Defendants implemented sweeping pauses of IRA/IIJA appropriated funds—under the OMB Directive and *Unleashing* EO—despite various fundings streams being governed by statutory commands that did not give discretion to withhold funds based on the policy initiatives the Executive sought to further. *See e.g.*, ECF Nos. 48-1 ¶¶ 4-5 , 68-124 at 2; 68-123 ¶¶ 6-10, 26; 68-123 ¶ 36; 68-92 ¶ 15. Thus, the States have substantiated a likelihood of success on illustrating that the Agency Defendants unreasonably exercised its discretion, in violation of the APA, when broadly freezing IRA/IIJA appropriated funds in contravention of the underlying statutory funding commands.

In sum, the Agency Defendants have failed to offer rational reasons for finding that the policy objectives stated in the OMB Directive and Section 2 of *Unleashing*

EO justified the indefinite pause on nearly all federal funding. The breadth and immediacy of the funding freeze and the catastrophic consequences that flowed reflects the Agency Defendants' failure to: (1) meaningfully consider the "important aspect[s] of the problem[s]"—namely the plain implications of withholding trillions of dollars of federal financial assistance; and (2) reflect if the freeze fell within the bounds of their statutory authority. Accordingly, the States have shown a likelihood of success on their APA claims (Counts I and II). The Court "need go no further."[14] It turns now to whether the States satisfy the other requirements for injunctive relief.[15]

## C.  Irreparable Harm

"District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C. Cir. 1987)). There are "relevant guideposts" to guide that discretion—"the plaintiff's showing must possess some substance" and "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19

---

[14] The Honorable Bruce M. Selya's body of over 1800 written opinions, *passim*.

[15] Under the constitutional avoidance doctrine, "federal courts are not to reach constitutional issues where alternative grounds for resolution are available." *Vaquería Tres Monjitas, Inc. v. Pagan*, 748 F.3d 21, 26 (1st Cir. 2014) (quoting *Am. Civil Liberties Union v. U.S. Conference of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013)). Thus, because the Court finds the challenged agency actions violate the APA, the Court will not decide the States' constitutional claims (Counts IV-VIII), although the Court has noted in its introduction to this decision that the constitutional balance of powers issues that arise from the Executive's actions in this case are serious.

(1st Cir. 1996) (citations omitted).  The Court found at the TRO stage that the States would suffer irreparable harm if the Defendants' blanket freeze of appropriated and obligated funds, which currently has no end date, were not enjoined.  After a full briefing and hearing on the merits where the Defendants presented no answer, no evidence, and no counter to the States' extensive evidence of still frozen funds and the harm resulting, the Court finds that the unrefuted evidence shows irreparable and continuing harm.

In their Complaint, preliminary injunction motion, and during the argument thereon, the States laid out scores of examples of obligated funding and the harm that withholding such funding has caused.  It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended.  And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again.

Defendants concede that there is no date written into the EOs or the OMB Directive or instructions when the freeze will end but argues that the funding recipients can be assured that it will end eventually, presumably when the agencies have reviewed all of the funding and made decisions about whether any or all or some align with how the President wants that money spent.  The States are not reassured by this vague promise, and neither is the Court.  This is particularly true where the

States had no notice of a potential freeze so they could plan, States appear to have little to no information about how any funding review is being conducted and by whom, and even though the frozen funds were obligated and owed, States had no chance to justify and protect the funding that they were granted by statute, regulation, or grant contract. *See, e.g.*, ECF Nos. 68-28 (receiving no response from EPA officials to inquiry about grants missing from ASAP); 68-33 (same). As the Court observed, these arbitrary and capricious actions violate the APA, with consequences that harm not only to our orderly system of government but also inflict direct pecuniary harm to the States and their residents.

The States have presented unrebutted evidence of the harm they are suffering and will continue to suffer due to this categorical funding freeze. The Court will not recount each instance but will summarize the "highlights" and note that while the States are the plaintiffs in this Court, it is their citizens, often our most vulnerable citizens, who are enduring much of the harm resulting from these arbitrary and capricious acts. The Court makes the following factual findings based on the record evidence.

Head Start and other childcare programs have been impacted. As of February 5, 2025, many Head Start providers were still having difficulties accessing federal funds and are considering layoffs, reductions in service, and even closures. *See* ECF Nos. 68-76; 68-41. Some States would have to pay more in provider subsidies if federally-funded Head Start childcare does not resume. ECF No. 68-111.

Other federally-funded childcare, child welfare services, and early childhood services are impacted.  *See* ECF Nos. 68-76; 68-36; 68-86; 68-116; 68-55; 68-68; 69-39; 68-43.

A freeze in federal funding for education "would catastrophically disrupt student instruction[,]" including for low-income students and children with disabilities.  ECF No. 68-89 ¶ 8; *see also* ECF Nos. 68-75; 68-43; 68-116.  A freeze impacts state universities who receive federal funding who may be forced to stop vital research projects.  "Even a temporary pause in funding could require the University to shutter or reduce programs, including mission-critical research activities, instruction, and public service activities and to furlough and/or lay off employees."  ECF Nos. 68-112 ¶ 7; 68-121 ¶ 7 ("Research projects that require daily activities and meticulous record-keeping may be ruined, setting back the research enterprise and wasting the federal investment.").

This funding freeze affects critical healthcare provided through federally-funded Medicaid programs, the Children's Health Insurance Program ("CHIP"), and other health care programs.  ECF Nos. 68-31, 68-32; 68-74; 68-105; 68-24.  Loss of Medicaid funding would "significantly impede the delivery of basic health care services to . . . low-income, elderly, and pregnant individuals, as well as individuals with disabilities."  ECF No. 68-32 ¶ 13.

The funding freeze also impacts law enforcement and public safety agencies who also rely on federal funding.  Federal grant programs support state and local law enforcement agencies, community violence, and crisis interruption programs, and programs addressing sexual violence, among many other crucial services.  ECF

Nos. 68-102, 68-18.  In an evident and acute harm, with floods and fires wreaking havoc across the country, federal funding for emergency management and preparedness would be impacted.  ECF Nos. 68-111; 68-39.  To be sure "[i]f a major disaster were to occur while federal emergency management funds . . . are frozen. . . [p]ending preparedness training and mitigation work may come to a stop and the incapacitation of federally-funded emergency management programs and services that would result from a federal funding freeze could very well lead to increased loss of life and injury …, slowed emergency response times, greater risks to first responders, greater property damage, and delays to community recovery and rebuilding."  ECF No. 68-99 ¶ 13.

The freeze affects job training, workforce development, and unemployment programs and the ripple effect of cutting off this funding is felt throughout the States.  ECF Nos. 68-94; 68-54; 68-70; 68-104; 68-39; 68-88; *see* ECF No. 68-29 ¶ 27 (harms to veterans seeking to acquire job skills and employment, and others seeking career and employment training services, reduced level of service in processing and approving unemployment insurance claims and paying out unemployment insurance benefits);  ECF No. 68-30 ¶ 13 (harms to workers seeking to participate in job apprenticeship programs).

The freeze also affects federal funds for critical transportation infrastructure, such as the $60 million in promised reimbursement for the costs of removal and salvage of debris from the Francis Scott Key Bridge for which Maryland is awaiting.  ECF No. 68-66 ¶¶ 5-7 .  Other States have likewise entered into contracts for projects

to be paid for with obligated funds.   ECF Nos. 68-77; 68-31; 68-66; 68-80; 68-39.
Without these funds, States may have to suspend, delay, or cancel projects.   ECF
No. 68-77.

IIJA and IRA funding programs are subject to the freeze and threaten the loss
of essential services to protect the health, safety, and welfare of the States' residents.
*See, e.g.*, ECF No. 68-28 (California Air Resource Board unable to access granted
federal funding aimed at monitoring air toxins); ECF No. 68-42 (frozen funds include
those awarded to South Coast Air Quality Management District for programs
reducing air pollution from freight corridors and warehousing hubs); ECF No. 68-113
(funding freeze threatens to pause important contamination remediation efforts;
contracted-for brownfield cleanup work being "held up" by funding freeze); ECF
No. 68-106 (frozen funds designated for monitoring of air pollution); ECF No. 68-92
(New York State Department of Environmental Conservation denied funding
reimbursement for plugging of orphaned oil and gas wells due to alleged inconsistency
with OMB's *Unleashing* Guidance).

Congress enacted these statutes and appropriated these funds for legitimate
reasons, and the Defendants' categorical freeze, untethered to any statute,
regulation, or grant term, frustrates those reasons, and causes significant and
irreparable harms to the States.  *See, e.g.*, ECF No. 68-118 (pause in funding streams
would have "massive impact," require resource shifts, and interfere with mission);
ECF No. 68-59 (without grant funding, "small public water systems … will continue
to rely on drinking water polluted by PFAs and/or other emerging contaminants,"

cleanup of oil and hazardous materials contamination in post-industrial communities would likely be abandoned, and state efforts to monitor and mitigate air pollution would be hampered); ECF No. 68-83 ("North Carolina will lose the benefits of over $117 million in conservation projects" if the freeze is not lifted, leaving its residents "more vulnerable to flooding and wildfires."); ECF No. 68-40 (state would have to regain trust of contractors and homeowners after reimbursement delays); ECF No. 68-122 (funding freeze causes uncertainty, harming Colorado's ability to provide services to Coloradans relying on federal funds for installation of energy-saving appliances; continued delay will cause homeowners to forfeit improvements to homes that would cut energy bills); ECF No. 68-95 (freezing of IIJA Grid Resilience Innovations Partnerships funding in New York will delay electric grid resilience improvements, "potentially increasing the risk of damage to the grid in a severe weather event and causing additional harm to small municipal electric utilities."); ECF No. 68-59 (pause in Long Island Sound Program Grant would impede remediation of nitrogen and other pollution); ECF No. 68-79 (frozen $25 million grant funds for replacing lead service lines to residential homes "put[s] the safety of Minnesotans' drinking water at risk"); ECF No. 68-31 (health care, emergency relief, highway safety, and billions of dollars in water infrastructure, transportation, and broadband infrastructure projects); ECF No. 68-30 (federal funding pause could render California government entities unable to deliver numerous services to increase workplace health and safety); ECF No. 68-35 (interruption in funding threatens California Water Board's ability to come into compliance with federal safe

drinking water standards, including ongoing work to remove lead from water service lines).

Even though some funding has begun to flow again after the TRO entered, the States have presented evidence of harm resulting from the chaos and uncertainty that the Defendants' arbitrary decision to categorically freeze billions of dollars in federal funding.  *See, e.g.*, ECF Nos. 68-40; 68-44 (Connecticut's Department of Energy and Environmental Protection "unable to recruit and hire future staff" to support Solar for All Program due to "budgetary uncertainty"); 68-107 (uncertainty has led Brown University's research community to suspend orders of large research equipment, which over time will negatively impact the ability of researchers to conduct their studies); 68-85 (uncertainty surrounding funding forcing New Jersey Board of Public Utilities to decide between delaying Solar for All Program or risking no reimbursement); 68-27 (uncertainty over grants has disrupted California agency's "ability to budget, plan… and carry out its mission"); *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) ("While funds have resumed flowing to some recipients, that does not erase the imminence or irreparability of what another pause would entail.").

Even with the Court's TRO in place, state agencies continue to experience interruptions to access and inconsistent ability to draw down funds from grants funded by IIJA and IRA appropriations.  Some funding has been restored in federal funding portals, but others appear to have been removed.  *See*, *e.g.*, ECF Nos. 68-28; 68-35; 68-33; 68-59.  And nothing in the Defendants' briefing or oral presentation

reassures the States that federal agencies, under the Executive's directives, will fulfill their funding obligations in the future. *See e.g.*, ECF Nos. 68-20 (Arizona has incurred obligations over $16 million in reliance on Home Electrification and Appliance Rebate award, of which over $15 million has yet to be reimbursed); 68-49 (University of Hawaii has been paying five employees out of pocket, without reimbursement to which they are entitled); 68-106 (elimination of $3 million Climate Pollution Reduction Grants ("CPRG") would make statutory compliance more costly); 68-61 (if not reimbursed through CPRG, Massachusetts may be forced to cancel vendor contract); 68-42 (California's South Coast Air Quality Management District and its subgrantees face risks that EPA would refuse to reimburse incurred work and costs). This litany of struggles experienced in the last seven weeks unquestionably constitute irreparable harm to the States.

### D.    Balance of the Equities and Public Interest

The Court need not say much more on the final two factors than it did when it granted the TRO as the more developed evidentiary record continues to overwhelmingly show that the balance of equities weighs heavily in favor of granting the States' preliminary injunction motion and the public interest is supported by "preserv[ing] the status quo." *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009).

The Defendants are not harmed where the order requires them to disburse funds that Congress has appropriated to the States and that they have obligated. The Court's order does not prevent the Defendants from making funding decisions in

situations under the Executive's "actual authority in the applicable statutory, regulatory, or grant terms," ECF No. 111 at 7; rather it enjoins agency action that violates statutory appropriations and obligations. An agency is not harmed by an order prohibiting it from violating the law.

On the other hand, without injunctive relief to pause the categorical freeze, the funding that the States are due and owed creates an indefinite limbo. Without the injunction, Congressional control of spending will have been usurped by the Executive without constitutional or statutory authority. While some of the funding has begun to flow, and some only after the Court issued an order to enforce the TRO, the States continue to face substantial uncertainty about whether Defendants will meet their contractual obligations under several statutorily appropriated programs, including those under the IIJA and IRA. ECF Nos. 68-93; 68-105; 68-34; 68-101; 68-100; 68-114; 68-39; 68-80; 68-28; 68-40; 68-35; 68-61; 68-95; 68-23; 68-49; 68-60; 68-51; 68-48; 68-106; 68-108; 68-52; 68-83; 68-72; 68-59; 68-42; 68-85; 68-56.

In light of the unrebutted evidence that the States and their citizens are currently facing and will continue to face a significant disruption in health, education, and other public services that are integral to their daily lives due to this overly broad pause in federal funding, the Court finds that the public interest lies in maintaining the status quo and enjoining any categorical funding freeze.

## IV. PRELIMINARY INJUNCTION

A preliminary injunction is appropriate, and the Court ORDERS as follows:

1.     The Agency Defendants[16] are enjoined from reissuing, adopting, implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 (the "OMB Directive") with respect to the disbursement and transmission of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations.

2.     The Agency Defendants are enjoined from pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations based on the OMB Directive, including funding freezes dictated, described, or implied by Executive Orders issued by the President before rescission of the OMB Directive or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress. This includes, but is by no means not limited to, Section 7(a) of Executive Order 14154, Unleashing American Energy.

3.     The Defendants must provide written notice of this Order to all federal departments and agencies to which the OMB Directive was addressed.  The written notice shall instruct those departments and agencies that they may not take any steps to implement, give effect to, or reinstate under a different name or through other means the directives in the OMB Directive with respect to the disbursement or

---

[16] "Agency Defendants" refers to the federal executive Agencies and Departments that are parties in this suit.

transmission of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations.

4.     The foregoing written notice shall also instruct those agencies to release and transmit any disbursements to the States on awarded grants, executed contracts, or other executed financial obligations that were paused on the grounds of the OMB Directive and Executive Orders included by reference therein or issued before the rescission of the OMB Directive.

5.     In light of the States' second motion to enforce the TRO, ECF No. 160, Defendant Federal Emergency Management Agency ("FEMA") shall file a status report on or before March 14, 2025, informing the Court of the status of their compliance with this order.

Additionally, based on its findings that the States: (1) are entitled to a preliminary injunction; and (2) will be irreparably harmed without this Order, the Court DENIES the Defendants' request to stay this Order pending appeal to the First Circuit.  *See* ECF No. 113 at 65-66.  Further, the Court DENIES as moot the Plaintiffs' motion to enforce the TRO because this Order's issuance renders the TRO expired.  ECF No. 160.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court for the District of Rhode Island

March 6, 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAII; OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN, <br><br> Plaintiffs, <br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; PATRICIA COLLINS, in her official capacity as Treasurer of the United States; U.S. | C.A. No. 25-cv-39-JJM-PAS |

DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F.
KENNEDY, JR., in his official
capacity as Secretary of Health and
Human Services; U.S.
DEPARTMENT OF EDUCATION;
LINDA MCMAHON, in her official
capacity as Secretary of Education;
U.S. DEPARTMENT OF
TRANSPORTATION; SEAN DUFFY,
in his official capacity as Secretary of
Transportation; U.S. DEPARTMENT
OF LABOR; LORI CHAVEZ-
DEREMER, in her official capacity as
Secretary of Labor; U.S.
DEPARTMENT OF ENERGY;
CHRIS WRIGHT, in his official
capacity as Secretary of Energy; U.S.
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his
official capacity as Administrator of
the U.S. Environmental Protection
Agency; U.S. DEPARTMENT OF
THE INTERIOR; DOUG BURGUM,
in his official capacity as Secretary of
the Interior; U.S. DEPARTMENT OF
HOMELAND SECURITY; KRISTI
NOEM, in her capacity as Secretary
of Homeland Security; U.S.
DEPARTMENT OF JUSTICE;
PAMELA BONDI, in her official
capacity as Attorney General of the
U.S. Department of Justice; THE
NATIONAL SCIENCE
FOUNDATION; DR. SETHURAMAN
PANCHANATHAN, in his capacity
as Director of the National Science
Foundation; U.S. DEPARTMENT OF
AGRICULTURE; BROOKE
ROLLINS, in her official capacity as
Secretary of Agriculture; U.S.
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT; SCOTT
TURNER, in his official capacity as

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Secretary of Housing and Urban
Development; U.S. DEPARTMENT
OF STATE; MARCO RUBIO, in his
official capacity as Secretary of State;
U.S. AGENCY FOR
INTERNATIONAL
DEVELOPMENT; MARCO RUBIO,
in his official capacity as Acting
Administrator of the United States
Agency for International
Development; U.S. DEPARTMENT
OF DEFENSE; PETER HEGSETH,
in his official capacity as Secretary of
Defense; U.S. DEPARTMENT OF
VETERANS AFFAIRS; DOUG
COLLINS, in his official capacity as
Secretary of Veterans Affairs; U.S.
DEPARTMENT OF COMMERCE;
HOWARD LUTNICK, in his official
capacity as Secretary of Commerce;
NATIONAL AERONAUTICS AND
SPACE ADMINISTRATION; JANET
PETRO in her official capacity as
Acting Administrator of National
Aeronautics and Space
Administration; CORPORATION
FOR NATIONAL AND
COMMUNITY SERVICE;
JENNIFER BASTRESS
TAHMASEBI, in her official capacity
as Interim Head of the Corporation
for National and Community Service;
U.S. SOCIAL SECURITY
ADMINISTRATION; LELAND
DUDEK, in his official capacity as
Acting Commissioner of United
States Social Security
Administration; U.S. SMALL
BUSINESS ADMINISTRATION; and
KELLY LOEFFLER, in her official
capacity as Administrator of U.S.
Small Business Administration,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Before the Court is the Plaintiff States' Motion for Enforcement of Preliminary Injunction. ECF No. 168. The States allege that Defendant Federal Emergency Management Agency ("FEMA") is implementing a categorical freeze on obligated funds that violates the Court's preliminary injunction order. The Defendants oppose the motion, contending that FEMA is merely implementing a manual review process of which the Court's preliminary injunction does not restrain. ECF No. 172. For the reasons stated below, the Court GRANTS the States' Motion for Enforcement.

## I.    BACKGROUND

On January 31, 2025, the Court entered a temporary restraining order ("TRO") that enjoined the Defendants from "paus[ing], freez[ing], imped[ing], block[ing], cancel[ling], or terminat[ing] Defendants' compliance with awards and obligations to provide federal financial assistance to the States," and instructed that the Defendants "shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." ECF No. 50, at 11. The TRO also stated that if the Defendants "engage in the 'indentif[ication] and review' of federal financial assistance programs" such an exercise "shall not affect a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." *Id.* at 12.

Within the weeks after the Court issued the TRO, the States continued to experience freezes of numerous grants and awards that went unresolved even after conferring with the Defendants' counsel. Thus, the States moved to enforce the TRO, ECF No. 66, which the Court granted—ordering the Defendants to: (1) "immediately restore frozen funding" and "immediately end any funding pause" during the pendency of the TRO, and (2) "immediately take every step necessary to effectuate the TRO."[1] ECF No. 96 at 4. Eventually, the States filed a Second Motion to Enforce, alleging that the States were facing obstacles to accessing millions of dollars of awarded and obligated FEMA funds and requesting the Court to order FEMA to show compliance with the Court's previous orders. ECF No. 160.

On March 6, the Court issued a preliminary injunction order that enjoined the Defendants—including FEMA—from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations based on the OMB Directive, . . . or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress." ECF No. 161 at 44.[2] Because the Court's issuance of the

---

[1] The Court later issued an order reaffirming that the TRO does not restrain the Defendants from limiting access to federal funds "on the basis of the applicable authorizing statutes, regulations, and term." ECF No. 107 at 3.

[2] The Defendants have since appealed the Court's preliminary injunction order. ECF No. 162. Though, the 1st Circuit denied the Defendants' motion for stay pending appeal of the Court's preliminary injunction. ECF No. 171.

preliminary injunction order rendered the TRO expired, the Court denied the States'
Second Motion to Enforce the TRO as moot. *Id.* at 45. Still, the Court ordered FEMA
to file a status report telling the Court of the status of their compliance with the
preliminary injunction order by March 14, 2025. *Id.* FEMA timely filed the ordered
status report, ECF No. 166, and the States swiftly responded, ECF No. 167—alleging
that FEMA was not in compliance with the Court's preliminary injunction order.
Now, the States move to enforce the Court's preliminary injunction order based on
these allegations of FEMA's noncompliance.

## II.    STANDARD OF REVIEW

"To prove civil contempt,[3] a movant must show with clear and convincing
evidence that (1) the alleged contemnor had notice of a court order, (2) the order was
clear and unambiguous, (3) the alleged contemnor had the ability to comply with the
order, and (4) the alleged contemnor violated the order." *Letourneau v. Aul*, No. CV
14-421JJM, 2024 WL 1364340, at *2 (D.R.I. Apr. 1, 2024) (citing *Hawkins v. Dep't of
Health & Hum. Servs.*, 665 F.3d 25, 31 (1st Cir. 2012)).

## III.   DISCUSSION

The States assert that they have not received "substantial disbursement of
funds on important grants since early February." ECF No. 174 at 5. They highlight
that these funding disruptions coincide with an email that Stacey Street, Director of
the Office of Grants Administration at FEMA, sent to all staff on February 10, 2025,

---

[3] While the States do no seek contempt at this time, the Court uses the same
factors to determine whether it should order enforcement of its preliminary
injunction.

which instructed the placement of "hold toggles" and "financial holds" on "all [FEMA] awards."  ECF No. 166-4.  Director Street clarified in a follow up email that these holds were not the holds directed in the OMB M-25-13 ("OMB Directive") that the Court enjoined in the TRO.  ECF No. 166-5 at 2.  Rather, Director Street indicated that "we are still processing out awards but will be adding a level of internal controls." *Id.*

But the States have presented undisputed evidence that this "processing" of awards has yet to come. *See e.g.*, ECF No. 168-1 at ¶¶ 11-12 (Hawaii's February 21 second obligation request for almost $6 million and February 25 drawdown reimbursement request for almost $500,000 still pending with FEMA); ECF No. 168-2 ¶ 20 (Oregon's Department of Emergency Management has not received federal FEMA funds since February 20, thus waiting on approximately $129.4 million in federal funds); ECF No. 168-3 ¶ 6 (None of the Colorado Department of Public Safety's Division of Homeland Security and Emergency Management's requests— between February 18 to March 25—for over $33 million in reimbursement costs from FEMA under fourteen grant program have been approved);  ECF No. 168-4 ¶ 7 (Rhode Island's FEMA grants, which support nearly a dozen grant programs, have been unavailable for more than thirty days); ECF No. 160-1 ¶¶ 4-20 (listing several FEMA grants to state agencies in Arizona, California, Colorado, Hawaii, Illinois, Maine, Maryland, Michigan, New Jersey, New York, Vermont, Washington, and Wisconsin that are frozen and unavailable for drawdown).  Overall, the States contend that "as of March 12, 2025, at least 215 FEMA grants to at least nineteen

plaintiff states remain frozen or otherwise inaccessible." ECF No. 168 at 4. Thus, the States allege that FEMA's implementation of a manual review process for payment requests violates the Court's preliminary injunction order because it constitutes "a categorical pause or freeze of funding appropriate by Congress." ECF No. 174 at 1.

But the Defendants counter that FEMA's manual review process is not a "pause or withholding of grant funds" but "simply an internal control where FEMA staff manually review all grant payment requests before disbursing payments to recipients." ECF No. 172 at 7. Cameron Hamilton, Acting FEMA Administrator, attests that he started this manual review process in response to the Department of Homeland Security ("DHS") Secretary Kristi Noem's January 28, 2025 memorandum titled "Direction on Grants to Non-governmental Organizations" ("NGO Grants Directive") ECF No. 172-1 ¶ 6; *see also* ECF No. 166-2. In the memorandum, Secretary Noem ordered a "hold pending review" on "all Department grant disbursements . . . that (a) go to non-profit organizations or for which non-profit organizations are eligible and (b) touch in any way on immigration." ECF No. 166-2. Thus, on February 14, Mr. Hamilton formalized the ordered review process, issuing the Grant Processing Guidance that ordered FEMA to review certain "obligations, disbursements, and payments" to ensure compliance with Secretary Noem's directive. *See* ECF No. 166-7 at 1.

The Defendants assert that this "review" of grant payments is not the type contemplated by the OMB Directive that instructed agencies to "review agency

programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities." ECF No. 172 at 8. Instead, the Defendants assert that the purpose of this review is to "ensure reimbursement payment requests are allowable, allocable, and reasonable per each award's terms and conditions . . . and are free from fraud, waste, or abuse." *Id.*

Further, the Defendants assert that this manual review process is not violative of the Court's injunction because FEMA is relying on its own independent authorities to implement the process rather than the OMB Directive. ECF No. 172 at 10. They contend that under 2 C.F.R. § 200.300(a), FEMA has an obligation to "manage and administer [each] Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations . . . and the requirements of this part." *Id.* at 11. The Defendants also highlight that relevant grant regulations dictate that for costs to be allowable under an award, such costs must be "necessary and reasonable for the performance of the Federal award and be allocable thereto" and be "adequately documented." *Id.* at 10-11 (citing 2 C.F.R. § 200.403(a), (g); 2 C.F.R. §§ 200.404-405). Thus, the Defendants contend that these regulations illustrate that "FEMA has independent regulatory authority to review payment requests to ensure they are appropriate and lawful before approving funds for disbursement." *Id* at 11.

But 2 C.F.R. § 200.300(a)'s text is general and nothing within the regulation authorizes FEMA's imposition of the challenged manual review process—which

essentially imposes an indefinite categorical pause on payments. Nor does 2 C.F.R. § 200.403 provide FEMA with independent regulatory authority to conduct such a review as that regulation merely sets forth the criteria that costs must meet to be allowable under Federal awards. As the States point out, 2 C.F.R Part 200 already prescribes the means that federal agencies may use to manage recipients' performance and ensure appropriate controls over federal awards—such as Subpart D[4] (Post Federal Award Requirements) and Subpart F (Audit Requirements). But neither § 200.300(a) nor § 200.403: (1) add to these existing regulatory mechanisms for managing recipients' compliance the Constitution, federal statutes, and applicable grant terms, or (2) imbue FEMA with the authority to implement an indefinite categorical manual review process with no clear end.[5]

In any event, the States have presented evidence that strongly suggests that FEMA is implementing this manual review process based, covertly, on the President's January 20, 2025 executive order—"Protecting the American People Against Invasions" ("*Invasion* EO"). Section 17 of the *Invasion* EO provides that the DHS

---

4 Notably, 2 C.F.R. § 200.339, which falls under Subpart D, provides federal agencies like FEMA with remedies for recipients' noncompliance "with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award."

5 To be clear, the preliminary injunction order does not enjoin the Defendants from making funding decisions based on their actual authority under the applicable statutory, regulatory or grant terms. That said, the regulations the Defendants cite to support FEMA's implementation of this manual review process does not provide FEMA with the "independent regulatory authority" to implement such a "review process" that amounts to an indefinite pause on payments—especially considering the explicit regulatory mechanisms that provides the means for federal agencies to manage federal award recipients' compliance with the Constitution, federal statutes, and grant terms and conditions. *See e.g.*, 2 C.F.R. § 200.339.

Secretary "shall . . . evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order 14159, 90 Fed. Reg. 8443, 8446 (Jan. 29, 2025). Then, section 19 directs that the DHS Secretary shall "(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens . . . [and] (b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a)." *Id.* at 8447.

Secretary Noem's NGO Grants Directive take steps to effectuate section 19 of the *Invasion* EO, as she directs a "hold" on "all Department grant disbursements . . . that (a) go to non-profit organizations or for which non-profit organizations are eligible and (b) touch in any way on immigration." ECF No. 166-2. Further, the NGO Grants Directive was issued barely a week after the *Invasion* EO and a day after the OMB Directive, which called for a pause on disbursements of all federal financial assistance that may be implicated by the Executive Orders—including the *Invasion* EO. *See* OMB M-25-13 at 1-2. The temporal proximity between the issuance of the *Invasion* EO, the OMB Directive, and the NGO Grants Directive further illustrates that Secretary Noem's mandate to pause DHS funding related to immigration was an effort to carry out the funding pause directed in the *Invasion* EO. Thus, Mr. Hamilton's assertion that the manual review process was implemented in response

to Secretary Noem's January 28 memorandum truly means that the manual review process was implemented to comply with the funding directives in the *Invasion* EO.

But the connection between FEMA's manual review process and the *Invasion* EO does not end with the NGO Grants Directive. On February 19, Secretary Noem issued a memorandum titled "Restricting Grant Funding for Sanctuary Jurisdictions." ECF No. 174 at 42-43. This memorandum ordered that:

> All components are to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions. To the extent consistent with relevant legal authorities and the applicable terms and conditions of each award, each component must cease providing federal funding to sanctuary jurisdictions."[6]

---

[6] The memorandum defines sanctuary jurisdictions as:
- Jurisdictions that fail to comply with the information sharing requirements of 8 U.S.C. §§ 1373 and 1644.
- Jurisdictions that violate other relevant laws, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(l)(A)(iv), prohibitions on transporting or moving illegal aliens, *id.* § 1324(a)(l)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, *id.* § 1324(a)(l)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.
- Jurisdictions that fail to honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer. A jurisdiction, however, is not a sanctuary jurisdiction merely because it lacks the necessary resources to assist in a particular instance.
- Any jurisdiction that fails to provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien.
- Any jurisdiction that leaks the existence of an enforcement operation.

ECF No. 174 at 42-43.

*Id.* at 43.  On March 20, Mr. Hamilton sent a memorandum to Secretary Noem that outlined FEMA's proposed plans to ensure compliance with the NGO Grants Directive and the Secretary's February 19 memorandum.  *See id.* at 18-41. Specifically, Mr. Hamilton proposed a "review process" for grant programs that FEMA administers to ensure alignment "with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions." *Id.* at 18.  Secretary Noem approved the proposals on March 25.  *See id.* at 20-21.

Secretary Noem's directive that "each component must cease providing federal funding to sanctuary jurisdictions" effectuates the *Invasion* EO mandate that the DHS Secretary ""shall . . . evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." *Compare* ECF No. 174 at 43 *with* 90 Fed. Reg. at 8447.  Thus, Mr. Hamilton's March 20 memorandum reveals that FEMA's adoption of a manual review process—which purports to ensure compliance with Secretary Noem's February 19 memorandum—is essentially an adoption of a funding review scheme that strives to effectuate the funding mandates in section 17 of the *Invasion* EO, which the Court enjoined in its preliminary injunction.

The Court reaffirms its preliminary injunction order that the Defendants are enjoined from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States . . . based on the OMB Directive, **including funding freezes dictated, described, or implied**

by Executive Orders issued by the President before rescission of the OMB Directive or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress." ECF No. 161 at 44 (emphasis added). FEMA received notice of the preliminary injunction order, the order is clear and ambiguous, and there are no impediments to FEMA's compliance with the order. The record makes clear that FEMA's manual review process imposes an indefinite pause on the disbursement of federal funds to the States, based on funding freezes dictated by: (1) the *Invasion* EO—an "Executive Order issued by the President before rescission of the OMB Directive"—and (2) Secretary Noem's NGO Grant Directive and February 19 memorandum—i.e., memoranda that are "materially similar" to the *Invasion* EO "under which the federal government imposes . . . a categorical pause or freeze of funding appropriated by Congress." Thus, FEMA's manual review process violates the Court's preliminary injunction order. So in accordance with the preliminary injunction order, FEMA is hereby ORDERED as follows:

1. Throughout the duration of the preliminary injunction order, FEMA must immediately cease the challenged manual review process implemented pursuant to Secretary Noem's "Direction on Grants to Non-governmental Organizations" and "Restricting Grant Funding for Sanctuary Jurisdictions" memoranda—including the manual review process as described in Cameron Hamilton's March 20, 2025 Memorandum to DHS Secretary Noem.

2. FEMA must immediately comply with the plain text of the preliminary injunction order not to pause or otherwise impede the disbursement of appropriated federal funds to the States based on funding freezes dictated, described, or implied by Executive Orders issued by the President before the rescission of the OMB Directive, which includes sections 17 and 19 of the *Invasion* Executive Order.

3.  FEMA must direct notice of this Order and notice of the Court's preliminary
    injunction order to FEMA's leadership and all FEMA staff who administer
    these FEMA grants and other federal financial assistance.    FEMA shall
    provide confirmation of these notices, including the names of recipients of
    the notice, no later than 48 hours after this Order.


IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court
    for the District of Rhode Island

April 4, 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAII; OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 1:25-cv-39-JJM-PAS |
| v. | ) ) | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; PATRICIA COLLINS, in her official capacity as Treasurer of the United States; U.S. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

A61

DEPARTMENT OF HEALTH AND )
HUMAN SERVICES; ROBERT F. )
KENNEDY, JR., in his official )
capacity as Secretary of Health and )
Human Services; U.S. )
DEPARTMENT OF EDUCATION; )
LINDA MCMAHON, in her official )
capacity as Secretary of Education; )
U.S. DEPARTMENT OF )
TRANSPORTATION; SEAN DUFFY, )
in his official capacity as Secretary of )
Transportation; U.S. DEPARTMENT )
OF LABOR; LORI CHAVEZ- )
DEREMER, in her official capacity as )
Secretary of Labor; U.S. )
DEPARTMENT OF ENERGY; CHRIS )
WRIGHT, in his official capacity as )
Secretary of Energy; U.S. )
ENVIRONMENTAL PROTECTION )
AGENCY; LEE ZELDIN, in his )
official capacity as Administrator of )
the U.S. Environmental Protection )
Agency; U.S. DEPARTMENT OF THE )
INTERIOR; DOUG BURGUM, in his )
official capacity as Secretary of the )
Interior; U.S. DEPARTMENT OF )
HOMELAND SECURITY; KRISTI )
NOEM, in her capacity as Secretary of )
Homeland Security; U.S. )
DEPARTMENT OF JUSTICE; )
PAMELA BONDI, in her official )
capacity as Attorney General of the )
U.S. Department of Justice; THE )
NATIONAL SCIENCE )
FOUNDATION; DR. SETHURAMAN )
PANCHANATHAN, in his capacity as )
Director of the National Science )
Foundation; U.S. DEPARTMENT OF )
AGRICULTURE; BROOKE )
ROLLINS, in her official capacity as )
Secretary of Agriculture; U.S. )
DEPARTMENT OF HOUSING AND )
URBAN DEVELOPMENT; SCOTT )
TURNER, in his official capacity as )

Secretary of Housing and Urban )
Development; U.S. DEPARTMENT )
OF STATE; MARCO RUBIO, in his )
official capacity as Secretary of State; )
U.S. AGENCY FOR )
INTERNATIONAL DEVELOPMENT; )
MARCO RUBIO, in his official )
capacity as Acting Administrator of )
the United States Agency for )
International Development; U.S. )
DEPARTMENT OF DEFENSE; )
PETER HEGSETH, in his official )
capacity as Secretary of Defense; U.S. )
DEPARTMENT OF VETERANS )
AFFAIRS; DOUG COLLINS, in his )
official capacity as Secretary of )
Veterans Affairs; U.S. )
DEPARTMENT OF COMMERCE; )
HOWARD LUTNICK, in his official )
capacity as Secretary of Commerce; )
NATIONAL AERONAUTICS AND )
SPACE ADMINISTRATION; JANET )
PETRO in her official capacity as )
Acting Administrator of National )
Aeronautics and Space )
Administration; CORPORATION )
FOR NATIONAL AND COMMUNITY )
SERVICE; JENNIFER BASTRESS )
TAHMASEBI, in her official capacity )
as Interim Head of the Corporation )
for National and Community Service; )
U.S. SOCIAL SECURITY )
ADMINISTRATION; LELAND )
DUDEK, in his official capacity as )
Acting Commissioner of United States )
Social Security Administration; U.S. )
SMALL BUSINESS )
ADMINISTRATION; and KELLY )
LOEFFLER, in her official capacity as )
Administrator of U.S. Small Business )
Administration, )
)
Defendants. )

ORDER

The Court recently granted the Plaintiff States' Motion for Enforcement of the Court's March 6 Preliminary Injunction after finding that Defendant Federal Emergency Management Agency ("FEMA") was implementing a manual review process that violated the injunction. *See* ECF No. 175. The Defendants now bring this Motion for Reconsideration of the Court's Enforcement Order based on the Supreme Court's recent ruling on an emergency stay application in *Department of Education v. California*, No. 24A910, 2025 WL 1008354 (Apr. 4, 2025) (per curiam). The Defendants assert the ruling in *California* suggests that "this Court lacks jurisdiction to consider the Plaintiffs' enforcement motion relating to non-payment of various FEMA grants." ECF No. 176 at 3. Thus, the Defendants ask that the Court withdraw its Enforcement Order or stay the Order pending resolution of their appeal of the underlying Preliminary Injunction.[1] *Id.* at 1.

The States assert that the Defendants' request to reconsider is "flawed on multiple levels" because: (1) the Defendants never argued this position when opposing the Preliminary Injunction and thus, cannot "collateral[ly] attack" the Preliminary Injunction at this stage because they have appealed it; and (2) this Court's Enforcement Order is not an action to enforce a contract between the States and the Defendants, but rather it is an enforcement of the Court's Preliminary Injunction prohibiting a categorical freeze on obligated funds. *See* ECF No. 179 at 1-5.

---

[1] The First Circuit denied a stay of the Court's Preliminary Injunction. ECF No. 171.

After careful consideration, the Court DENIES the Defendants' Motion for Reconsideration and request for a stay of the Court's Enforcement Order.

## I.    DISCUSSION

In *Department of Education v. California*, the Supreme Court stayed, pending appeal, a district court's temporary restraining order that enjoined the Government from terminating education-related grants.    2025 WL 1008354, at *2.    When analyzing the relevant factors for granting a stay pending appeal, the Supreme Court held that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at *1.  What is at issue here is the Supreme Court's assessment on jurisdiction.  The Supreme Court highlighted that the APA's sovereign immunity waiver does not apply to claims seeking "money damages." *Id.* (citing 5 U.S.C. § 702).  The Supreme Court reaffirmed its precedent indicating that "a district court's jurisdiction 'is not barred by the possibility' that setting aside agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)).  But the Supreme Court explained that the APA's immunity waiver "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered . . . ." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).  Rather, the Supreme Court noted that the "Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

On a surface level, the facts in the *California* case may appear to be generally analogous to the facts here, as both cases involve states challenging federal agencies' decision-making regarding appropriated federal funds, but the similarities end there. When the Court delves deeper, however, it finds several significant and relevant differences that underscore *California's* inapplicability to this case. In *California*, the First Circuit Court of Appeals determined that "the terms and conditions of each individual grant award" were "at issue." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025). On appeal, the Supreme Court then granted the Department's application for a stay because it concluded that the district court issued an order "to enforce a contractual obligation to pay money" and "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *California*, 2025 WL 1008354, at *1. That is not the case here.

In this case, the terms and conditions of each individual grant that the States receive from the Agency Defendants *are not at issue*. Rather, this case deals with the Agency Defendants' implementation of a broad, categorical freeze on obligated funds *pending* determinations on whether it is lawful to end disbursements of such funds. The categorical funding freeze was not based on individualized assessments of any particular grant terms and conditions or agreements between the Agency Defendants and the States; it was based on the OMB Directive and the various Executive Orders that the President issued in the early days of the administration. Therefore, the

Court's orders addressing the categorical funding freeze were *not* enforcing a contractual obligation to pay money.[2]

This is particularly true with the Court's Enforcement Order, which is the target of the Defendants' Motion to Reconsider. Specifically, the Court did not, and was not required to, review and analyze the contractual obligations or any provision of the agreements between FEMA and the States. This matter is a claim about process, not damages. Thus, the action the Court enjoined was the implementation of that categorical freeze—*not* action that breached any specific contract-like agreements.

In any event, the Supreme Court's ruling in *California* was made in the context of an emergency application for a stay pending appeal. In that procedural posture, the Supreme Court relied on "barebones briefing, no argument, and scarce time for reflection" when applying a likelihood of success standard to the Government's application—engaging in a limited analysis of *Bowen* and *Great-West* and a perfunctory discussion of jurisdictional issues, which does not appear to fully resolve the jurisdiction issues here. *Id.* at *2 (Kagan, J., dissenting). Rather, *Bowen* is the guiding compass here, as the case instructs the Court to carefully scrutinize the

---

[2] *California's* suggestion that the Court of Claims has jurisdiction over similar claims does not apply here for another critical reason. The Court of Claims, an Article I court, would not have the powers to adjudicate the States' claims because it generally does not have equitable jurisdiction—therefore the States could not seek equitable relief from the categorical funding freeze in the Court of Claims. *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011) (citations omitted) (the United States Court of Federal Claims "has no general power to provide equitable relief against the Government or its officers.").

States' claims and requests for relief to decide whether: (1) the Court has jurisdiction under the APA, or (2) the Court of Claims has jurisdiction under the Tucker Act.

Recall that the APA's sovereign immunity waiver does not apply to claims for "money damages." 5 U.S.C. § 702. What *Bowen* affirms is that, even if a court's enforcement order can be "construed in part as orders for the payment of money by the Federal Government to the State, such payments are not 'money damages'" precluded under the APA. *Bowen*, 487 U.S. at 910. The Court's Enforcement Order—and underlying Preliminary Injunction—do not grant "money damages" because money damages are a remedy at law that "provide[s] relief that substitutes for that which ought to have been done." *Id.* The Court's orders do not provide monetary relief that is a *substitute* for the harm the States experience from the categorical funding freeze. Instead, the Court's orders provide *specific relief*, as they "undo the [Agency Defendants' acts effecting a categorical freeze of federal funds obligated to] the State[s]." *Id.* That the Court's orders could give rise to the disbursement of funds to the States does not bar its jurisdiction under the APA—particularly when, as here, such disbursements are a "mere by-product" of the Court's "primary function" of reviewing the Agency Defendants' "interpretation of federal law" and regulation. *Id.* Accordingly, *Bowen* makes clear that the Court has jurisdiction, under the APA, to set aside FEMA's actions pursuant to its Preliminary Injunction.

Additionally, the Supreme Court's limited ruling in *California* does not require this Court to reconsider its prior rulings for other reasons. Unlike in *California*, there is no indication in this case that the States could not or would not pay the money back

if so ordered.    This Court cited extensive irreparable harm if the Preliminary
Injunction and Enforcement Order were not issued, unlike in *California*, where the
Supreme Court found that the "Government compellingly argues that [the plaintiff
states] would not suffer irreparable harm."    *California*, 2025 WL 1008354, at \*1.
Thus, the significant distinctions render the Supreme Court's holding in *California*
inapplicable to the facts here.

Thus, the Court DENIES the Defendants' Motion for Reconsideration of the
Court's Enforcement Order.    ECF No. 176.    Additionally, the Court DENIES the
Defendants' alternative request for a stay pending appeal of the Court's Enforcement
Order because that order is not appealable.    As concluded above, the Court merely
enforced its March 6, 2025 Preliminary Injunction when instructing FEMA to cease
actions that violated its plain terms.    The Court did not modify the injunction to make
the Enforcement Order appealable under 28 U.S.C. § 1292(a)(1).    Finally, the Court
dissolves the administrative stay it imposed while it considered this Motion to
Reconsider (Text Order, Apr. 7, 2025) and reinstates the Enforcement Order.    ECF
No. 175.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

April 14, 2025