Nos. 25-1236, 25-1413

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; OFFICE OF THE GOVERNOR OF KENTUCKY, ex rel. ANDREW BESHEAR, in their official capacity as Governor of the Commonwealth of Kentucky,

Plaintiffs-Appellees,

(*caption continued on next page*)

———————————————

On Appeal from the United States District Court
for the District of Rhode Island (No. 1:25-cv-00039)
The Honorable John J. McConnell, Jr.

## BRIEF OF PLAINTIFFS-APPELLEES

<table>
<tr><td>

LETITIA JAMES
Attorney General
State of New York

BARBARA D. UNDERWOOD
Solicitor General
JUDITH N. VALE
Deputy Solicitor General
MARK S. GRUBE
Senior Assistant Solicitor General
28 Liberty Street
New York, NY 10005

</td><td>

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General
ALEX HEMMER
Deputy Solicitor General
R. SAM HORAN
Assistant Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov

</td></tr>
</table>

(*additional counsel on signature page*)

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in their official capacity as Secretary of the Treasury; PATRICIA COLLINS, in their official capacity as Treasurer of the U.S.; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in their official capacity as Secretary of Education; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, in their official capacity as Acting Administrator of the U.S. Federal Emergency Management Agency; U.S. DEPARTMENT OF TRANSPORTATION; SEAN P. DUFFY, in their official capacity as Secretary of Transportation; U.S. DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, in their official capacity as Secretary of Labor; U.S. DEPARTMENT OF ENERGY; CHRISTOPHER ALLEN WRIGHT, in their official capacity as Secretary of the U.S. Department of Energy; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, in their official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, in their official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in their official capacity as Attorney General; NATIONAL SCIENCE FOUNDATION; DR. SETHURAMAN PANCHANATHAN, in their official capacity as Director of the National Science Foundation; U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in their official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacities as Secretary of State and Acting Administrator of the United States Agency for International Development; US AGENCY FOR INTERNATIONAL DEVELOPMENT; U.S. DEPARTMENT OF DEFENSE; PETE HEGSETH, in their official capacity as Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS; DOUGLAS COLLINS, in their official capacity as Secretary of Veterans Affairs; U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JANET

PETRO, in their official capacity as Acting Administrator of National Aeronautics and Space Administration; CORPORATION FOR NATIONAL AND COMMUNITY SERVICE; JENNIFER BASTRESS TAHMASEBI, in their official capacity as Interim Head of the Corporation for National and Community Service; U.S. SOCIAL SECURITY ADMINISTRATION; LELAND DUDEK, in their official capacity as Acting Commissioner of United States Social Security Administration; U.S. SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, in their official capacity as Acting Administrator of U.S. Small Business Administration,

Defendants-Appellants.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

STATEMENT OF THE ISSUE ......................................................... 3

STATEMENT OF THE CASE ........................................................... 4

    A.    Legal Background ................................................... 4

    B.    Factual Background .................................................. 6

    C.    Procedural History ................................................ 10

SUMMARY OF ARGUMENT ......................................................... 16

STANDARD OF REVIEW .............................................................. 18

ARGUMENT ................................................................................. 18

I.    Plaintiff States Are Likely To Succeed On The Merits. ............... 18

    A.    The funding freezes were final agency actions. .................... 19

    B.    The funding freezes were arbitrary and capricious............. 27

    C.    The funding freezes were contrary to law............................ 34

           1.    The funding freezes violated statutes governing specific funding streams. ............................... 34

           2.    The funding freezes were contrary to the ICA. .......... 40

    D.    Defendants' remaining counterarguments fail..................... 46

           1.    Defendants' procedural arguments are waived and meritless................................................. 46

i

2.    This case is not moot.....................................................49

3.    The Tucker Act did not deprive the district court
of jurisdiction. .............................................................53

II.    The District Court Did Not Abuse Its Discretion By Awarding
Injunctive Relief. ....................................................................61

A.    The funding freezes irreparably harmed Plaintiff
States. ...................................................................................62

B.    The balance of the equities and the public interest
strongly favor Plaintiff States. ...........................................65

CONCLUSION ...........................................................................69

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State,*
770 F. Supp. 3d 121 (D.D.C. 2025) ...........................................44, 59

*Am. Clinical Lab'y Ass'n v. Becerra,*
40 F.4th 616 (D.C. Cir. 2022) ...........................................................53

*Am. Sci. & Eng'g, Inc. v. Califano,*
571 F.2d 58 (1st Cir. 1978)...............................................................54

*Atterbury v. U.S. Marshals Serv.,*
805 F.3d 398 (2d Cir. 2015)..............................................................56

*Bayley's Campground, Inc. v. Mills,*
985 F.3d 153 (1st Cir. 2021)..............................................................52

*Bennett v. Spear,*
520 U.S. 154 (1997) .....................................................19, 20, 21, 22

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ...............................................................54, 57

*California v. Trump,*
963 F.3d 926 (9th Cir. 2020) ............................................................43

*California v. U.S. Dep't of Educ.,*
132 F.4th 92 (1st Cir. 2025) ................................................57-58, 58

*Calvary Chapel of Bangor v. Mills,*
52 F.4th 40 (1st Cir. 2022) ...............................................................50

*City & Cnty. of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) ............................................................4

*City of New Haven v. United States,*
809 F.2d 900 (D.C. Cir. 1987) .............................................41, 42, 43

*City of Providence v. Barr,*
    954 F.3d 23 (1st Cir. 2020)......................................................4, 34, 35

*Clean Air Council v. Pruitt,*
    862 F.3d 1 (D.C. Cir. 2017) ..............................................................20

*Colorado v. U.S. Dep't of Health & Hum. Servs.,*
    No. 25-cv-121 (D.R.I.) ......................................................................66

*Comcast of Me./N.H., Inc. v. Mills,*
    988 F.3d 607 (1st Cir. 2021)..............................................................18

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
    38 F.4th 1099 (D.C. Cir. 2022)..........................................54, 55, 56

*CSL Plasma Inc. v. U.S. CBP,*
    33 F.4th 584 (D.C. Cir. 2022)............................................................42

*Cuozzo Speed Techs., LLC v. Lee,*
    579 U.S. 261 (2016) ..........................................................................45

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ..........................................................26, 37, 38

*Dep't of Educ. v. California,*
    145 S. Ct. 966 (2025) ..............................................54, 57, 58, 59, 64

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ........................................................28, 29, 30, 32

*Doe v. Trs. of Bos. Coll.,*
    892 F.3d 67 (1st Cir. 2018)................................................................47

*Does 1-6 v. Mills,*
    16 F.4th 20 (1st Cir. 2021) ................................................................65

*Emigrant Residential, LLC v. Pinti,*
    134 F.4th 626 (1st Cir. 2025) ......................................................46, 47

*FCC v. Prometheus Radio Project,*
        592 U.S. 414 (2021) ........................................................27

*Fox v. Cap. Co.,*
        299 U.S. 105 (1936) ........................................................59

*Friedman v. FAA,*
        841 F.3d 537 (D.C. Cir. 2016) ........................................19

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
        528 U.S. 167 (2000) ...........................................50, 51, 53

*Gen. Land Off. v. Biden,*
        722 F. Supp. 3d 710 (S.D. Tex. 2024) ...........................45

*Haaland v. Brackeen,*
        599 U.S. 255 (2023) ........................................................64

*Hisp. Affs. Project v. Acosta,*
        901 F.3d 378 (D.C. Cir. 2018) ........................................24

*Illinois v. FEMA,*
        No. 25-cv-206 (D.R.I.) ....................................................66

*Lincoln v. Vigil,*
        508 U.S. 182 (1993) ...............................34-35, 36, 38, 39

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
        591 U.S. 657 (2020) ........................................................33

*Lubow v. U.S. Dep't of State,*
        783 F.3d 877 (D.C. Cir. 2015) ........................................26

*Lujan v. Nat'l Wildlife Fed'n,*
        497 U.S. 871 (1990) ...................................22, 23, 24, 26

*Mach Mining, LLC v. EEOC,*
        575 U.S. 480 (2015) ................................................43-44

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ................................................................42, 43

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ...........................................54, 56, 57

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................28, 30

*Nat'l Council of Nonprofits v. OMB*,
    763 F. Supp. 3d 13 (D.D.C. 2025) ...................................................9

*Nat'l Council of Nonprofits v. OMB*,
    775 F. Supp. 3d 100 (D.D.C. 2025) ..............................29, 30, 32, 34

*New York v. NSF*,
    No. 25-cv-4452 (S.D.N.Y.) ..............................................................66

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................22, 23, 24

*Ohio v. U.S. EPA*,
    969 F.3d 306 (6th Cir. 2020) .........................................................52

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) .........................................................48

*Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*,
    427 F. Supp. 118 (D.D.C. 1977) ....................................................45

*Ryan v. U.S. ICE*,
    974 F.3d 9 (1st Cir. 2020)...............................................................47

*Sackett v. EPA*,
    566 U.S. 120 (2012) ................................................................21, 44

*Safari Club Int'l v. Jewell*,
    842 F.3d 1280 (D.C. Cir. 2016) ................................................20, 21

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ........................................................ 66

*Union of Concerned Scientists v. Wheeler*,
    954 F.3d 11 (1st Cir. 2020) .......................................................... 39

*United States v. Pro. Air Traffic Controllers Org.*,
    678 F.2d 1 (1st Cir. 1982) ............................................................ 68

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ...................................................................... 49

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
    121 F.4th 339 (1st Cir. 2024) ....................................................... 18

*Vaquería Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009) ........................................................ 45

*We the People PAC v. Bellows*,
    40 F.4th 1 (1st Cir. 2022) ............................................................ 62

## STATUTES

2 U.S.C.
    § 681 ................................................................................................ 5
    § 682 .............................................................................................. 40
    § 683 ................................................................................................ 6
    § 684 ................................................ 6, 38, 40, 41, 42, 43, 44, 45
    § 687 .............................................................................................. 44
    § 688 ................................................................................................ 5

5 U.S.C.
    § 701 .................................................................................. 37, 38, 39
    § 704 .............................................................................................. 19

23 U.S.C.
    § 104 .................................................................................... 4, 38
    § 179 .............................................................................................. 36

33 U.S.C.
    § 1381 ............................................................................... 5
    § 1384 ............................................................................... 5

42 U.S.C.
    § 1396b ........................................................................ 4, 68
    § 1862q ............................................................................ 36
    § 7437 ......................................................................... 39, 40

Inflation Reduction Act of 2022,
    Pub. L. No. 117-169, 136 Stat. 1818 ......................................... 5, 35

Infrastructure Investment and Jobs Act,
    Pub. L. No. 117-58, 135 Stat. 429 (2021) ................................... 5, 35

## OTHER AUTHORITIES

Fed. R. Civ. P.
    18 ................................................................................... 26
    20 ................................................................................... 26
    65 ................................................................................... 67

11A Wright et al., *Federal Practice and Procedure* (3d ed. 2025)
    § 2949 .............................................................................. 49
    § 2960 .............................................................................. 60

Doc. 47, *Council II*,
    763 F. Supp. 3d 13 (No. 25-cv-239) ............................................ 48

Emergency Motion for Stay Pending Appeal,
    *California v. U.S. Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025) (No. 25-1244) .................................. 58

## INTRODUCTION

Seven days after President Trump's inauguration, the Office of Management and Budget ("OMB") issued a memorandum directing all federal agencies to "temporarily pause" billions of dollars in federal financial assistance pending a review of the spending's alignment with the new administration's policy preferences.  A116.[1]  Those agencies complied, initiating funding freezes that indefinitely suspended all payments on a staggering range of government programs, all without any warning or explanation.

The funding freezes instantly deprived the States of access to billions of dollars authorized and appropriated by Congress to support a wide array of essential services, from education to healthcare to public safety.  Payment portals went offline and routine funding drawdowns went unfulfilled, throwing state budgets and state programs—many established to implement federal statutes and substantially dependent on federal funds—into disarray.  After Plaintiff States and others filed suit, OMB purported to rescind its directive, but funds remained

---

[1]  Entries on the district court's docket are cited "Doc.," appellants' opening brief is cited "U.S. Br.," the appendix is cited "A," and the supplemental appendix is cited "SA."

1

inaccessible and state programs remained in jeopardy.  Plaintiff States thus sought, and the district court issued, a calibrated preliminary injunction designed to mitigate and avert the irreparable harm that the freezes were causing and would continue to cause absent emergency relief.

Based on the extensive factual record Plaintiff States submitted in support of their motion for a preliminary injunction, the district court found that, rather than making informed decisions based on specific authority, the defendant non-OMB agencies and their officers (together, "agency defendants") had instituted categorical freezes on federal financial assistance without regard to whether they had any authority to do so under controlling statutes, regulations, or grants.  And the court explained that both those freezes and OMB's directive had violated the Administrative Procedure Act ("APA")'s requirement of reasoned decisionmaking and numerous federal funding statutes.  The court thus entered a preliminary injunction blocking the unreasoned, categorical freezes but expressly leaving agencies free to exercise their actual authority under applicable statutes, regulations, and grant terms.  During the four months it has been in effect, that order has not

prevented defendants from making decisions concerning federal spending that are at least assertedly based on some statutory, regulatory, or grant-term authority—many of which some Plaintiff States have challenged on other grounds in other cases. But the order has prevented defendants from unlawfully instituting funding freezes that do not even purport to rest on any such authority, thus preventing the severe damage that the continued and indefinite unavailability of federal funds would inflict on Plaintiff States.

Although Congress has given the Executive Branch certain authority over federal spending, the Executive Branch must exercise that authority within the limits Congress has imposed. Defendants failed to do so here, and because that failure threatened immediate, irreparable harm to Plaintiff States, the district court did not abuse its discretion by granting a preliminary injunction tailored to the harms wrought by the categorical, indefinite suspension of federal funds.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in preliminarily enjoining defendants' unreasoned and unlawful categorical freezes on billions of dollars in federal funds.

## STATEMENT OF THE CASE

### A.    Legal Background

The Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  Pursuant to that power, Congress has enacted a complex set of statutes governing federal funding and limiting executive discretion over appropriated funds.

In many statutes, Congress specifically provides funds that it requires federal agencies to distribute to the States and other entities, who then spend the funds to ensure that critical services are provided across the Nation.  For instance, Congress has required the Secretary of Health and Human Services to "pay to each State" a fixed portion of its annual Medicaid expenditures in order to provide health insurance, 42 U.S.C. § 1396b(a), and mandated that the Secretary of Transportation "shall distribute" federal funds to States in order to build highways, 23 U.S.C. § 104(a)(1), (b), (c).  These appropriations, and others, are called "formula" grants, in that they afford federal agencies no discretion either in whether to provide funding or in how much to provide.  *City of Providence v. Barr*, 954 F.3d 23, 27-28 (1st Cir. 2020).

Statutes governing non-formula federal programs, though, are also mandatory, in that agencies have no discretion to ignore Congress's instructions as to whether and how to spend appropriated funds. For example, Congress appropriated over $2 trillion in 2021 and 2022 in two federal statutes that invested in energy and infrastructure projects across the Nation. *See* Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 ("IRA"); Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) ("IIJA"). These statutes require agencies to provide money to States for purposes ranging from wastewater treatment to the rehabilitation of water systems to air quality monitoring. A8-9; *see, e.g.*, 33 U.S.C. §§ 1381(a), (b) (Environmental Protection Agency ("EPA") "shall make capitalization grants to each State" to implement Federal Clean Water Act); *id.* § 1384 (requiring allotment among States); IIJA § 50210 (authorizing funding). In authorizing these programs and providing funds to support them, Congress instructed federal agencies to spend funds in certain ways and gave those agencies no discretion to decline to do so.

Finally, Congress has provided in the Impoundment Control Act of 1974 ("ICA," or "Act"), 2 U.S.C. §§ 681-688, that federal agencies can

"impound," or decline to spend, appropriated funds only under certain circumstances. Specifically, the Act withholds from the Executive Branch the power to categorically decline to spend appropriated funds, instead instructing the President to "propose[]" such an action (called a "rescission") to Congress if he thinks appropriate. *Id.* § 683. And it allows the Executive Branch to "defer" expenditure of appropriated funds only under narrow circumstances, not for policy reasons, and only on notice to Congress. *Id.* § 684.

### B.    Factual Background

On January 20, 2025, shortly after his inauguration, the President issued a series of executive orders directing federal agencies to pause or suspend distribution of funds pending a review of that spending. For example, Executive Order 14,154, "Unleashing American Energy," directed "[a]ll [federal] agencies" to "immediately pause the disbursement of funds appropriated through the [IRA] or the [IIJA]" while reviewing those funds' alignment with the new administration's policies. SA6. Other orders likewise directed agencies to implement "pauses" to align funding with the President's priorities. *See* SA14 (agencies shall "[p]ause distribution" of funds under "all contracts,

grants, or other agreements" providing services to removable noncitizens); SA18 (similar for funds supporting "gender ideology").

The agencies quickly implemented these executive orders. On January 27, OMB issued a memorandum to all federal agencies directing them to conduct a "comprehensive analysis of all of their Federal financial assistance programs to identify" programs "implicated by any of the President's executive orders." A116 ("Directive"). While doing so, OMB directed that, "to the extent permissible under applicable law, Federal agencies must," beginning the following day, "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance." A116. Other agencies issued contemporaneous guidance instructing funding officials to pause disbursements pending a review of federal programs for compliance with presidential priorities. *E.g.*, A215 (EPA: "all disbursements of unliquidated obligations funded by any line of accounting . . . are paused"); A249 (Department of Energy: "[a]ll funding and financial assistance . . . shall not be . . . provided"). A document created by OMB identified approximately 2,600 affected federal programs. A118-69.

Consistent with those instructions, agency defendants initiated funding freezes that, without any regard to the governing statutes, regulations, or grant terms, suspended payments on a wide range of programs, including to Plaintiff States, which immediately lost access to billions of dollars of funds.  A19, A22 & n.10, A32, A36-42.  Some agencies abruptly locked Plaintiff States out of entire payment platforms—such as the one used by the Department of Health and Human Services to process payments for Medicaid and other vital programs.  A22; *e.g.*, SA27-29, SA128, SA140.  EPA and other agencies suspended—in some cases deleting from federal payment systems— grants under the IRA and IIJA supporting critical air, water, and infrastructure projects, again leaving Plaintiff States unable even to seek (much less obtain) reimbursement for expenses already approved by the relevant federal agencies. A22 & n.10; *e.g.*, SA71-74, SA91-92. Affected funding streams spanned an array of programming areas:  for example, the Department of Agriculture placed payments on grants supporting American farmers indefinitely "on hold," SA151-54, while the Department of Labor failed to reimburse recipients of workforce-development funding, SA145-47.

Unsurprisingly, as the district court later found, these funding freezes caused an extraordinary "disruption in health, education, and other public services" within Plaintiff States. A43. Routine payments of tens or hundreds of millions of dollars were delayed or denied. *E.g.*, SA27 (nearly $200 million to California); SA133-34 (over $300 million to New York). Plaintiff States were immediately forced to consider modifying or eliminating programs and services in areas ranging from K-12 education to environmental protection to public safety. A36-41. And Plaintiff States had to do so amid "the chaos and uncertainty" that the funding freezes created, hampering their ability to budget, hire, and plan for future programming. A41.

Less than 24 hours after the Directive was issued, the U.S. District Court for the District of Columbia issued an administrative stay suspending the Directive, *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 13, 17 (D.D.C. 2025), and OMB quickly purported to rescind it, A170. But the White House Press Secretary later clarified that OMB's action was "NOT a rescission of the federal funding freeze" itself, but "simply a rescission of the OMB memo" prompted by the stay. A252. And, as the district court found, freezes "continued," A11-12,

9

with Plaintiff States still unable to access important funding streams,
*e.g.*, A52-53 (Federal Emergency Management Agency ("FEMA")
funding); SA121-22 (IRA funding); SA145-47 (workforce-development
funding).

### C.    Procedural History

1.    Plaintiffs are 24 States and state executives that receive
hundreds of billions of dollars in federal funds annually—funds used to
provide services ranging from healthcare to education to infrastructure.
A309-12.

Plaintiff States filed this action within 24 hours of the Directive's
issuance and sought a temporary restraining order ("TRO") to preserve
their ability to provide these services.  A10.  Plaintiff States named the
President and 25 agencies and agency executives as defendants and
alleged that defendants had undertaken a "freeze of all federal
assistance" to the States.  A77-81, A98. The district court issued a TRO,
ordering defendants not to "pause, freeze, impede, block, cancel, or
terminate" federal funding on a categorical basis, but permitting them
to do so "on the basis of the applicable authorizing statutes, regulations,
and terms."  A183.  Defendants appealed and sought an administrative

stay from this Court, which was denied.  A291-92.  Defendants

dismissed their appeal.

2.    Plaintiff States moved for a preliminary injunction and,

during briefing on that motion, amended their complaint, naming

additional defendants that had implemented the President's executive

orders by unlawfully instituting categorical funding freezes.  A304-68.

In their reply, Plaintiff States asked that the court "consider the

amended complaint as the operative pleading" for purposes of the

motion.  Doc. 147 at 2 n.1.  Defendants did not object to this request.

The district court granted the preliminary injunction.  It began by

rejecting defendants' argument that the purported rescission of the

Directive had mooted the case.  As the court explained, the voluntary-

cessation doctrine applied because the rescission "was a clear effort to

moot" this and other litigation related to the Directive and because

there was reason to believe that defendants might reinstate the policy

contained in the Directive were this case dismissed.  A15-18.  And it

found that agency defendants had maintained funding freezes even

after the Directive's rescission.  A11-12, A18 n.6, A41-42.

The district court concluded that Plaintiff States were likely to succeed on the merits. A20-34. The court found that, in response to the Directive and the President's executive orders, agency defendants had instituted categorical funding freezes without regard to whether they had any statutory, regulatory, or grant-term authority to do so, rather than undertaking individualized review processes. A21-24. And it held that those freezes, and the Directive, constituted final agency actions reviewable under the APA. A21-24.

The court held that the Directive and freezes violated the APA in multiple respects. A25-34. It determined that the Directive and freezes were arbitrary and capricious because defendants "ha[d] not provided a rational reason [why] the need to 'safeguard valuable taxpayer resources' . . . justified . . . such a sweeping pause of nearly all federal financial assistance with such short notice." A32. It also concluded that the agency actions were contrary to law, because they contravened both statutes setting funding requirements for particular programs and the ICA. A25-30.

The court next found that there was "unrebutted evidence" that the freezes had irreparably harmed Plaintiff States and their residents.

A36; *see* A548 (canvassing "127 exhibits, which included more than 100 declarations, as well as grant documents and communications with the relevant agencies").  It described injuries to a broad array of state programs, including childcare, education, environmental protection, healthcare, job training, public safety, and transportation.  A36-41.  And it found that the freezes had also created operational difficulties for Plaintiff States, including difficulty hiring staff, disruptions to research, and interference with budgeting and planning.  A41.

Finally, the court determined that the balance of the equities and the public interest favored Plaintiff States.  A42-43.  The court reasoned that a tailored injunction preventing defendants from engaging in unlawful conduct while preserving their ability to exercise any lawful discretion over funding decisions would impose no cognizable burden on defendants or the public.  *Id.*

The district court therefore entered a preliminary injunction enjoining defendants, other than the President, "from pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under . . . executed financial obligations based on the OMB Directive, including

funding freezes dictated, described, or implied by Executive Orders issued by the President before rescission of the OMB Directive."  A44. But it emphasized that the injunction did "not prevent [defendants] from making funding decisions . . . under the Executive's actual authority in the applicable statutory, regulatory, or grant terms."  A42-43 (cleaned up).

3.   Defendants appealed and sought a stay from this Court, which denied defendants' motion.  A538.  It rejected defendants' argument that Plaintiff States had presented a programmatic attack, rather than challenging discrete agency actions.  A561-68.  As the Court explained, the district court had found that agency defendants had imposed categorical freezes that were discrete, reviewable agency actions, and defendants had failed to provide any basis to disturb that finding.  A561-68.  The Court also held that defendants would not be irreparably harmed absent a stay, emphasizing that the district court's order did "not bar all freezes in funding," but "instead enjoin[ed] the discrete final agency actions to adopt the broad, categorical freezes challenged here."  A574.

4.     While defendants' stay motion was pending in this Court,
Plaintiff States moved in the district court to enforce the preliminary
injunction, explaining that they had been unable to access hundreds of
millions of dollars in FEMA funding from hundreds of disaster-
mitigation and -relief grant programs, in some instances for over thirty
days.  A458, A461-63.  Defendants contended that FEMA had imposed
an individualized manual review process that did not violate the
preliminary-injunction order.  Doc. 172 at 1-2.

The district court granted Plaintiff States' motion.  A49.  It found,
as a factual matter, that FEMA had implemented "an indefinite
categorical pause on payments" that violated the preliminary-injunction
order.  A55.  It thus ordered FEMA to "cease the challenged manual
review process."  A59.  But it did not order the payment of specific
funds, and reiterated that defendants were free to "mak[e] funding
decisions based on their actual authority under the applicable
statutory, regulatory or grant terms."  A55 n.5.  Defendants sought
reconsideration, arguing for the first time that the Tucker Act deprived
the court of jurisdiction to enforce the preliminary injunction with
respect to FEMA funding.  Doc. 176.  The court denied the motion, A64-

65, and defendants appealed, A602. This Court consolidated that appeal with the appeal of the preliminary injunction.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in granting Plaintiff States a preliminary injunction.

The court correctly held that Plaintiff States are highly likely to succeed on the merits. As the court found, defendants implemented the President's executive orders by issuing the Directive and establishing categorical funding freezes. In doing so, they undertook discrete, final agency actions subject to APA review. Those actions cannot withstand that review for multiple reasons. First, the agencies' inadequate justifications make clear that their decisions were arbitrary and capricious. Defendants did not consider the practical consequences of, or obvious alternatives to, large-scale freezes of federal funds, or even ask whether they had statutory or regulatory authority to institute such freezes. Second, the freezes were contrary to law, both because they cannot be squared with specific federal funding laws and because they violated the ICA.

Defendants' attempts to evade review on technical grounds fail. First, defendants failed to object to the district court's consideration of Plaintiff States' amended complaint below and, regardless, that consideration was consistent both with the parties' earlier filings and with ordinary practice at the preliminary-injunction stage. Second, the threat that defendants will reinstate the policy underlying the Directive prevents OMB's supposed voluntary rescission of that document from mooting any aspect of this case. And third, because Plaintiff States have not brought claims that sound in contract and seek only equitable remedies, the Tucker Act did not deprive the district court of jurisdiction either to grant or to enforce the preliminary injunction.

The equitable factors overwhelmingly favor Plaintiff States. The district court's extensive factual findings, based on unrebutted evidence, document the immense irreparable harm that defendants' actions would inflict on Plaintiff States absent an injunction, across fields as diverse as education, infrastructure, and public safety. These injuries far outweigh the speculative harms defendants attribute to the preliminary injunction, which is tailored to defendants' conduct and the irreparable harm that it caused, and would continue to cause, Plaintiff States.

## STANDARD OF REVIEW

This Court "will uphold a decision to grant a preliminary injunction unless it constitutes an abuse of discretion." *Comcast of Me./N.H., Inc. v. Mills*, 988 F.3d 607, 611 (1st Cir. 2021). The Court "review[s] the district court's findings of fact for clear error and its conclusions of law de novo." *Id.*

## ARGUMENT

In evaluating a motion for a preliminary injunction, a "district court must consider the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships; and the effect . . . on the public interest." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (cleaned up). As the district court correctly concluded, each factor favors Plaintiff States, and the court did not abuse its discretion in granting a preliminary injunction.

## I.    Plaintiff States Are Likely To Succeed On The Merits.

Plaintiff States are highly likely to succeed on the merits. As the district court explained, Plaintiff States properly raised APA challenges to a set of discrete, final agency actions; those actions violated the APA

18

on multiple grounds; and defendants' efforts to evade review on a range of technicalities lack merit.

### A.  The funding freezes were final agency actions.

As the district court and this Court's stay panel each explained, Plaintiff States challenge a set of related but discrete agency actions: (1) the Directive and (2) "the decisions by [agency defendants] to implement broad, categorical freezes on obligated funds" in response to the Directive and the executive orders identified therein.  A564; *see* A20-24.  Defendants identify no reason to disturb that conclusion.

1.     The APA permits judicial review of "final agency action."  5 U.S.C. § 704.  "[T]wo conditions must be satisfied for agency action to be final:"  the action must (1) "mark the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up); *see also Friedman v. FAA*, 841 F.3d 537, 541 (D.C. Cir. 2016) (finality inquiry is "pragmatic and flexible").  The Directive and the freezes implemented by agency defendants each satisfy these requirements.

As defendants effectively concede, U.S. Br. 33, the Directive was a final agency action.  First, the Directive "mark[ed] the consummation of the agency's decisionmaking process," *Bennett*, 520 U.S. at 178 (cleaned up), because there is no indication that OMB intended to reconsider its decision to require federal agencies to categorically pause federal financial assistance while conducting an indefinite review of that funding. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (temporary stay of regulation's effective date was final agency action). The Directive's supposedly "[t]emporary" nature, A115, does not change this result.  As the D.C. Circuit explained in concluding that a temporary suspension of permit issuance was a final agency action, "[t]he possibility that [an agency] may revise its decision based on new information is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1283, 1289 (D.C. Cir. 2016) (cleaned up); *accord Pruitt*, 862 F.3d at 6.  The Directive, that is, was a final decision as to whether to order categorical funding freezes, regardless of whether those freezes might later be lifted through *new* agency actions after the indefinite funding review was complete.

20

Second, the Directive triggered legal consequences and determined Plaintiff States' rights. *See Bennett*, 520 U.S. at 178. Even in defendants' telling, the Directive required agencies to pause certain funding streams while conducting "comprehensive analys[es]" of their programs. U.S. Br. 16 (quoting A116). This new obligation for agencies and the resulting "de facto denial" of funding to Plaintiff States readily satisfy *Bennett*'s second prong. *Safari Club*, 842 F.3d at 1289 (temporary denial of permits sufficiently "determined" "rights"); *see also Sackett v. EPA*, 566 U.S. 120, 126 (2012) (changes in financial penalties faced by party are "legal consequences" under *Bennett*). The Directive was thus a reviewable final agency action.

For the same reasons, so too were the freezes instituted by individual agencies. Like the Directive, these freezes indefinitely paused funding. *See, e.g.*, SA35-36 (statement by National Science Foundation ("NSF") that "all payments under active awards [would] be paused" pending agency review); SA66 ("[The U.S. Agency for International Development ("USAID")] is working to immediately implement the funding pause for . . . all Federal financial assistance programs."); *see also supra* pp. 7-10. Like the Directive, those pauses

"mark[ed] the consummation of the agenc[ies'] decisionmaking process[es]" and caused "legal consequences"—as demonstrated by the extensive, unrebutted evidence of Plaintiff States' immediate inability to access federal funding. *Bennett*, 520 U.S. at 178 (cleaned up); *see* A22-24; *supra* pp. 8-10. Thus, as the district court held, A21-24, each funding freeze was a final agency action.

2. Defendants do not genuinely contend that any specific action fails the finality standard; indeed, they do not discuss that standard at all. Instead, they primarily reprise arguments already rejected by this Court in denying the motion for a stay pending appeal. *Compare* U.S. Br. 35-36, *with* A561-68. Those arguments are no more persuasive the second time around.

As at the stay stage, defendants seek to characterize this case as a "programmatic attack on federal spending" barred by *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), and *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004). U.S. Br. 35-36. That characterization misunderstands both the caselaw and the record.

*Lujan* and *Norton* rejected plaintiffs' efforts to entangle courts in day-to-day agency management by lumping a wide variety of different

22

agency activities into a single "program" or "policy," then challenging

that purported program or policy.  *Lujan*, 497 U.S. at 890 & n.2; *Norton*,

542 U.S. at 64-65.  Thus, in *Lujan*, the Court explained that the

plaintiff could not designate an agency's "continuing (and thus

constantly changing)" handling of over a thousand separate land-use

matters—involving many disparate actions or omissions, such as

failures to properly revise land-use plans, failures to submit

recommendations to Congress, or inordinate focus on certain issues,

many of which would not be individually reviewable—as a single agency

"program" subject to APA challenge.  497 U.S. at 890-93.  Rather than

"seeking wholesale improvement of this [purported] program by court

decree," the plaintiff was required instead to "direct its attack against

some particular agency action that cause[d] it harm.'"  *Id.* at 891

(cleaned up).  At the same time, however, the Court acknowledged that,

"[i]f there is in fact some specific order or regulation, applying some

particular measure across the board to all individual [decisions], and if

that order or regulation is final, and has become ripe for review," then

"it can of course be challenged under the APA."  *Id.* at 890 n.2.  Thus,

the question under *Lujan* is not whether a challenged action has a

23

significant or broad effect, *contra* U.S. Br. 35, but simply whether it is a final agency action in the first place.   497 U.S. at 890 & n.2.  And *Norton* reaffirmed this rule, explaining that the APA permits review only of "*discrete* agency action[s]."  542 U.S. at 64.

Here, contrary to defendants' attempt to construe each agency defendant's funding freeze as an amalgam of "many individual decisions," U.S. Br. 36, the district court correctly found, as a factual matter, that each agency defendant made a single decision to "execute a categorical, indefinite funding freeze," A23; *see also Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 (D.C. Cir. 2018) (existence of "de facto" agency action is factual question (cleaned up)).  In other words, each agency's freeze itself represented the type of discrete, across-the-board agency action that *Lujan* confirmed "can of course be challenged under the APA," 497 U.S. at 890 n.2, rather than the "programmatic attack" that *Lujan* and *Norton* forbid, *Norton*, 542 U.S. at 64; *see also Hisp. Affs. Project*, 901 F.3d at 386 (concluding that agency's across-the-board policy was discrete, reviewable action).

Defendants fail to show that this finding was clearly erroneous. As the stay panel observed, the record thoroughly documents agency

defendants' implementation of discrete, categorical funding freezes. A567; *supra* pp. 7-10.  The NSF, for example, alerted funding recipients that it was "paus[ing]" "all payments under active awards" pending the review required by the Directive.  SA35-36.  USAID, too, announced that it was "working to immediately implement the funding pause for foreign assistance programs, and all Federal financial assistance programs."  SA66; *see also, e.g.*, SA113 (similar for Department of Defense); A215 (similar for EPA).  At the same time, States lost access federal funds:  the funding portals used by multiple federal agencies became unavailable, *see, e.g.*, SA27-29, SA128 (Department of Health and Human Services); SA140 (FEMA), while routine funding drawdowns went unfulfilled, *see, e.g.*, SA145-47 (Department of Labor); SA133-35 (multiple agencies).  Defendants' apparent view that each agency's freeze in fact represented "many individual decisions" by individual employees to freeze funds "across a wide swath of programs," U.S. Br. 36, strains credibility, especially given that the freezes occurred within days of OMB's instruction to pause federal funding streams.  Like the district court, this Court should reject defendants' request that it "'exhibit a naiveté from which ordinary citizens are

free.'"  A567 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)).

To the extent defendants mean to argue that, even though each funding freeze was a discrete agency action subject to APA review, Plaintiff States cannot challenge multiple such actions in a single suit, that argument also fails.  Just as at the stay stage, defendants offer no "supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once."  A566.  Indeed, courts routinely consider cases that simultaneously challenge multiple related agency actions.  *See, e.g.*, *Lubow v. U.S. Dep't of State*, 783 F.3d 877, 883 (D.C. Cir. 2015) (reviewing "four final agency actions" by multiple agencies).  Such cases represent straightforward applications of ordinary joinder principles to APA litigation.  *See* Fed. R. Civ. P. 18(a), 20(a)(2).  And they do not implicate the concerns present in *Lujan* and *Norton*:  Those cases rejected efforts to compress an array of disparate agency activities, many individually unreviewable under the APA, into a single purported "program," *Lujan*, 497 U.S. at 890— not joinder of claims involving multiple, essentially identical final agency actions that *are* each reviewable under the APA.

Nor is there anything otherwise "improp[er]" about Plaintiff States' challenging the funding freezes together in a single case. *Contra* U.S. Br. 36. Because the unrebutted evidence establishes that each agency froze funding categorically across its programs without any program-specific consideration of the governing statutes or regulations, it would make no sense for Plaintiff States to proceed on the program-by-program basis that defendants would prefer. U.S. Br. 36, 40, 44. And, having simultaneously engaged in similar unlawful conduct, defendants cannot seriously object to Plaintiff States' seeking relief efficiently through a single case, rather than burdening the courts with two dozen different lawsuits against individual agencies raising essentially the same claims.

In sum, the funding freezes were final agency actions subject to review in a single lawsuit under the APA.

### B.    The funding freezes were arbitrary and capricious.

To survive arbitrary-and-capricious review, agency actions must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). While a court may not "substitute its own policy judgment for that of the agency," *id.*, it must ensure that the

agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). When an agency changes an existing policy, "its reasoned analysis must consider the alternatives that are within the ambit of the existing policy" and any "serious reliance interests" engendered by the status quo. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up). The threadbare reasoning OMB offered in the Directive did not meet this standard. Nor did agency defendants make any independent effort to justify their funding freezes. Defendants' actions were arbitrary and capricious.

1.    The only reasoning that defendants cite in support of the funding freezes appeared in the Directive. That document's explanation for requiring a sweeping pause of federal financial assistance amounted to (1) an observation that the federal government spends more than $3 trillion on financial-assistance programs annually and (2) an assertion that a "temporary [spending] pause [would] provide the Administration time to review agency programs and determine the best uses of the

funding for those programs consistent with the law and the President's priorities." A115-16; U.S. Br. 26-27.  That reasoning was inadequate in multiple respects.

First, the Directive did not reasonably explain the decision to abruptly freeze billions of dollars in financial assistance that support critical services for millions of Americans—including healthcare, public safety, environmental protection, education, and infrastructure.  A19 & n.8, A36-42.  As the district court observed, "[i]t is difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences."  A32.  In another court's words, this was a "breathtakingly large sum of money to suspend practically overnight." *Nat'l Council of Nonprofits v. OMB* ("*Council II*"), 775 F. Supp. 3d 100, 124 (D.D.C. 2025), *appeal docketed*, No. 25-5148 (D.C. Cir.).  And this extraordinary decision was particularly inexplicable because the Directive's analysis left unaddressed an obvious alternative "within the ambit of the existing" policy, *Regents*, 591 U.S. at 30:  reviewing federal spending *before* cutting off any funding.

Defendants cannot correct this flaw by asserting that a pre-review pause "was necessary to minimize the expenditure of funds inconsistent

with the Administration's policy priorities while the Administration reviewed funding." U.S. Br. 26. This reasoning—or *any* reference to the possibility of reviewing spending without a preemptive freeze—did not appear in OMB's explanation, and defendants cannot rely on a "*post hoc* rationalization[]." *Regents*, 591 U.S. at 21-23. And, even if the agency had timely supplied it, that conclusory statement plainly does not grapple with "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, such as the practical consequences of immediately suspending vast swaths of federal funding, and so would not justify the Directive. A31-33; *see Council II*, 775 F. Supp. 3d at 124-25.

Second, OMB transparently did not consider the "serious reliance interests" of federal funding recipients, *Regents*, 591 U.S. at 30—and, in particular, Plaintiff States and their agencies and residents, who depend on that funding to keep critical government services running, A36-42. This failure independently rendered the Directive arbitrary and capricious.

Defendants point to several pieces of ostensibly limiting language contained in the Directive, but none fixes the agency's faulty reasoning. The carveout for "assistance received directly by individuals" A115 n.1,

does not undermine the challenge to the Directive because even if such assistance were excluded from consideration, the freezes contemplated by the Directive still implicated a staggering amount of funding, A115-69; *supra* pp. 7-10, and the agency provided no rationale for cutting off that funding *before* conducting any review.  And the exemption would do nothing to address the reliance interests of nonindividual funding recipients, like Plaintiff States, or the many individuals who benefit indirectly from the frozen funding, like the States' residents.  *See, e.g.*, A473-76 (describing importance of frozen FEMA wildfire-relief funding to States and their residents).

The Directive's statement that "OMB may grant [other agencies] exceptions [to the Directive's requirements] . . . on a case-by-case basis," A116, is no more helpful.  The statement provided no explanation as to how agencies could plausibly identify programs or recipients meriting exceptions on the single-day timeline mandated by the Directive, and, regardless, any "exceptions" OMB might have offered would not have addressed the deficiencies in the Directive's reasoning with respect to programs *not* granted exceptions—which, the record shows, included a staggering range of funding on which Plaintiff States rely.  A36-42.  Nor

have defendants identified any evidence beyond a single conclusory assertion in an OMB guidance document to support their claim that the agency had already "approv[ed] many" such exceptions within a day of issuing the Directive.  U.S. Br. 26 (quoting A171).  Instead, the evidence shows that agency defendants instituted uniform, categorical funding freezes across an extraordinary range of federal funds.  *Supra* pp. 7-10.

Finally, the Directive's boilerplate savings clause, suggesting that agencies freeze funds only "to the extent permissible under applicable law," A116, does not make the Directive sufficiently reasoned, *contra* U.S. Br. 24, 26.  Even if agencies followed this instruction, it would not correct the deficiencies in the Directive's own reasoning, which did not justify freezing even a subset of funds.  *See Regents*, 591 U.S. at 16, 35-36 (invalidating decision as arbitrary and capricious notwithstanding agency's undisputed legal authority to act); *Council II*, 775 F. Supp. 3d at 125 n.11 ("Just because an agency *can* do something does not make it *rational* to do so.").  Nor did the Directive describe how agencies could realistically assess, in one day, whether they had legal authority to pause all affected funding streams.   Indeed, defendants offered no evidence that *any* agency attempted to assess the scope of its authority

to freeze funds. And it is implausible that agency defendants did so when the unrebutted evidence establishes that they abruptly and categorically froze billions of dollars of funding essentially overnight, yielding freezes that were contrary to law in multiple respects. *Infra* pp. 34-46.

2. Defendants make no effort at all to defend the agencies' *own* funding freezes as sufficiently reasoned, U.S. Br. 25-28, instead resting entirely on the Directive. That makes sense: the agencies' freezes were not accompanied by any independent reasoning, and so cannot survive arbitrary-and-capricious review if the Directive does not. Indeed, the agencies' funding freezes, if anything, more transparently fail that test. The Supreme Court has explained that one "important aspect of the problem" an agency must consider is the "requirements" imposed by relevant statutes. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020). As the district court found, though, agency defendants wholly failed to consider the scope of their own authority (or lack thereof) to implement funding freezes, instead implementing categorical freezes without regard to governing law while waiting to "decide later which funding streams they actually had lawful

authority to withhold." A32.  Agency defendants' failure to evaluate

their authority to implement the funding freezes likewise renders those

freezes arbitrary and capricious.

## C.    The funding freezes were contrary to law.

The district court also correctly held that the freezes were likely

contrary to law in two independent ways, violating (1) statutes

requiring that funds be put to specific uses and (2) the ICA's general

restrictions on the Executive Branch's ability to withhold funds.  A25-

30.

### 1.    The funding freezes violated statutes governing specific funding streams.

Federal agencies have only those powers conferred on them by

Congress, and agency action that exceeds statutory limits violates the

APA.  *Providence*, 954 F.3d at 31.  Defendants have never cited any

federal law that allows them "to unilaterally pull the plug on nearly all

federal monetary flows," *Council II*, 775 F. Supp. 3d at 126, and none

exists.  Instead, agencies must comply with statutes mandating that

funding be used in a specific manner, for specific ends, or according to

specific terms, which each limit agencies' authority to decline to spend

funds appropriated by Congress.  *See Lincoln v. Vigil*, 508 U.S. 182, 193

(1993) (explaining that "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes"). Here, defendants failed to comply with multiple federal funding statutes.

First, as the district court correctly concluded, A8-9, many funding streams that defendants froze are "formula" grants, which Congress has required that States receive based on enumerated statutory factors, like population or the expenditure of qualifying state funds, *see, e.g.*, *Providence*, 954 F.3d at 27-28. Such grants provide funding for critical government services ranging from Medicaid to highway construction to special-education services to mental-health and substance-abuse treatment. A8. The record demonstrates that defendants froze state access to many of these critical funds, *see, e.g.*, SA27-29, SA134-35, and those freezes plainly violated these federal laws.

The freezes of IIJA and IRA funding—which goes to projects such as increasing broadband access, improving the electric grid, providing clean water, and reducing pollution—are likewise contrary to Congress's specific dictates. *See, e.g.*, IIJA § 50102; IIJA § 50210; A8-9. As the district court correctly explained, A28-29, those statutes *require*

35

implementing agencies to expend the funds that Congress appropriated for specific purposes, and defendants have "no discretion to deviate" from these statutory commands, A29; *supra* pp. 4-5. Yet defendants categorically and indefinitely froze these funds, too. SA134, SA180-96.

Defendants do not genuinely dispute that these freezes occurred or that at least some violated federal law. Instead, defendants assert that *some* federal programs "provide ample room for the administering agency to pause funding." U.S. Br. 37. But defendants identify no such program. Instead, they cite two statutes governing grant programs that, although they do not require awards to any particular recipients, do require that the relevant agencies spend the appropriated funds for specific purposes. *See* 23 U.S.C. § 179(b)(1) (mandating that the Federal Highway Administrator "shall" spend appropriated funds to encourage use of certain building materials); 42 U.S.C. § 1862q(a) ("The Director of the [NSF] . . . shall continue to award competitive, merit-reviewed grants to support [educational programs]."); U.S. Br. 37-40. Despite accepting that the agencies must "allocate [these] funds to meet permissible statutory objectives," U.S. Br. 38 (cleaned up) (quoting *Lincoln*, 508 U.S. at 193), defendants nowhere explain how a categorical

36

pause would advance the "objectives" of the statutes they identify. Defendants say that certain documents memorializing the award of funds under these programs permit the agencies in question to "suspend[]" or "terminate[]" individual grants under certain conditions, U.S. Br. 38-39, but defendants did not exercise clauses in award agreements to suspend or terminate particular grants; as the district court found, they categorically froze access to funding streams governing a staggering range of federal programs.

Defendants also err in arguing that some applications of the funding freezes are unreviewable under the APA's exception for actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see* U.S. Br. 41-44. The Supreme Court "ha[s] read [this] exception . . . quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com.*, 588 U.S. at 772 (cleaned up). Here, at least two different sources provide the necessary standard. First, the relevant funding statutes include detailed congressional instructions identifying "permissible statutory objectives" that agencies must pursue using appropriated

37

funds. *Lincoln*, 508 U.S. at 193; *see, e.g.*, 23 U.S.C. § 104 (creating formula grant to distribute highway funding to States); *supra* pp. 4-5. Second, as discussed below, *infra* pp. 40-46, the ICA directly regulates deferrals, including the funding freezes. *See* 2 U.S.C. § 684. Either authority provides sufficient "law to apply" in evaluating Plaintiff States' claims. *Dep't of Com.*, 588 U.S. at 773.

Defendants' contrary view that they possessed unreviewable discretion to freeze at least those funding streams supported by lump-sum appropriations misreads *Lincoln*. The plaintiffs there challenged a decision by the Indian Health Service—an agency funded via lump-sum appropriations and charged with "expend[ing] such [appropriations] . . . for the benefit, care, and assistance of" native populations—to reallocate spending from one healthcare program to another. 508 U.S. at 184-85. The Supreme Court explained that "as long as [an] agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude." *Id.* at 193. Because the relevant statutes "d[id] not so much as mention" the defunded program and the replacement "clearly f[ell]

within the Service's statutory mandate," the agency's decision was unreviewable. *Id.* at 194.

*Lincoln* thus undermines, rather than supports, defendants' position. The Supreme Court emphasized that an agency "is not free simply to disregard statutory responsibilities," and specified that the allocation of lump-sum appropriations is unreviewable only "as long as the agency" pursues "permissible statutory objectives." *Id.* at 193. And only after verifying that the new program in fact fell within the agency's "statutory mandate" did the Court apply § 701. *Id.* at 194. In short, the agency had discretion to decide how to advance its statutory mandate, but not whether to advance that mandate at all. *Cf. Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18-20 (1st Cir. 2020) (§ 701 did not wholly preclude review notwithstanding agency's "wide" discretion). So too here: even if agency defendants have some discretion as to *how* to expend certain funds, Congress gave them no discretion as to *whether* to do so. By way of example, Congress may not have specified to whom EPA must "competitively award grants" to reduce greenhouse gas air pollution, U.S. Br. 43 (quoting 42 U.S.C. § 7437(c)(1)), but it mandated that the agency "shall" award such grants

39

and "shall make funds available to . . . grantee[s]," 42 U.S.C. § 7437(c).

Likewise, as discussed below, it expressly prohibited agencies from

withholding funds for policy reasons or without complying with the

ICA's procedural requirements.  2 U.S.C. § 684.  Section 701 does not

preclude review here.

### 2.    The funding freezes were contrary to the ICA.

The district court also correctly held that the funding freezes

violated the Impoundment Control Act.  That statute permits "deferral[]

of budget authority" only for certain enumerated nonpolicy reasons and

only after an Executive Branch official sends a detailed message to

Congress justifying the deferral.  2 U.S.C. § 684.  The funding freezes

were deferrals, and their implementation violated the ICA.  And

defendants' counterarguments—primarily that, even if the freezes did

violate the ICA, Plaintiff States cannot obtain relief—are meritless.

a.    The funding freezes violated the ICA because they were

deferrals covered by the Act, and defendants failed to follow the Act's

requirements.  The ICA defines a "deferral of budget authority" to

include "withholding or delaying the obligation or expenditure of budget

authority . . . provided for projects or activities."  2 U.S.C. § 682(1).  The

40

funding freezes fell squarely within this definition:  As the district court

reasoned, they involved the "indefinite withholding or delay of obligated

funds."  A27; *see supra* pp. 7-10 (describing freezes' implementation).

And these deferrals violated the Act in multiple respects.  First, the Act

specifies that "[d]eferrals shall be permissible only" for three nonpolicy

reasons:  "to provide for contingencies," "to achieve savings made

possible by or through changes in requirements or greater efficiency of

operations," or "as specifically provided by law."  2 U.S.C. § 684(b); *see*

*id.* ("No officer or employee of the United States may defer any budget

authority for any other purpose."); *see also City of New Haven v. United*

*States*, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987) (identical language

forbids "policy impoundments").  Defendants do not claim that any of

those categories covers the funding freezes; indeed, defendants ascribe a

policy goal to the freezes—"ensur[ing] [spending's] alignment with the

President's priorities."  U.S. Br. 32.[2]  Second, even if the freezes had

---

[2]  Defendants assert that funding "pauses" "are commonplace and
accepted by" Congress, U.S. Br. 32, but their cited authorities explain
that the ICA at most allows the Executive Branch to institute
"programmatic" deferrals "intended to *advance* congressional budgetary
policies by ensuring that congressional programs are administered
efficiently," while forbidding "policy" deferrals—like the funding

served permissible purposes, defendants could not implement them without informing Congress, 2 U.S.C. § 684(a), which they concededly did not do, A27.  The funding freezes were contrary to law under the ICA.

b.    Defendants' primary response is that, even if the freezes violated the ICA, Plaintiff States cannot obtain relief under the APA. Defendants are incorrect.

First, defendants are wrong that Plaintiff States cannot pursue an APA claim because their injuries fall outside the ICA's zone of interests. U.S. Br. 28-30.  For one, defendants waived this argument by failing to raise it before the district court.  *See* Doc. 113 at 43-44; *see also CSL Plasma Inc. v. U.S. CBP*, 33 F.4th 584, 588 (D.C. Cir. 2022) (zone-of-interests requirement is nonjurisdictional).  In any event, the argument is wrong.  The zone-of-interests standard "is not meant to be especially demanding" and "do[es] not require any indication of congressional purpose to benefit the would-be plaintiff."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)

---

freezes—that "*negate* the will of Congress by substituting the fiscal policies of the Executive Branch."  *New Haven*, 809 F.2d at 901, 908.

(cleaned up). "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (cleaned up).

Plaintiff States easily clear that bar. The Act flatly prohibits deferrals—like the funding freezes—instituted for policy reasons, *see* 2 U.S.C. § 684(b), confirming "congressional power over appropriations," *California v. Trump*, 963 F.3d 926, 942 (9th Cir. 2020), *vacated as moot*, 142 S. Ct. 46 (2021); *see New Haven*, 809 F.2d at 906-09. Plaintiff States' claims, which seek to prevent unlawful deferrals and vindicate Congress's funding decisions, are entirely "congruent" with those interests. *Trump*, 963 F.3d at 942. Because it is "reasonable—indeed, predictable," *Patchak*, 567 U.S. at 227—that parties denied funds by unlawful deferrals would invoke the ICA's prohibition on those deferrals, Plaintiff States' injuries fall within the Act's zone of interests.

Defendants' argument that the ICA implicitly precludes APA review, U.S. Br. 28-30, fares no better. "Court[s] appl[y] a strong presumption favoring judicial review," and defendants cannot meet their "heavy burden" to overcome that presumption. *Mach Mining, LLC*

43

*v. EEOC*, 575 U.S. 480, 486 (2015) (cleaned up); *see AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 148 n.17 (D.D.C. 2025) (rejecting defendants' argument), *appeal docketed*, No. 25-5098 (D.C. Cir.).  Defendants characterize the Act as primarily "built around the give-and-take between the political branches," U.S. Br. 29, but it expressly and categorically prohibits policy deferrals like the funding freezes, 2 U.S.C. § 684(b).  APA review of this basic rule is "entirely consistent" with the statutory scheme.  *Sackett*, 566 U.S. at 128.

Nor does the Act's express cause of action, which authorizes the Comptroller General to challenge certain refusals to "ma[ke] [budget authority] available for obligation," 2 U.S.C. § 687, support defendants' position.  The Supreme Court has flatly rejected the argument that a statute's inclusion of one judicial-review provision necessarily precludes APA review.  *See Sackett*, 566 U.S. at 129.  That conclusion is especially appropriate here:  the ICA's cause of action permits the Comptroller General (who likely is not authorized to seek review under the APA) to *also* challenge violations of the ICA, it does not preclude separate suits.  Far from providing a "clear and convincing indication[] . . . that

44

Congress intended to bar review," *Cuozzo Speed Techs., LLC v. Lee*, 579
U.S. 261, 273 (2016) (cleaned up), then, the ICA's express cause of
action *expands* the availability of review.[3]

Finally, defendants are wrong that the ICA violations do not
provide an independent basis to enjoin the freezes. The "district court
is in the best position to tailor the scope of injunctive relief," and so this
Court's "review is for abuse of discretion only." *Vaquería Tres Monjitas,
Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009). The district court did
not abuse its discretion here: requiring only that defendants send a
message notifying Congress of their intent to defer spending, as
defendants propose, U.S. Br. 31, would neither correct the freezes'
impermissibly policy-based nature, 2 U.S.C. § 684(b); *supra* p. 41, nor
prevent irreparable harm to Plaintiff States while this case proceeds.
The district court's order appropriately does both, while leaving the

---

[3] For these reasons, two out-of-circuit district court decisions on which
defendants rely, both of which found implicit preclusion of APA claims
based on the ICA's explicit cause of action, are unpersuasive. U.S. Br.
31 (citing *Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 733-35 (S.D.
Tex. 2024); *Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp.
118, 134 (D.D.C. 1977)).

Executive Branch ample room to exercise its lawful discretion over federal spending.  *See infra* pp. 66-67.

### D.    Defendants' remaining counterarguments fail.

As they did at the stay stage, defendants rely primarily on an assortment of procedural and technical arguments rather than on any sustained defense of their conduct on the merits.  These arguments are waived, incorrect, or both.

### 1.    Defendants' procedural arguments are waived and meritless.

Defendants first assert that the district court's preliminary-injunction order was "[p]rocedurally [i]mproper" because Plaintiff States amended their complaint after defendants filed their opposition to the preliminary-injunction motion.  U.S. Br. 33-35.  That argument fails for multiple reasons.

To begin, defendants waived this issue by failing to raise it before the district court despite ample opportunity to do so.  *See Emigrant Residential, LLC v. Pinti*, 134 F.4th 626, 637 (1st Cir. 2025) (argument not presented to district court is waived).  Plaintiff States filed their amended complaint on February 13.  Their reply in support of their preliminary-injunction motion, filed the next day, explicitly requested

that the district court treat the amended complaint "as the operative pleading." Doc. 147 at 2 n.1. Defendants did not object to this request during the week between that filing and the preliminary-injunction hearing, at the hearing, or during the weeks between the hearing and the district court's issuance of its preliminary-injunction order. Had defendants acted at any point during that three-week window, the district court could easily have mooted the point by authorizing a surreply. By denying the district court that opportunity to address the issue, defendants waived this argument.

Even setting this waiver aside, the argument fails on both the facts and the law. As a factual matter, the amended complaint did not materially change the scope of the case. The ICA argument defendants describe as "entirely new" to the amended complaint, U.S. Br. 34, was

---

[4] In a two-sentence footnote, defendants also assert that, "[a]ccording to" an amicus brief, the Governor of Kentucky cannot obtain relief on behalf of state agencies. U.S. Br. 34 n.1. Defendants have waived *this* argument (which, in any event, mischaracterizes the amicus brief) three times over by failing to raise it before the district court and by raising it now "only in a footnote [and] in a perfunctory manner." *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 83 n.7 (1st Cir. 2018); *see Pinti*, 134 F.4th at 637; *Ryan v. U.S. ICE*, 974 F.3d 9, 33 n.10 (1st Cir. 2020) (Court "eschew[s] arguments raised only by amici and not by the parties"); U.S. Br. 34 n.1 (citing no Kentucky law).

advanced in the Plaintiff States' TRO motion, filed the same day as the original complaint, Doc. 3 at 12; was a basis for the TRO itself, A178; and had featured prominently in both parties' preliminary-injunction briefs before the amended complaint was filed, Doc. 67 at 54-55; Doc. 113 at 43-47.  And although the amended complaint identified additional agency defendants, the original complaint had already named 23 such defendants and sought to enjoin them from freezing funding.  A78-81, A105.  Indeed, in other litigation challenging the Directive, OMB and its director characterized the TRO in *this* case— based on Plaintiff States' original complaint—as "extending beyond just the [Directive]."  Doc. 47 at 13, *Council II*, 775 F. Supp. 3d 100 (No. 25-cv-239).  Defendants, that is, have always correctly understood this case's scope as encompassing agencies' own conduct, not just OMB's, and the Court should reject their post hoc challenges to the amended complaint.

Nor do defendants cite any authority barring a court from treating an amended complaint filed after a preliminary-injunction motion as operative.  *Cf. Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 638 (9th Cir. 2015) (cited at U.S. Br. 35) (noting that party

"might have sought leave to amend its complaint" to include an additional claim but failed to do so). Unsurprisingly so, since such a rule would be at odds with settled practice concerning preliminary-injunction motions. As the Supreme Court has explained, "given the haste that is often necessary if [the status quo is] to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal . . . than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Consistent with that approach, "a preliminary injunction may be granted upon a motion made before a formal complaint is presented." 11A Wright et al., *Federal Practice and Procedure* § 2949 (3d ed. 2025). The ordinary procedure Plaintiff States employed here does not call the preliminary injunction into question.

## 2. This case is not moot.

Defendants are also wrong that OMB's purported rescission of the Directive mooted Plaintiff States' claims concerning that document. U.S. Br. 19-22. Notably, defendants do not argue that the challenges to agency defendants' funding freezes are moot. Nor could they, given the extensive and unrebutted evidence that those freezes persisted until— and, in some cases, after—the district court enjoined them. *See, e.g.*,

49

A58-59 ("[t]he record makes clear" that FEMA maintained a funding freeze even after the preliminary-injunction order); *supra* pp. 15-16.

Even with respect to the Directive itself, defendants' mootness argument fails due to the voluntary-cessation doctrine, as the district court held. A15-18. That doctrine "holds that a defendant's voluntary change in conduct moots a case only if" (1) the change is "unrelated to the litigation" or (2) "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Calvary Chapel of Bangor v. Mills*, 52 F.4th 40, 47 (1st Cir. 2022) (cleaned up). As the parties asserting mootness, defendants bear the "heavy burden" of showing that this doctrine does not apply. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). They have not made that showing. Indeed, they have not even attempted to show that the purported rescission was unrelated to the litigation. *See* U.S. Br. 19-22. Nor could they. The district court properly found that the rescission "was a clear effort to moot legal challenges" to the Directive, A16—a finding supported by the White House Press Secretary's explicit statement that the rescission was a response to purported "confusion created by" litigation, A252.

50

Defendants cannot satisfy the doctrine's second prong, either. Faced with the "heavy burden" of showing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Laidlaw*, 528 U.S. at 189, defendants offer only speculation that the funding freezes mandated by the Directive "would necessarily happen only once, shortly after the Executive Orders [identified in the Directive] were issued and before OMB had a chance to conduct its review," U.S. Br. 20. But defendants cite no evidence showing that OMB or any other agency has completed the reviews contemplated by the Directive, and do not explain why the executive orders would become less relevant over time. And the district court found, and the record shows, that the funding freezes continued even after the purported rescission. A11-12, A18 n.6, A41-42; *supra* pp. 9-10, 15-16. It is therefore far from "absolutely clear" that OMB cannot "reasonably be expected" to "return to [its] old ways" absent judicial intervention, *Laidlaw*, 528 U.S. at 189, and so the voluntary-cessation doctrine applies.

Defendants' narrower arguments that certain aspects of the challenge to the Directive are moot also fail. In asserting that the

preliminary-injunction motion is moot with respect to the Directive,

defendants appear to suggest—without evidence—that OMB will not

reinstate the policy underlying the Directive before the district court

enters final judgment in this case.  U.S. Br. 22.  But the voluntary-

cessation doctrine's demand for absolute clarity applies equally at the

preliminary-injunction stage, *see Bayley's Campground, Inc. v. Mills*,

985 F.3d 153, 157-58 (1st Cir. 2021), and the speed with which OMB

issued the Directive—a week after President Trump took office, and

only a day before freezes were to take effect—demonstrates that, absent

the preliminary injunction, the agency could easily reinstate that policy

at any time.  Indeed, defendants essentially admit as much, observing

only that "plaintiffs would be free to seek preliminary relief against"

any renewed agency action.  U.S. Br. 22.  The voluntary-cessation

doctrine prevents this game of whack-a-mole.  *See Bayley's*

*Campground*, 985 F.3d at 157-58; *cf. Ohio v. U.S. EPA*, 969 F.3d 306,

309-10 (6th Cir. 2020) (cited at U.S. Br. 22) (concluding that

preliminary-injunction motion was moot because challenged conduct

could not feasibly recur before district court entered final judgment).

Nor have defendants established that any of Plaintiff States' APA arguments concerning the Directive are moot:  they speculate that any future OMB action might implicate different programs or rest on more fulsome reasoning, U.S. Br. 21-22, but cite no evidence showing as much with "absolute[]" clarity, *Laidlaw*, 528 U.S. at 189.  More broadly, defendants' reasoning would essentially render the voluntary-cessation doctrine inapplicable to arbitrary-and-capricious challenges, since an agency always *might* rely on new or different reasoning in the future.  That cannot be right.  *See, e.g.*, *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 623-25 (D.C. Cir. 2022) (vacating agency action as arbitrary and capricious after applying voluntary-cessation doctrine).  No aspect of this case is moot.

### 3. The Tucker Act did not deprive the district court of jurisdiction.

Defendants next assert that the Tucker Act deprived the district court of jurisdiction over certain aspects of this case.  U.S. Br. 44-49.  To start, it is not clear how broadly this argument extends, beyond a single "illustrative" example involving FEMA funding, U.S. Br. 45—in part because defendants failed to advance it in their preliminary-injunction briefing, *see* Doc. 113 at 11-22.  Regardless, defendants are wrong.

Longstanding precedent makes clear that Plaintiff States were not required to bring this case in the Court of Federal Claims pursuant to the Tucker Act.  *See Bowen v. Massachusetts*, 487 U.S. 879, 904-05 (1988); *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-71 (D.C. Cir. 1982).  The Supreme Court's per curiam decision in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), does not change the analysis.  And, having appropriately entered a preliminary injunction, the district court had jurisdiction to enforce it, as it did with respect to the FEMA funding freeze.

1. "[T]he Court of Federal Claims has exclusive jurisdiction of an action pursuant to the Tucker Act only if the claim in question is 'at its essence' contractual."  *Crowley*, 38 F.4th at 1113 (quoting *Megapulse*, 672 F.2d at 968).  "Whether a claim is 'at its essence' contractual . . . 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'"  *Id.* at 1106 (quoting *Megapulse*, 672 F.2d at 968); *accord Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir. 1978).  Both factors support the district court's exercise of jurisdiction here.

54

First, Plaintiff States' claims—and the district court's preliminary injunction—are based on the Constitution and federal statutes, not contracts. Plaintiff States allege that defendants acted arbitrarily and capriciously and in excess of their statutory and constitutional authority by imposing the funding freezes—not that they violated the terms of any particular award. As a result, "determining whether [defendants] infringed [Plaintiff States'] rights as alleged in the complaint requires primarily an examination of the statutes [and constitutional provisions that defendants] ha[ve] purportedly violated, not of [any] contract." *Crowley*, 38 F.4th at 1108-09. Consistent with that conclusion, the district court, in granting the injunction, not only did not rely on the terms of any award, but also explicitly noted that defendants remain free to "mak[e] funding decisions" based on any "applicable . . . grant terms." A42-43. This case thus does not involve any claim that is "at its essence" contractual.

The fact that some funding streams may also be memorialized in written grant agreements is irrelevant. A court's "jurisdiction does not turn on whether the plaintiff could conceivably have based his claim on a government contract," but on "whether the claim 'is validly based on

grounds other than a contractual relationship with the government.'"
*Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 407 (2d Cir. 2015)
(quoting *Megapulse*, 672 F.2d at 968); *see also Megapulse*, 672 F.2d at
968 ("[T]he mere fact that a court may have to rule on a contract issue
does not . . . deprive the court of jurisdiction it might otherwise have.").
Defendants cannot escape the district court's jurisdiction by pointing
out *other* ways in which they may have violated Plaintiff States' rights.
*See Atterbury*, 805 F.3d at 407-08 (rejecting argument that, because
federal employee's discharge may have breached contract, district court
lacked jurisdiction over constitutional challenge to termination).
Because the sources of Plaintiff States' rights are "truly independent" of
any contract, the Tucker Act does not apply. *Crowley*, 38 F.4th at 1107.

The second consideration—"the type of relief sought (or
appropriate)," *id.* at 1106—reinforces this conclusion. Plaintiff States
do not seek, and the district court did not award, the "prototypical
contract remed[ies]" of monetary damages or specific performance,
*id.* at 1110, but declaratory and injunctive relief requiring defendants
to comply with federal statutes and the Constitution by refraining from
implementing unlawful categorical funding freezes going forward,

A43-45, A362.  And while defendants emphasize that the preliminary injunction's prohibition against unlawful categorical funding freezes sometimes indirectly results in their transferring funds to Plaintiff States, U.S. Br. 45, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages,'" *Bowen*, 487 U.S. at 893. Nor does "the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting" bring a noncontract claim within the scope of the Tucker Act.  *Megapulse*, 672 F.2d at 971.  The equitable remedies at issue in this case thus confirm that the district court had jurisdiction.

2.     Defendants rest their Tucker Act argument almost entirely on the Supreme Court's order in *California*.  But that case does not change the result here.

There, a group of States challenged the cancellation of several existing federal grant awards, which cancellations the defendant agency had announced with letters to individual award recipients.  *See* 145 S. Ct. at 968; *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 95 (1st Cir.

2025).  The district court issued a TRO enjoining the terminations, and this Court denied a stay pending appeal, reasoning that "although the terms and conditions of each individual grant award [would be] at issue" in determining whether the cancellations were permissible, "the essence of the claims [was] not contractual," 132 F.4th at 96-97 (cleaned up).  The Supreme Court then entered a stay in a brief order, stating that the defendants were "likely to succeed in showing the [d]istrict [c]ourt lacked jurisdiction" because that court's order was essentially one "to enforce a contractual obligation to pay money" covered by the Tucker Act.  145 S. Ct. at 968.

*California* has no bearing on this case.  That case involved, in part, a challenge to a federal agency's termination of a range of grant awards, which defendants insisted rested on the agency's individualized review of "each . . . grant" and "grant document."  Emergency Motion for Stay Pending Appeal at 3-4, *California*, 132 F.4th 92 (No. 25-1244). Here, in contrast, Plaintiff States challenge defendants' implementation of "broad, categorical freezes on obligated funds" without any review of statutory, regulatory, or grant terms that might be applicable. A564; *see also* A348-62.  As a result, and as discussed, *supra* pp. 55-56, none of

defendants' challenged actions, none of Plaintiff States' claims or arguments, and none of the district court's reasoning depends on the terms of particular awards.  *See AIDS Vaccine*, 770 F. Supp. 3d at 137 (observing that "it would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached").  Indeed, many of the funding streams at issue here are formula funds that do not involve agreements resembling contracts.  *See supra* pp. 4, 35.  Nothing in *California* deprived the district court of jurisdiction.[5]

3.    Nor did the Tucker Act divest the district court of jurisdiction to enforce the preliminary injunction with respect to FEMA funding.  *Contra* U.S. Br. 45-49.  As an initial matter, the order merely enforced the preliminary injunction, and this Court lacks appellate jurisdiction to review it.  *See Fox v. Cap. Co.*, 299 U.S. 105, 107 (1936);

---

[5] Some Plaintiff States are also plaintiffs in *California*.  Those States maintain that the Tucker Act did not implicitly strip the district court of jurisdiction there and will defend that position in that case.  After all, the Supreme Court's decision—issued with "barebones briefing, no argument, and scarce time for reflection," 145 S. Ct. at 969 (Kagan, J., dissenting)—was preliminary, and courts will likely further consider the jurisdictional question on a more developed record.  But even assuming the Court reached the correct result in *California*, that decision is inapposite here.

11A Wright et al., *supra*, § 2960; *cf.* U.S. Br. 45 n.2 (not disputing that order to enforce preliminary injunction is not independently appealable).  And even if defendants were correct that the order modified the preliminary injunction and appellate jurisdiction existed, that would only highlight that the preliminary injunction itself poses no issues under the Tucker Act.

Regardless, the district court had jurisdiction to issue the enforcement order.  The district court found, as a factual matter, that FEMA's purported manual funding review was, in reality, "an indefinite categorical pause on payments" to Plaintiff States, in violation of the preliminary injunction.  A55; *see* A52-55, A59.  That finding rested on a voluminous factual record showing that Plaintiff States were unable to access hundreds of millions of dollars in FEMA funds, covering an array of programs, sometimes for over a month.  A52-53; *see, e.g.*, SA197-205 (describing funding withheld from thirteen Plaintiff States).  Because this indefinite, categorical pause flouted the preliminary injunction, the district court properly required FEMA to comply with that order.

For the same reasons as with the preliminary injunction itself, this enforcement order did not implicate the Tucker Act.  Defendants'

60

contrary view ignores both the district court's findings about the FEMA
freeze's categorical, indefinite nature and the extensive evidence
supporting those findings.  And it mischaracterizes the district court's
order as "compelling continued payment of funds under . . . particular
FEMA grants."  U.S. Br. 48.  The order did not compel any specific
payments; consistent with the preliminary injunction, it forbade the
indefinite, categorical freeze that FEMA had implemented, leaving the
agency free to make appropriate funding decisions "based on [its] actual
authority under the applicable statutory, regulatory, or grant terms."
A42-43, A55 n.5; *see also* A67 (same point in denying reconsideration).
The Tucker Act thus had no effect on the district court's jurisdiction to
enter that order.

## II.    The District Court Did Not Abuse Its Discretion By Awarding Injunctive Relief.

The district court also correctly held that the remaining equitable
factors overwhelmingly favored Plaintiff States.  A34-43.  As the court
explained, the funding freezes, which implicated roughly 2,600 funding
sources and billions of dollars, A115-69; *supra* pp. 7-10, irreparably
harmed Plaintiff States and their residents, and would have continued
to do so if not enjoined.  The district court's narrow order serves the

public interest by preventing that harm and inflicts no comparable injury on defendants. The court's balancing of these factors thus was not an abuse of discretion. *See We the People PAC v. Bellows*, 40 F.4th 1, 25 (1st Cir. 2022).

### A. The funding freezes irreparably harmed Plaintiff States.

As the district court observed, Plaintiff States "presented unrebutted evidence of the [irreparable] harm" caused by the funding freezes—harm that would have continued absent injunctive relief. A36; *see supra* pp. 9-10. The district court's findings—which, the court emphasized, only "summarize[d] the 'highlights,'" A36—amply justified entry of an injunction.

The district court found numerous harms to critical programs and services provided by Plaintiff States. Childcare programs were forced to "consider[] layoffs, reductions in service, and even closures." A36-37. Public-safety agencies were unable to access grants for providing emergency response and other critical functions. A37-38. The freezes also "affect[ed] federal funds for critical transportation infrastructure," without which "States may have [had] to suspend, delay, or cancel projects." A38-39. The district court identified similar effects across an

array of fields, including K-12 education, healthcare, services for the

elderly and people with disabilities, and environmental protection.

A34-41.

The district court also recognized harms the freezes caused to

Plaintiff States' operations.  A41-42.  As this Court recognized in

denying a stay pending appeal, these included "the obligation of new

debt; the inability to pay existing debt; impediments to planning,

hiring, and operations; and disruptions to research projects by state

universities."  A579.

Defendants do not challenge any of those findings.  Instead, they

largely repackage their merits arguments, asserting that Plaintiff

States "have no cognizable interest in receiving federal funds to which

they are not legally entitled or on a timeline that is not legally

compelled."  U.S. Br. 52.  Since Plaintiff States are likely to succeed in

showing that the freezes were unlawful, *supra* pp. 18-61, this argument

is beside the point.  Similarly, the district court did not "find irreparable

harm only by *presuming* that federal funds would be cut off unlawfully,"

U.S. Br. 52 (emphasis added); it explained at length why the freezes

were unlawful in multiple respects, A20-34.

Defendants' authorities are equally off point.  They note that, in *California*, the Supreme Court found no risk of irreparable harm to the plaintiffs because if "they ultimately prevail[ed], they [could] recover any wrongfully withheld funds through suit in an appropriate forum." 145 S. Ct. at 969; *see* U.S. Br. 53.  But this reasoning rested on the Court's belief (correct or not) that the plaintiffs in that case "ha[d] the financial wherewithal to keep the[] [affected] programs running" while the case proceeded.  145 S. Ct. at 969.  Not so here.  As the district court found, even temporary implementation of the funding freezes would compromise Plaintiff States' operations and force them to modify or eliminate important programs and services.  A36-42.

Defendants also cite *Haaland v. Brackeen*, 599 U.S. 255 (2023), for the point "that States cannot invoke harms on behalf of their citizens in actions against the federal government."  U.S. Br. 52.  But, as the stay panel explained, *Brackeen* dealt only with Article III standing, not the equitable factors relevant to the preliminary-injunction analysis.  A578 (citing *Brackeen*, 599 U.S. at 295).  And, as the panel further observed, even "set[ting] aside the harms to [Plaintiff States'] residents, the [d]istrict [c]ourt still found a number of harms that [Plaintiff States]

themselves would irreparably suffer." A579; *see supra* p. 63 (discussing these harms). In sum, the likelihood of irreparable harm strongly supports the district court's order.

### B. The balance of the equities and the public interest strongly favor Plaintiff States.

The district court also did not abuse its discretion in concluding that the balance of equities and the public interest "weigh[ed] heavily in favor of granting" a preliminary injunction. A42-43; *see Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (these factors "merge when the government is the opposing party" (cleaned up)). The speculative harms defendants attribute to the preliminary injunction do not withstand scrutiny, and none outweighs the irreparable injuries the freezes would inflict on Plaintiff States.

Defendants primarily offer variations on a theme already rejected by this Court: that the preliminary injunction "interferes with agencies' ability to exercise their lawful authorities to implement the President's policy directives." U.S. Br. 49; *see* A574-75 (rejecting this argument). This argument stumbles at the threshold because, as discussed, *supra* pp. 18-61, the funding freezes were unlawful, and "there is generally no

public interest in the perpetuation of unlawful agency action." *Shawnee*

*Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (cleaned up).

In any event, defendants' argument mischaracterizes both the

scope and effect of the district court's order. As the court repeatedly

explained, the preliminary injunction "does not prevent [defendants]

from making funding decisions . . . under the Executive's actual

authority in the applicable statutory, regulatory, or grant terms." A42-

43 (cleaned up); *accord* A55 n.5, A295. And the court has made clear

that defendants need not seek its approval before exercising their

lawful discretion. A295. Consistent with the order's narrow scope, and

contrary to defendants' claim that the district court is "micromanaging"

their operations, U.S. Br. 51 (quoting A4), the parties have litigated

only one motion to enforce the preliminary injunction, and none in the

last three months. During the same period, federal agencies have taken

a bevy of funding-related actions, many of which have drawn *separate*

legal challenges from some or all Plaintiff States.[6] Defendants'

---

[6] *See, e.g.*, *Colorado v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-
121 (D.R.I) (public-health funding); *Illinois v. FEMA*, No. 25-cv-206
(D.R.I.) (homeland-security grants); *New York v. NSF*, No. 25-cv-4452
(S.D.N.Y.) (NSF grants).

assertions that the preliminary injunction will "chill agencies from . . . review[ing] and realign[ing] funding," U.S. Br. 50, or permit Plaintiff States to use this case as a forum to litigate "all manner of funding disputes . . . whenever [they] dislike a funding decision by any of the 23 agency defendants," U.S. Br. 51, simply do not reflect reality. Instead, the district court's narrow order leaves defendants ample room to exercise their lawful discretion.

Defendants' related objection to the preliminary injunction's purported "vague[ness]," U.S. Br. 50, is unpersuasive for the reasons already identified by this Court when denying the stay motion, A575-76. The injunction prohibits defendants from implementing the Directive "under a different name or through other means," and extends to orders that are "materially similar" to the Directive in "impos[ing] or appl[ying] a categorical pause or freeze of funding appropriated by Congress." A44. As this Court explained, that description satisfies Rule 65, which requires only that an injunction "describe in *reasonable* detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C) (emphasis added); *see* A575. "It does not 'require that an order list the components of a term whose boundaries are understood by

67

common parlance.'" A575 (quoting *United States v. Pro. Air Traffic Controllers Org.*, 678 F.2d 1, 3 (1st Cir. 1982)).  Further, as at the stay stage, "[d]efendants do not identify any particular action with respect to which they are unclear about the [injunction's] reach." A575.  Nor can defendants reasonably claim to be unsure which executive orders are implicated by the district court's order, which "plainly . . . identifie[s]" those at issue.  A576; *see* A44.

Finally, as at the stay stage, defendants have not shown that they would have any difficulty recovering inappropriately disbursed funds "[i]f the government's position is later vindicated in this litigation." U.S. Br. 52; *see* A577.  Even setting aside the fact that nothing in the court's order prevents defendants from stopping payments under "the applicable statutory, regulatory, or grant terms," A43, Plaintiff States have ongoing relationships with the federal government, and numerous funding statutes include explicit mechanisms for recouping excessive payments.  *See, e.g.*, 42 U.S.C. § 1396b(d) (Medicaid).  And because all four preliminary-injunction factors favor Plaintiff States, the district court did not abuse its discretion in granting relief.

## CONCLUSION

The Court should affirm the preliminary injunction.

Respectfully submitted,

LETITIA JAMES
Attorney General
State of New York

BARBARA D. UNDERWOOD
Solicitor General
JUDITH N. VALE
Deputy Solicitor General

/s/ Mark S. Grube
MARK S. GRUBE
Senior Assistant Solicitor General
RABIA MUQADDAM
Special Counsel for Federal
    Initiatives
MICHAEL J. MYERS
Senior Counsel
MOLLY THOMAS-JENSEN
Special Counsel
COLLEEN FAHERTY
Special Trial Counsel
ZOE LEVINE
Special Counsel for Immigrant
    Justice
28 Liberty St.
New York, NY 10005
(212) 416-8020
mark.grube@ag.ny.gov
rabia.muqaddam@ag.ny.gov
michael.myers@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
colleen.faherty@ag.ny.gov

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

/s/ Alex Hemmer
ALEX HEMMER
Deputy Solicitor General
R. SAM HORAN
Assistant Attorney General
115 S. La Salle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov

69

zoe.levine@ag.ny.gov

ROB BONTA
Attorney General
State of California

/s/ Laura L. Faer
LAURA L. FAER
CHRISTINE CHUANG
Supervising Deputy Attorneys
    General
NICHOLAS GREEN
MARIE ELIZABETH LOGAN
THEODORE MCCOMBS
Deputy Attorneys General
1515 Clay St.
Oakland, CA 94612
(510) 879-3304
laura.faer@doj.ca.gov
christine.chuang@doj.ca.gov
nicholas.green@doj.ca.gov
marie.logan@doj.ca.gov
theodore.mccombs@doj.ca.gov

PETER F. NERONHA
Attorney General
State of Rhode Island

/s/ Kathryn M. Sabatini
KATHRYN M. SABATINI
Civil Division Chief
Special Assistant
    Attorney General
SARAH W. RICE
Deputy Chief, Public Protection
    Bureau
Assistant Attorney General
LEONARD GIARRANO IV
Special Assistant Attorney
    General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
ksabatini@riag.ri.gov
srice@riag.ri.gov
lgiarrano@riag.ri.gov

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

/s/ Katherine B. Dirks
KATHERINE B. DIRKS
Chief State Trial Counsel
TURNER SMITH
Deputy Chief, Energy and
    Environment Bureau
DAVID C. KRAVITZ

MATTHEW J. PLATKIN
Attorney General
State of New Jersey

/s/ Angela Cai
ANGELA CAI
*Executive Assistant Attorney*
    *General*
JEREMY M. FEIGENBAUM
Solicitor General
SHANKAR DURAISWAMY

State Solicitor
ANNA LUMELSKY
Deputy State Solicitor
1 Ashburton Pl.
Boston, MA  02108
(617) 963-2277
katherine.dirks@mass.gov
turner.smith@mass.gov
david.kravitz@mass.gov
anna.lumelsky@mass.gov

Deputy Solicitor General
25 Market St.
Trenton, NJ 08625
(609) 376-3377
angela.cai@njoag.gov
jeremy.feigenbaum@njoag.gov
shankar.duraiswamy@njoag.gov

KRISTEN K. MAYES
Attorney General
State of Arizona

WILLIAM TONG
Attorney General
State of Connecticut

/s/ Joshua D. Bendor
JOSHUA D. BENDOR
Solicitor Gener*al*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
joshua.bendor@azag.gov
nathan.arroswmith@azag.gov

/s/ Michael K. Skold
MICHAEL K. SKOLD
Solicitor General
JILL LACEDONIA
165 Capitol Ave.
Hartford, CT 06106
(860) 808-5020
michael.skold@ct.gov
jill.lacedonia@ct.gov

PHILIP J. WEISER
Attorney General
State of Colorado

KATHLEEN JENNINGS
Attorney General
State of Delaware

/s/ Shannon Stevenson
SHANNON STEVENSON
Solicitor General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000

/s/ Vanessa L. Kassab
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8413

71

shannon.stevenson@coag.gov

vanessa.kassab@delaware.gov

BRIAN L. SCHWALB
Attorney General
District of Columbia

ANNE E. LOPEZ
Attorney General
State of Hawaiʻi

/s/ Andrew Mendrala
ANDREW MENDRALA
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for
    the District of Columbia
400 Sixth Street, NW
Washington, DC 20001
(202) 724-9726
andrew.mendrala@dc.gov

/s/ Kalikoʻonālani D. Fernandes
DAVID D. DAY
Special Assistant to the Attorney
    General
KALIKOʻONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

AARON M. FREY
Attorney General
State of Maine

ANTHONY G. BROWN
Attorney General
State of Maryland

/s/ Jason Anton
JASON ANTON
Assistant Attorney General
Maine Office of the Attorney
    General
6 State House Station
Augusta, ME 04333
207-626-8800
jason.anton@maine.gov

/s/ Adam D. Kirschner
JULIA DOYLE
Solicitor General
ADAM D. KIRSCHNER
Senior Assistant Attorney
    General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6424
akirschner@oag.state.md.us

DANA NESSEL
Attorney General

KEITH ELLISON
Attorney General

72

State of Michigan

/s/ Linus Banghart-Linn
LINUS BANGHART-LINN
Chief Legal Counsel
NEIL GIOVANATTI
Assistant Attorney General
Michigan Department of Attorney
    General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
banghart-linnl@michigan.gov
giovanattin@michigan.gov

State of Minnesota

/s/ Liz Kramer
LIZ KRAMER
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

AARON D. FORD
Attorney General
State of Nevada

/s/ Heidi Parry Stern
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney
    General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
hstern@ag.nv.gov

RAÚL TORREZ
Attorney General
State of New Mexico

/s/ Anjana Samant
ANJANA SAMANT
Deputy Counsel
N.M. Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov

JEFF JACKSON
Attorney General
State of North Carolina

/s/ Daniel P. Mosteller
DANIEL P. MOSTELLER

DAN RAYFIELD
Attorney General
State of Oregon

/s/ Robert A. Koch
BENJAMIN GUTMAN
Solicitor General

73

Associate Deputy Attorney
    General
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov


CHARITY R. CLARK
Attorney General
State of Vermont

/s/ Jonathan T. Rose
JONATHAN T. ROSE
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
jonathan.rose@vermont.gov




OFFICE OF THE GOVERNOR
EX REL. ANDY BESHEAR
in his official capacity as
Governor of the Commonwealth of
Kentucky


/s/ S. Travis Mayo
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel
LAURA C. TIPTON

ROBERT A. KOCH
Senior Assistant Attorney
    General
100 SW Market Street
Portland, OR 97201
(503) 378-4402
robert.a.koch@doj.oregon.gov


NICHOLAS W. BROWN
Attorney General
State of Washington

/s/ Andrew Hughes
ANDREW HUGHES
Assistant Attorney General
LEAH BROWN
Assistant Attorney General
Office of the Washington State
    Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
andrew.hughes@atg.wa.gov
leah.brown@atg.wa.gov




JOSHUA L. KAUL
Attorney General
State of Wisconsin

/s/ Aaron J. Bibb
AARON J. BIBB
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810

Deputy General Counsel                 bibbaj@doj.state.wi.us
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

July 18, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,993 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirement of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.


/s/ Alex Hemmer
ALEX HEMMER

July 18, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2025, I electronically filed the foregoing Brief of Plaintiffs-Appellees with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER