Nos. 25-1236, 25-1413

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————————

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS;
STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH
OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF
COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF
MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF
NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO;
STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON;
STATE OF WISCONSIN, OFFICE OF THE GOVERNOR OF KENTUCKY, ex
rel. ANDREW BESHEAR, in their official capacity as Governor of the
Commonwealth of Kentucky,

Plaintiffs-Appellees,

(*caption continued on inside cover*)

————————————

On Appeal from the United States District Court
for the District of Rhode Island

————————————

## REPLY BRIEF FOR APPELLANTS

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in their official capacity as Secretary of the Treasury; PATRICIA COLLINS, in their official capacity as Treasurer of the U.S.; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in their official capacity as Secretary of Education; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, in their official capacity as Acting Administrator of the U.S. Federal Emergency Management Agency; U.S. DEPARTMENT OF TRANSPORTATION; SEAN P. DUFFY, in their official capacity as Secretary of Transportation; U.S. DEPARTMENT OF LABOR; LORI CHAVEZDEREMER, in their official capacity as Secretary of Labor; U.S. DEPARTMENT OF ENERGY; CHRISTOPHER ALLEN WRIGHT, in their official capacity as Secretary of the U.S. Department of Energy; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, in their official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, in their official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in their official capacity as Attorney General; NATIONAL SCIENCE FOUNDATION; DR. SETHURAMAN PANCHANATHAN, in their official capacity as Director of the National Science Foundation; U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in their official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacities as Secretary of State and Acting Administrator of the United States Agency for International Development; US AGENCY FOR INTERNATIONAL DEVELOPMENT; U.S. DEPARTMENT OF DEFENSE; PETE HEGSETH, in their official capacity as Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS; DOUGLAS COLLINS, in their official capacity as Secretary of Veterans Affairs; U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JANET PETRO, in their official capacity as Acting Administrator of National Aeronautics and Space Administration; CORPORATION FOR NATIONAL AND COMMUNITY SERVICE; JENNIFER BASTRESS TAHMASEBI, in their official capacity as Interim Head of the Corporation for National and Community Service; U.S. SOCIAL SECURITY ADMINISTRATION; LELAND DUDEK, in their official capacity as Acting Commissioner of United States Social Security Administration; U.S. SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, in their official capacity as Acting Administrator of U.S. Small Business Administration,

Defendants-Appellants.

———————————————

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ..................................................................1

ARGUMENT ....................................................................................................1

I.     Plaintiffs' Challenges to the OMB Memorandum Fail ...........................1

II.    Plaintiffs Cannot Leverage Moot Claims Against the OMB
       Memorandum to Challenge Dozens of Independent Agency Funding
       Decisions ............................................................................................ 12

       A.    The Broad Injunction Suffers Procedural Flaws .......................12

       B.    The Broad Injunction Suffers Substantive Flaws ......................17

III.   The Remaining Factors Do Not Support the District Court's Preliminary
       Injunction............................................................................................ 23

CONCLUSION ............................................................................................. 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                  **Page(s)**

*American Clinical Lab'y Ass'n v. Becerra*
40 F.4th 616 (D.C. Cir. 2022) ........................................................................... 3

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
794 F.3d 168 (1st Cir. 2015) ........................................................................... 16

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984) ........................................................................................... 8

*Bondi v. VanDerStok*,
145 S. Ct. 857 (2025) ....................................................................................... 17

*Boston Bit Labs, Inc. v. Baker*,
11 F.4th 3 (1st Cir. 2021) .................................................................................. 2

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .................................................................................... 22, 23

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ......................................................................................... 12

*Clarke v. Securities Indus. Ass'n*,
479 U.S. 388 (1987) ........................................................................................... 9

*Corrigan v. Boston Univ.*,
98 F.4th 346 (1st Cir. 2024) .............................................................................. 2

*Department of Educ. v. California*,
145 S. Ct. 966 (2025) (per curiam) ...................................................... 21, 22, 25

*Global Health Council v. Trump*, --- F.4th ---,
No. 25-5097, 2025 WL 2326021 (D.C. Cir. Aug. 13, 2025) ....................... 7, 8

*Harris v. University of Mass. Lowell*,
43 F.4th 187 (1st Cir. 2022) .............................................................................. 3

*Holyoke Nursing Home, Inc., In re*,
372 F.3d 1 (1st Cir. 2004) ............................................................................... 12

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ......................................................................................... 19

*Lujan v. National Wildlife Fed'n*,
   497 U.S. 871 (1990) ........................................................................... 15

*Milk Train, Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002) ......................................................... 19

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) ........................................................................... 17

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................ 5, 6

*National Foreign Trade Council v. Natsios*,
   181 F.3d 38 (1st Cir. 1999) ............................................................. 13

*National Insts. of Health v. American Pub. Health Ass'n*,
   No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) ................ 21

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024) ....................................................... 12

*Noem v. Haaland*,
   41 F.4th 1013 (8th Cir. 2022) .......................................................... 3

*Patsy's Italian Rest., Inc. v. Banas*,
   658 F.3d 254 (2d Cir. 2011) ............................................................ 12

*Sackett v. EPA*,
   566 U.S. 120 (2012) ........................................................................... 8

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ............................................................ 9

*Studebaker Corp. v. Gittlin*,
   360 F.2d 692 (2d Cir. 1966) ............................................................ 14

*Trump v. American Fed'n of Gov't Emps.*,
   145 S. Ct. 2635 (2025) ...................................................................... 5

*Trump v. Sierra Club*,
   140 S. Ct. 1 (2019) ............................................................................. 9

*United States v. Vanvliet*,
   542 F.3d 259 (1st Cir. 2008) ........................................................... 13

**Statutes:**

Administrative Procedure Act (APA):
    5 U.S.C. § 702 ....................................................................... 22, 23
    5 U.S.C. § 704 ............................................................................ 23

Pub. L. No. 119-21, § 60013,
    139 Stat. 72, 156 (2025) ............................................................20

42 U.S.C. § 1396b(d) .......................................................................... 25

42 U.S.C. § 7437(a)(1) ....................................................................... 20

42 U.S.C. § 7437(a)(2) ....................................................................... 20

42 U.S.C. § 7437(b) ........................................................................... 20

42 U.S.C. § 7437(c)(1) ....................................................................... 20

42 U.S.C. § 7437(c)(3) ....................................................................... 20

**Other Authorities:**

11A *Federal Practice & Procedure* § 2949 (3d ed. 2025) ........................................14

U.S. GAO, GAO-18-278, *Department of Energy: New Process to Review
    Financial Assistance for Research Projects Created Uncertainty* (2018) ........................... 10, 11

iv

**INTRODUCTION AND SUMMARY**

Plaintiffs' response brief underscores the degree to which they, and the district court, seek to supervise the federal government's fiscal operations. This case began as a challenge to a now-rescinded Office of Management and Budget (OMB) Memorandum addressing the unique circumstances of a change in presidential administration, but it has morphed into oversight of prospective agency funding decisions.

There are numerous errors in the district court's injunction and plaintiffs' defense of it. But the procedural and substantive flaws with the various facets of the decision highlight the overarching flaw in the district court's approach: rather than resolving a live case or controversy regarding a discrete agency action, the court enjoined a broad swath of conduct, much of it plainly lawful, across a wide range of spending programs and agencies, almost half of which were not even parties to the case when the preliminary-injunction motion was filed.

If plaintiffs find fault with concrete agency actions, they can bring targeted claims in the appropriate forum and attempt to obtain relief. The broad-brush injunction in this case, however, cannot stand.

**ARGUMENT**

**I.    Plaintiffs' Challenges to the OMB Memorandum Fail**

1. Plaintiffs' challenges to the OMB Memorandum are moot, because that Memorandum has been rescinded. Plaintiffs do not claim that they can still receive

effective relief against the Memorandum that is no longer in effect. Their sole argument is that these challenges are saved by the voluntary cessation exception to mootness. *See* Pls. Br. 50-53.

That doctrine only applies if there is "a reasonable expectation that the challenged conduct will be repeated," *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021) (quotation omitted), and the future conduct will be "sufficiently similar" to qualify as a continuation of the "challenged conduct," *Corrigan v. Boston Univ.*, 98 F.4th 346, 353 (1st Cir. 2024) (quotation omitted). Here, it is implausible that OMB will issue any materially similar memorandum in the future. The now-rescinded OMB Memorandum was a product of the unique context in which it arose—namely, an evaluation of funding at the beginning of a new Administration. Plaintiffs' challenges were accordingly limited to those specific parameters and explanations, which would almost invariably be different in any ostensibly similar action in the future. *See* Gov't Br. 20-22.

Plaintiffs identify nothing in the record suggesting that there is a reasonable expectation that OMB will issue a similar memorandum in the future. And given the heavily context-dependent nature of the OMB Memorandum, common sense dictates that OMB is unlikely to again engage in materially similar action. Plaintiffs largely elide the relevant inquiry by insisting on "absolute clarity" that the challenged conduct will not recur, Pls. Br. 52, which would pose an almost insuperable hurdle to establishing mootness that case law does not support.

2

Mootness is especially clear with respect to plaintiffs' arbitrary-and-capricious claims, which turn on the particular reasoning in the rescinded OMB Memorandum. *See Noem v. Haaland*, 41 F.4th 1013, 1017 (8th Cir. 2022) (holding that arbitrary-and-capricious challenge became moot despite possible future disputes because "the circumstances are likely to be different each time"). The same is true for plaintiffs' request for injunctive relief, which depends on whether plaintiffs will suffer imminent harm. *See Harris v. University of Mass. Lowell*, 43 F.4th 187, 192 (1st Cir. 2022) (holding that "claims for injunctive relief are inescapably moot" when the challenged policy "no longer appl[ies]").

Plaintiffs' citation to *American Clinical Laboratory Association v. Becerra*, 40 F.4th 616 (D.C. Cir. 2022), does not advance their argument. Pls. Br. 53. In that case, the agency had replaced the challenged rule with a new rule, but explicitly stated that it might "reinstitute the challenged portion of the rule." *Id.* at 623 (quotation omitted). Relying on that evidence, the court ordered entry of "a declaratory judgment" to prevent the agency from restoring the old rule with its deficient reasoning. *Id.* at 625. Here, by contrast, OMB has not suggested that it might issue the Memorandum again—which, as noted above, would make little sense at this different stage of the Administration—let alone do so based on the same reasoning.

2. In any event, plaintiffs' claims that the OMB Memorandum was unlawful lack merit. Plaintiffs do not dispute that the President and OMB may issue policy guidance directing federal agencies in the exercise of their discretionary authorities.

Nor do plaintiffs meaningfully dispute that the Executive Orders and OMB Memorandum—which were explicit that agencies should pause funding only where legally permissible—could be lawfully instituted with respect to many funding programs. *See* Gov't Br. 23-25. Instead, plaintiffs focus on whether the OMB Memorandum was adequately explained.

As an initial matter, the OMB Memorandum itself reflected that agencies were responsible for determining which funding streams to pause. It permitted agencies to request exemptions and directed agencies to implement the Memorandum's directions only "to the extent permissible by law." A116. That instruction necessarily required agencies to evaluate whether pausing funding was appropriate in particular circumstances—or, conversely, whether legal constraints or factors such as reliance interests militated in favor of continued funding. That devolution of authority to agencies was eminently reasonable. *See* Gov't Br. 27-28.

Plaintiffs err in discounting this important feature of the OMB Memorandum as a "boilerplate savings clause." Pls. Br. 32. In analogous circumstances, the Supreme Court recently granted a stay of a preliminary injunction entered against implementation of an Executive Order and a joint OMB and Office of Personnel Management memorandum directing agencies, where legally permitted, to develop certain reorganization plans. Although the Supreme Court "express[ed] no view on the legality of" any specific reorganization plans, which were "not before th[e] Court," the Court concluded that "the Executive Order and Memorandum" were likely

"lawful." *Trump v. American Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025). Justice Sotomayor's concurrence explained that "the relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law'" and the memorandum "reiterates as much." *Id.* (Sotomayor, J., concurring in the grant of stay). Given those constraints incorporated into the Executive Order and the memorandum, the claims against those actions failed. The same result holds here.

Plaintiffs' arguments are no more persuasive when they actually focus on the OMB Memorandum's reasoning. Plaintiffs contend that the Memorandum does not "reasonably explain the decision" to pause funding while the Executive Branch conducted its review rather than "reviewing federal spending *before* cutting off any funding." Pls. Br. 29-30. As the government has explained, the basis for directing a pause pending further review is plain: because substantial federal funds are expended every day, the pause was necessary to prevent funds inconsistent with the President's priorities from being irretrievably expended in the interim. *See* Gov't Br. 26.

In plaintiffs' view, that rationale does not appear in the OMB Memorandum. *See* Pls. Br. 29-30. But the Memorandum notes the extremely large volume of federal spending totaling more than "$3 trillion" annually, *see* A115, and articulates its objectives of "safeguard[ing] valuable taxpayer resources" while "determin[ing] the best uses of the funding for" federal programs "consistent with the law and the President's priorities," A115-16. Based on that explanation, OMB's "path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto.*

5

*Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted).  Indeed, the Supreme Court has accepted, under that standard, explanations "of less than ideal clarity." *Id.* (quotation omitted).  The cursory suggestion that OMB entirely failed to consider the practical consequences of the pause is likewise erroneous.  *See* Pls. Br. 30.  The Memorandum was designed to minimize the negative consequences while simultaneously protecting the public fisc.  *See* Gov't Br. 26-27.

Plaintiffs are also wrong in contending that the OMB Memorandum ignored recipients' reliance interests.  *See* Pls. Br. 30-32.  The Memorandum contemplated that funds would continue being disbursed in circumstances where reliance interests would be most acute, including for direct assistance to individuals, payments required by law, and payments that agencies believed appropriate to continue on a case-by-case basis. *See* Gov't Br. 27-28.  Although plaintiffs may believe that those exceptions do not adequately protect reliance interests in programs subject to the pause, *see* Pls. Br. 31, the Memorandum undertook to balance the important government interests against the need to continue funding certain programs.  And the Memorandum left agencies to take any legitimate reliance interests into account in individual circumstances.  That is precisely the sort of reasoned decisionmaking required by the Administrative Procedure Act (APA).

3.  Plaintiffs fare no better in contending that the OMB Memorandum directed, or that the agencies implemented, funding "deferrals" in violation of the Impoundment Control Act.  Pls. Br. 40-42.  That argument fails multiple times over:

6

plaintiffs are not proper parties to enforce that statute, the government's actions comported with the statute, and the asserted procedural violation cannot support the district court's broad injunction. *See* Gov't Br. 28-33.

a. As the D.C. Circuit recently held, plaintiffs may not properly enforce the Impoundment Control Act, which governs the relationship between the Legislative and Executive Branches and does not provide for enforcement by third parties. *See Global Health Council v. Trump*, --- F.4th ---, No. 25-5097, 2025 WL 2326021 (D.C. Cir. Aug. 13, 2025). Plaintiffs appear to accept that the statute is focused on regulating inter-Branch relations rather than providing rights to private parties. Nonetheless, plaintiffs claim that this suit is compatible with that statutory scheme because the statute "prohibits policy deferrals." Pls. Br. 44.

That response elides the relevant point, in multiple respects. For one, although the statute prohibits some deferrals, the statute primarily requires the President to notify Congress about deferrals, thereby allowing Congress—not third parties—to determine whether any particular deferral is prohibited (and, if so, what actions should be taken in response). The statutory scheme is thus built around this inter-Branch dialogue, not around judicial enforcement by third parties. Congress is best positioned to decide whether a withholding of funds constitutes a deferral subject to the statute or reflects an attempt to effectively implement Congress's budgetary determinations. And the statute creates a framework for Congress to communicate

7

any such determination to the President and for the political branches to hash out their disagreement among themselves.

At the same time, the statute provides a limited cause of action to the Comptroller General, a Legislative Branch official, but imposes important limitations to give Congress control over any such suit. *See* Gov't Br. 29-30. As the D.C. Circuit explained, "it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits at any time and without notice to Congress of the alleged violation." *Global Health Council*, 2025 WL 2326021, at *10. Plaintiffs cite *Sackett v. EPA*, 566 U.S. 120 (2012), *see* Pls. Br. 44, in which the Supreme Court held that a statutory cause of action allowing for review of one type of Environmental Protection Agency (EPA) action under the Clean Water Act did not preclude APA review of a different type of EPA action. The Court expressly distinguished the situation here, where Congress provides for limited review by some parties but not others, explaining that there is a "strong" inference that an action "is not reviewable at the instance of other parties" if the statute provides that the action "is reviewable at the instance of one party." *Sackett*, 566 U.S. at 130; *see also Block v. Community Nutrition Inst.*, 467 U.S. 340, 346-47 (1984) (holding that, by allowing for dairy handlers and producers to obtain judicial review of certain agency orders, Congress impliedly precluded an APA challenge by consumers).

Plaintiffs' brief response to the government's zone-of-interests argument is likewise unavailing. Although plaintiffs argue forfeiture, the government argued in

district court that the Impoundment Control Act is "not enforceable" by private parties "through an APA suit" because the statute is about "enforc[ing] Congress's power over the purse in relation to the Executive." *See* Dkt. No. 113, at 44 (citing *Trump v. Sierra Club*, 140 S. Ct. 1 (2019), which involved zone-of-interests requirements, *see Sierra Club v. Trump*, 929 F.3d 670, 703-04 (9th Cir. 2019)). The briefing more than sufficed to put plaintiffs and the district court on notice of the argument. On the merits, plaintiffs argue only that this suit is an attempt to "vindicate Congress's funding decisions," Pls. Br. 43, but that is precisely the point: the Impoundment Control Act is about vindicating Congress's own interests, not about protecting the interests of third parties like plaintiffs here. Plaintiffs' interests are—at best—"marginally related" to the statute and they therefore may not enforce it. *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987).

b. Plaintiffs have also failed to demonstrate that the temporary pauses contemplated by the OMB Memorandum or implemented by the defendant agencies constituted "deferrals" under the Impoundment Control Act. To the extent plaintiffs suggest that any withholding or delaying of expenditures comes within the Impoundment Control Act, *see* Pls. Br. 40-41, they cite nothing in history or precedent that could support that conclusion and they overlook that temporary delays in expenditures are commonplace, *see* Gov't Br. 32-33. Agencies regularly do not obligate or expend all appropriated funds immediately upon receiving them—as, for example, when agencies solicit and review applications to select recipients, comply

9

with external legal requirements, or determine that funds should be spread throughout the fiscal year rather than obligated all at once. Those routine actions do not trigger the Impoundment Control Act.

Plaintiffs retreat to suggesting that agencies may permissibly withhold funds—without notifying Congress—only if the withholding is "intended to *advance* congressional budgetary policies by ensuring that congressional programs are administered efficiently." Pls. Br. 41 n.2 (quotation omitted). The OMB Memorandum contemplates just such pauses to ensure effective administration of the relevant programs. As explained below, many of the programs at issue in this case reflect Congress's determination that the relevant agency should have wide discretion regarding how to expend funds to advance the goals of the program. The Memorandum was intended to provide an opportunity for the Executive Branch to properly exercise that discretion to implement each program effectively and efficiently, consistent with the President's policy views. Nothing about such a pause in obligations implicates the Impoundment Control Act.

The Government Accountability Office (GAO) has recognized as much in similar circumstances. In 2018, GAO evaluated the Department of Energy's actions to "delay[] new award agreements, as well as other types of financial assistance for new work," pending "a review of all financial assistance for new work across the department" to "determine whether the financial assistance aligned with the new administration's priorities." U.S. GAO, GAO-18-278, *Department of Energy: New Process*

10

*to Review Financial Assistance for Research Projects Created Uncertainty* 1-2 (2018).  GAO concluded that this delay of funding "did not require the President to send a special message under the Impoundment Control Act." *Id.* at 10.  In words that map directly onto this case, GAO explained that "the purpose of the review was to ensure that the agency's financial assistance aligned with the priorities of the current administration," *id.* at 10-11, and that the agency was "taking reasonable and necessary steps to implement a program," *id.* at 11 n.16.  Of course, if Congress disagrees with the President's determinations in this regard, Congress may pursue political remedies in response to any delay in expenditures.  But the fact that, even on plaintiffs' view, the touchstone is whether an agency's actions properly align with congressional policies only underscores that the statutory scheme is focused on inter-Branch interactions and leaves no room for judicial intervention at the behest of third parties.

    c.  In any event, even if the district court were correct that there has been a violation of the Impoundment Control Act's notification procedures, that conclusion could not support the district court's preliminary injunction, which goes beyond simply requiring the government to provide the statutory special message.  In attempting to justify the broader injunction, plaintiffs contend not only that the OMB Memorandum directed a deferral that triggers the Impoundment Control Act, but also that the alleged deferral is prohibited outright by the Impoundment Control Act.  *See* Pls. Br. 45.  The district court did not go that far, however, concluding only that the government failed to send a special message to Congress.  *See* A27; Gov't Br. 31.

Plaintiffs cannot defend the injunction as an exercise of the court's equitable discretion on bases that the court itself did not consider.

Nor do plaintiffs advance the ball by arguing that the broader injunction was required to prevent harm to plaintiffs. *See* Pls. Br. 45. A court's "equitable powers" do not reflect "a roving commission to do equity." *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 5 (1st Cir. 2004) (quotation omitted) (discussing equitable powers of bankruptcy court). Instead, any injunction must be "narrowly tailored to fit specific legal violations." *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) (quotation omitted); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (noting that "the scope of injunctive relief is dictated by the extent of the violation established"). The only relevant legal violation found by the district court was the failure to send a special message, so the only possible injunctive remedy could be one requiring the sending of that message. *Cf. NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1126 n.9 (9th Cir. 2024).

## II.    Plaintiffs Cannot Leverage Moot Claims Against the OMB Memorandum to Challenge Dozens of Independent Agency Funding Decisions

### A.    The Broad Injunction Suffers Procedural Flaws

The district court improperly granted injunctive relief based on an amended complaint that plaintiffs filed after the government had already opposed their preliminary-injunction motion. *See* Gov't Br. 33-35. Plaintiffs do not dispute that in the middle of briefing they amended their complaint to add a new plaintiff, more than

10 new agency defendants, and a new theory of liability not raised in the original complaint. *See* Pls. Br. 47-48. And the focus of their challenge expanded beyond the OMB Memorandum to encompass a variety of agency funding decisions that plaintiffs nicknamed the "Federal Funding Freeze." *Compare* A71-73, *with* A306-08. Plaintiffs' defenses of these tactics are unavailing.

Plaintiffs' contention that the government forfeited its procedural objection, *see* Pls. Br. 46-47, is perplexing. In making that assertion, plaintiffs nowhere acknowledge that they amended their complaint only after the government filed its opposition. By waiting until the government's deadline had passed and amending the complaint one day before plaintiffs' reply was due, plaintiffs deprived the government of any meaningful opportunity to respond. Plaintiffs did not solve the problem by stating in a footnote in their reply that the district court could "consider the amended complaint as the operative pleading." Dkt. No. 147, at 2 n.1. It was improper to raise this argument "for the first time in a reply brief," *United States v. Vanvliet*, 542 F.3d 259, 265 n.3 (1st Cir. 2008), and "only in a footnote," *National Foreign Trade Council v. Natsios*, 181 F.3d 38, 60 n.17 (1st Cir. 1999). The government noted these timing issues at the preliminary-injunction hearing, explaining that "shortly before filing their reply brief, Plaintiffs have filed an amended complaint seeking to broaden their claims, no longer just challenging th[e] singular OMB memo but challenging the so-called funding freeze." Dkt. No. 164, at 38-39.

All of these procedural machinations illustrate the rationale for the ordinary rule that requests for injunctive relief must be tethered to the complaint in effect at the time the motion is made. *See* Gov't Br. 34-35 (citing cases). Apart from a case generally stating that preliminary-injunction procedures are less formal than merits trials, plaintiffs' only support for their contrary approach is a treatise stating that "a preliminary injunction may be granted upon a motion made before a formal complaint is presented." Pls. Br. 49 (quoting 11A *Federal Practice & Procedure* § 2949 (3d ed. 2025)). The lone case on which that proposition was premised stated that, in light of the extreme exigency of a situation in which "[t]he initial paper in the action was an order to show cause" why a preliminary injunction should not issue "supported by an extensive affidavit," the district court under the circumstances "could properly treat the affidavit as a complaint" and hold a hearing to decide whether to issue an injunction. *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 694 (2d Cir. 1966). None of these authorities remotely suggests that a plaintiff may file a complaint about one thing and then a preliminary injunction about something else, much less fault the opposing party for failing to respond to a complaint that has not yet been filed.

Although plaintiffs suggest that "the scope of the case" has not "materially change[d]" since the original complaint, Pls. Br. 47, that claim cannot be squared with the amended complaint, which added another plaintiff, almost doubled the number of agency defendants, and expanded the legal theories. And plaintiffs never come to

14

grips with the fact that the original complaint did not allege a general "Federal Funding Freeze" but instead focused on, and sought relief only against, the OMB Memorandum. *See* Gov't Br. 33.

In a similar vein, plaintiffs erroneously seek an abstract pronouncement of law about what they call a "Federal Funding Freeze," even though the legality or reviewability of any particular decision may depend on specific features of the applicable statutes, regulations, or grant terms. *See* Gov't Br. 35-36. The Supreme Court has expressly rejected analogous efforts to seek "wholesale correction" of a collection of decisions by grouping them together as one unitary action. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 893 (1990). Instead, courts are obligated to engage in a "case-by-case approach" that "is the traditional, and remains the normal, mode of operation," even if it is "understandably frustrating" for some litigants who would prefer "across-the-board" relief. *Id.* at 894. Permitting the sort of broad-brush approach that plaintiffs desire in this case is different in kind than allowing a targeted challenge to a regulation that "appl[ies] some particular measure across the board to all individual" decisions across a program. *Id.* at 890 n.2. In that circumstance, a court can address a legal issue that does not vary from situation to situation. Here, by contrast, plaintiffs seek to mount "a generic challenge to all aspects of" the various decisions that allegedly make up the federal funding freeze, *id.*, where the district court could not provide a uniform legal answer as to each decision in one fell swoop.

Plaintiffs' responses largely miss the point. There is no dispute that, in appropriate circumstances, a plaintiff may "simultaneously challenge multiple related agency actions" and seek "relief efficiently through a single case." Pls. Br. 26-27. However, to obtain a preliminary injunction covering the full panoply of agency decisions, plaintiffs must establish that each one is likely unlawful. *See Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015) (upholding portions of preliminary injunction where plaintiff was likely to succeed but vacating portions where plaintiff was not likely to succeed). Neither plaintiffs nor the district court purported to perform the requisite analysis. By challenging agency funding decisions completely divorced from the context of any specific grant program or funding instrument, plaintiffs adopted the very approach that they admit is forbidden—namely, mushing together "an array of disparate agency actions, many individually unreviewable under the APA" and many entirely permissible under the governing legal framework. Pls. Br. 26.

The closest plaintiffs come to attempting to surmount the relevant hurdle is when they assert that "each agency defendant made a single decision to execute a categorical, indefinite funding freeze." Pls. Br. 24 (quotation omitted). Even on its own terms, that assertion does not justify the district court's one-size-fits-all approach because it acknowledges distinct agency decisions whose lawfulness would need to be assessed agency by agency. But the problems run deeper because plaintiffs' formulation also glosses over the heterogeneity of programs within each agency.

16

Plaintiffs can cherry-pick examples in which they believe a pause on funding would be unlawful, but even assuming that they are correct about those examples, they would at most establish that the pauses were unlawful as applied in particular circumstances and would not justify invalidating them across the board.

The Supreme Court recently eschewed such a broad-brush attack in *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025). There, the Court determined that a handful of valid applications of a regulation sufficed to reject a claim that the regulation was unlawful in its entirety. *Id.* at 865, 869. Similarly here, plaintiffs have made no attempt to show that every implementation of an agency's pause of federal grant funding would be unlawful. Even if the district court were convinced that certain agency decisions were unlawful, that conclusion still would not justify the broad injunction sweeping in conduct that is not properly enjoined. Rather than proceeding in a blunderbuss fashion, plaintiffs and the district court were obligated to examine the particulars. *Cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024) (vacating appellate decisions where the courts and the parties had not adequately "address[ed] the full range of activities the [challenged] laws cover" to determine whether a preliminary injunction was warranted on a facial challenge).

## B. The Broad Injunction Suffers Substantive Flaws

Despite the breadth and depth of the requested remedy, the district court did not require plaintiffs to make a stronger showing that an injunction would reach only unlawful conduct. Rather, the court accepted the characterization that plaintiffs

challenge an amorphous "Federal Funding Freeze," declared the freeze in the abstract to be likely unlawful, and entered a far-reaching preliminary injunction. This case starkly exhibits the untenable consequences of the court's approach. The resulting injunction wrongly prohibits the agency defendants from engaging in conduct that is legally permitted, overrides administrative decisions committed to agency discretion by law, and orders relief outside the district court's power. *See* Gov't Br. 36-49. Plaintiffs fail to rehabilitate these fundamental defects that require reversal.

1. In its opening brief, the government provided multiple examples of covered grant programs that allow pauses of funding. *See* Gov't Br. 37-40. Plaintiffs do not claim that any applicable statutory or regulatory provision bars the agencies from suspending federal grant funds in those programs pending an assessment for consistency with the President's priorities. Rather, a pause of funding is consonant with the only constraint that plaintiffs assert the statutes impose—namely, a requirement to "spend the appropriated funds for specific purposes," such as encouraging the use of certain building materials or supporting educational programs. Pls. Br. 36. To achieve those broad objectives, agencies may redirect money to different activities or different recipients. Indeed, as plaintiffs do not contest, *see* Pls. Br. 37, the underlying grant agreements often specifically authorize suspending or terminating awards that no longer effectuate agency priorities. The power to administer and allocate grant funds—and, in many instances, to terminate funding under a grant agreement based on a change in agency policies—necessarily includes

18

the power to pause funding under a grant agreement, at least where, as here, plaintiffs identify no legal requirement that funding be provided on a particular timetable.

It does not matter whether the agency defendants expressly referenced the "clauses in award agreements to suspend or terminate particular grants." Pls. Br. 37. The relevant point is that, for purposes of assessing whether a challenged decision is contrary to law, the unequivocal terms of certain grant instruments allow the agency to pause funding—and plaintiffs point to no other source of law barring the agency from doing so. Plaintiffs also contend that "at least some [funding pauses] violated federal law." Pls. Br. 36. Even if true, that contention would not justify the district court's injunction, which prohibits pauses that do not violate federal law. Rather, those pauses would need to be challenged individually.

2. Likewise, plaintiffs fail to rebut that a swath of the funding decisions covered by the preliminary injunction are committed to agency discretion by law. *See* Gov't Br. 41-44. The Supreme Court has left no doubt that "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). The same is true for other funding programs that permit the agency to decide "how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Plaintiffs do not dispute that there are several examples of statutory schemes implicated here that

19

leave the responsible agency with "discretion as to *how* to expend certain funds." Pls. Br. 39.  That tacit admission is dispositive.

Plaintiffs take issue with one of the many examples presented in the government's opening brief, but their arguments only underscore the point.  The relevant statutory provision appropriates a lump sum of $5 billion for the EPA to "competitively award grants to eligible entities to implement plans" to reduce greenhouse gas air pollution, with funds made available "in such amounts, upon such a schedule, and subject to such conditions" as the agency determines.  42 U.S.C. § 7437(a)(1)-(2), (c)(1), (c)(3).  According to plaintiffs, the statute provides "no discretion as to *whether* to" expend the funds.  Pls. Br. 39.  A pause of funding does not run afoul of the statutory requirement even as plaintiffs conceive of it.[1]  And plaintiffs ignore the broader context, in which the agency is responsible for selecting grant recipients, setting grant terms, and distributing the money in the optimal way to "achieve or facilitate the reduction of greenhouse gas air pollution."  42 U.S.C. § 7437(b), (c)(3).  The agency's decision to pause current funding to consider whether to redirect it to a different objective or recipient is part and parcel of that discretionary judgment over which the APA precludes judicial second-guessing.

---

[1] It is far from clear that the agency is required to expend the funds, particularly in light of Congress's recent decision to rescind "[t]he unobligated balances of amounts made available to carry out . . . 42 U.S.C. 7437."  Pub. L. No. 119-21, § 60013, 139 Stat. 72, 156 (2025).

3.  The district court also exceeded its authority to the extent that contractual disputes fall within the scope of the preliminary injunction.  *See* Gov't Br. 44-49. Plaintiffs agree that where "the claim in question is at its essence contractual," it is properly brought under the Tucker Act in the Court of Federal Claims, not under the APA in the district court.  Pls. Br. 54 (quotation omitted).  The district court transgressed that channeling scheme prescribed by Congress, as exemplified by the court's order enforcing the preliminary injunction in a dispute regarding whether the Federal Emergency Management Agency (FEMA) had taken too long to process plaintiffs' grant funding.

The only cognizable claim that arises out of that dispute would be a breach-of-contract claim that belongs in the Court of Federal Claims.  The grant agreements are the only possible source of plaintiffs' purported right to timely payment, and plaintiffs argued that the agency was in violation because its payments were delinquent.  The court ordered FEMA to refrain from "paus[ing] or otherwise imped[ing] the disbursement of appropriated federal funds" to plaintiffs.  A59.  That remedy was, at bottom, an order for the agency to keep paying under the grants.  The APA "does not extend to [such] orders to enforce a contractual obligation to pay money."  *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) (quotation omitted); *see also National Insts. of Health v. American Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025) (reiterating *California*'s reasoning that the APA "does not provide [district courts] with jurisdiction to adjudicate claims based on

[federal] grants or to order relief designed to enforce any obligation to pay money pursuant to those grants" (quotations omitted)).

Plaintiffs largely seek to change the subject from FEMA funding to the case as a whole. *See* Pls. Br. 54-59. When plaintiffs finally get around to discussing the FEMA dispute, they claim that the district court merely concluded that FEMA's "manual funding review" violated the preliminary injunction, and that the court "did not compel any specific payments." Pls. Br. 60-61. Even on its own terms, that argument provides no response to the government's argument that the court cannot micromanage the government's contractual performance under the guise of an APA claim. In addition, plaintiffs do not reconcile that claim with the order's text, which not only instructs FEMA to "immediately cease the challenged manual review process," but also instructs FEMA not to "pause or otherwise impede the disbursement of appropriated federal funds." A59. Indeed, the genesis of the dispute was plaintiffs' allegation that they had "not received substantial disbursement of funds on important grants" for an intolerably long period. A51 (quotation omitted). The Supreme Court stayed a similar order "requir[ing] the Government to pay out past-due grant obligations," concluding that the district court likely "lacked jurisdiction to order the payment of money under the APA." *California*, 145 S. Ct. at 968.

Like the district court, plaintiffs mistakenly rely on *Bowen v. Massachusetts*, 487 U.S. 879 (1988). *See* Pls. Br. 54, 57. *Bowen* did not involve a contract claim at all, let alone the APA provision in 5 U.S.C. § 702 precluding claims that are impliedly

22

forbidden by another statute.  Instead, *Bowen* involved two separate provisions: (1) the provision of 5 U.S.C. § 702 precluding APA claims for "money damages," and (2) the provision of 5 U.S.C. § 704 precluding APA claims where there is another "adequate remedy in a court" for an agency action.  *Bowen* held that a State's APA claim that certain services qualified for reimbursement under the Medicaid program was not a claim for "money damages," 487 U.S. at 891-901, and that a Tucker Act suit premised on an ostensibly money-mandating statute was not an alternative "adequate remedy," *id.* at 901-08.  Nothing in *Bowen* addresses the separate bar at issue here on suits "expressly or impliedly forbid[den]" by statutes like the Tucker Act.  5 U.S.C. § 702.

In summary, the district court's preliminary injunction applies to an assortment of agency conduct that is not properly enjoined.  Plaintiffs offer no way to rectify these fundamental issues and propose no appropriately tailored alternative.  The injunction cannot stand in its current form.

## III.  The Remaining Factors Do Not Support the District Court's Preliminary Injunction

The district court's injunction prohibiting the defendants from "impeding the disbursement" of certain funds "based on" the OMB Memorandum and any "funding freezes dictated, described, or implied by" the President's Executive Orders, A44, inflicts a direct harm on the government and the public.  Plaintiffs have never contended—much less established—that every implementation of the Memorandum and the Executive Orders across the wide swath of covered spending programs would

be unlawful.  Enjoining agencies from carrying out lawful directives to pause and reassess funding is contrary to the public interest.  *See* Gov't Br. 49-50.

Plaintiffs do not contest that the injunction allows them to bring all manner of funding disputes to a single district judge to pass judgment on compliance issues.  *See* Gov't Br. 51.  Although plaintiffs have thus far asked the district court to rule on "only one motion to enforce the preliminary injunction," Pls. Br. 66, that one dispute alone involved hundreds of grants spanning dozens of grant programs, *see* A446-47, and plaintiffs can return to the court whenever they are dissatisfied with a future funding decision.  Enforcement of the preliminary injunction is backed by the court's contempt power.  One plaintiff State has already sought contempt in another case, *see* Gov't Br. 51, and plaintiffs in this case have affirmatively raised the possibility of doing so, *see* A371 n.1.  While the injunction may not formally require the defendant agencies to "seek [the district court's] approval before exercising their lawful discretion," Pls. Br. 66, they face the threat of contempt proceedings if plaintiffs later disagree with any one of those decisions.

The district court's opaque prohibitions on "giving effect to" the OMB Memorandum "under a different name" and on pausing funds as "implied by" the President's Executive Orders, A44, only heighten the risks of failing to comply.  *See* Gov't Br. 50.  Plaintiffs dismiss this indeterminacy and insist that the agency defendants face no impediment in "exercis[ing] their lawful discretion."  Pls. Br. 67-68.  But the injunction's imprecise language has already proven to be an opening to

24

block agencies from taking actions within their authority to ensure that taxpayer funds are properly being expended.  Indeed, the district court concluded that FEMA's implementation of a process to verify grant payment requests before disbursement violated the preliminary injunction not because FEMA lacked regulatory authority, *see* A54-55, but because a string of agency memoranda purportedly showed that the review process was "based, covertly, on" one of the covered Executive Orders, A55-58.  Where such a tenuous chain of inferences can bring an agency's funding decision within the scope of the injunction, agencies lack the requisite certainty about what conduct is allowed.

The injunction also threatens to irreparably harm the public fisc, as the government may well never be able to recover funds that are disbursed pursuant to the preliminary injunction.  *See* Gov't Br. 52.  Despite their "ongoing relationships with the federal government," Pls. Br. 68, plaintiffs have not "promised to return [disbursed] funds" if the government prevails in the litigation, *California*, 145 S. Ct. at 969 (quotation omitted).  Nor does plaintiffs' meager effort to identify one "mechanism[] for recouping excessive payments" in one program change the calculus.  Pls. Br. 68.  Plaintiffs make no representations that funds released pursuant to an injunction would qualify as an overpayment under the relevant statute.  *See* 42 U.S.C. § 1396b(d).  In any case, plaintiffs provide no basis to conclude that there are reliable recoupment mechanisms across the swath of covered programs.

25

On the other side of the balance, the gravamen of plaintiffs' injury is monetary—the classic example of reparable harm. *See* Gov't Br. 52-53. Every harm that they claim, *see* Pls. Br. 62-63, stems from the government's alleged failure to timely pay money due. Plaintiffs do not dispute that they will receive any funds legally owed to them if they succeed in litigation; their true grievance is about the timing of receiving payments. But they identify no statute, regulation, or term in their funding instruments purportedly mandating such immediate payment. And even if they could, the proper recourse would be to file an appropriate legal action in the proper forum challenging the discrete funding decision. In all events, plaintiffs' asserted harms pale in comparison to the serious harm to the government and the public occasioned by the sweeping injunction preemptively impeding theoretical exercises of agency authority. There is no sound justification for a single district court to assign itself the role of policing the full gamut of federal funding by numerous federal agencies.

# CONCLUSION

For the foregoing reasons, and those in the government's opening brief, the district court's preliminary injunction should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA

 *s/ Brian J. Springer*
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

August 2025

27

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,478 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brian J. Springer*
Brian J. Springer

**CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Brian J. Springer*
Brian J. Springer